66 Drake L. Rev. 307

Drake Law Review
Second Quarter 2018

Article

Jodi Nafzger [a1]

Copyright © 2018 by Drake University; Jodi Nafzger

# LEVELING FELONY CHARGES AT PROSECUTORS FOR WITHHOLDING EVIDENCE

## ABSTRACT

*This Article addresses the intersection of the rule of* Brady v. Maryland, 373 U.S. 83 (1963), *and ABA Model Rule of Professional Conduct 3.8.* Brady *requires prosecutors to automatically disclose materially exculpatory evidence in the government's possession to the defense. ABA Model Rule 3.8 requires a prosecutor in a criminal case "to make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense." The ABA issued a formal opinion in 2009 which concluded that the prosecutor's ethical duty under 3.8 is broader in scope than the constitutional requirements under* Brady. *ABA Comm'n on Ethics & Prof's Responsibility, Formal Op. 09-454, 1 (2009). Essentially,* Brady *requires a determination that the evidence would likely produce a different outcome at trial (materiality), but the ethical rule requires disclosure without regard to the impact at trial. In short,* Brady *and Rule 3.8 impose different standards on prosecutors. The intersection of these principles leads to inefficient and sometimes unjust results.*

*The Article briefly examines, state-by-state, how often and under what circumstances prosecutors face disciplinary action for failure to disclose information and California's state law imposing felony charges on prosecutors for withholding exculpatory evidence. The Article draws attention to the national conversation and concern centered on prosecutorial misconduct and highlights a number of elected prosecutors who are making headlines for withholding exculpatory evidence. The Article advocates for a revision to Model Rule 3.8 (and its state equivalents) to alleviate ambiguity related to the prosecutor's discovery obligations and to conform to constitutional requirements. It further supports current initiatives by certain states to incorporate open file discovery and develop independent "prosecution integrity units."*

## TABLE OF CONTENTS

| | |
|---|---|
| I. Introduction | 308 |
| II. *Brady* Versus the Ethical Rules: A Puzzle of Overlap and Conflict | 314 |
|     A. A Prosecutor's Disclosure Obligations Under the Ethical Rules | 315 |
|     B. A Prosecutor's Disclosure Obligation under *Brady* | 322 |
|     1. Disclosure of Material Evidence | 324 |
|     2. Knowledge of the Evidence | 326 |
|     C. The Imposition of Differing Standards | 327 |
| III. Misconduct: Prosecutors in the Spotlight | 329 |
|     A. Scrutiny by the Judiciary | 332 |
|     B. Response by the States | 335 |
| IV. *Brady* Violations Rarely Lead to Disciplinary Proceedings | 338 |
|     A. *Brady* Violations Far Outstrip Disciplinary Actions | 340 |
|     B. Findings of Prosecutorial Misconduct Rarely Invoke Disciplinary Proceedings | 347 |
| V. Prosecutors and Police Are Exploring New Initiatives to Achieve Transparency | 349 |
| VI. Harmonizing the Ethical Rules with *Brady*'s Constitutional Requirements | 352 |
| VII. Conclusion | 354 |

**\*308  I. Introduction**

Prosecutors are frequently under fire for prosecutorial misconduct, abusing their authority, and seeking convictions at all costs. Then-Chief Judge of the U.S. Court of Appeals for the Ninth Circuit Alex Kozinski referred to "an epidemic of *Brady* violations" in a well-known dissent. [1]  The  **\*309**  Innocence Project recently celebrated 25 years of uncovering wrongful convictions, some of which are attributed to misconduct by prosecutors. [2]  Elected prosecutors are making headlines for withholding exculpatory evidence. [3]  Now states are passing new laws with criminal penalties to hold prosecutors accountable where constitutional protections and ethical rules fall short. [4]  Reading these judicial opinions and news headlines leaves an impression that our criminal justice system is broken and prosecutors are corrupt. However, the prosecutor's duty of disclosure is not well defined. At one time, the U.S. Supreme Court described the prosecutor's constitutional duty of disclosure as not "measured by the moral culpability, or the willfulness, of the prosecutor .... If the suppression of evidence results in  **\*310**  constitutional error, it is because of the character of the evidence, not the character of the prosecutor." [5]  The very rules that guide the prosecutor's duty of disclosure give rise to confusion and error.

While *Brady* violations may be sanctioned in the court system, prosecutors are rarely disciplined under the ethical rules for failing to disclose information material to the preparation of the defense. [6]  This phenomenon is due, in large part, to the differing standards imposed on prosecutors under the American Bar Association's (ABA) Model Rule 3.8 (and its state equivalents) and under the due process requirements articulated by the U.S. Supreme Court in *Brady v. Maryland*. [7]  Under the *Brady* rule, prosecutors are required to disclose information material to the preparation of the defense; [8]  however, Model Rule 3.8 and its state equivalents impose more demanding disclosure obligations without regard to materiality. [9]  These rules are rooted in the principle that a criminal defendant is deprived of a fair trial when the government withholds information that is material to guilt or punishment. [10]

Despite a more stringent standard, a stark lack of disciplinary cases exist, perhaps reflecting a missed opportunity to leverage our ethical rules to guide appropriate prosecutorial conduct. As a result, the state of California is now threatening prosecutors who withhold evidence with criminal penalties in order to curb prosecutorial misconduct. [11]  Last year, California passed a new law which makes it a felony for prosecutors to withhold evidence. [12]  Under the new law, prosecutors can receive up to three years in  **\*311**  prison for altering or intentionally withholding evidence that defendants might use to exonerate themselves. [13]  As of this Article's writing, California has not yet charged a prosecutor under this new statute, but the statute's criminal penalties signal that policy leaders do not view the constitutional and ethical requirements as sufficient to motivate prosecutors to comply with disclosure obligations.

The complex and overlapping sets of rules and standards governing the prosecutor's duty to disclose evidence favorable to the defense, including constitutional doctrine, statutes, criminal procedure rules, and ethical rules, may contribute to this perceived abuse of power. Each rule or law requires the prosecutor to meet a different standard, as well as carries its own specific consequences when that standard is not met. The consequences of a *Brady* violation include dismissal of the charge, reversal of a conviction, vacation of a sentence, or a finding of prosecutorial misconduct. [14]  A resulting disciplinary case may lead to formal charges followed by public censure, suspension, or disbarment. [15]  The courses of the criminal case and the disciplinary case are not coextensive. Most states interpret Model Rule 3.8 to apply separately (and more broadly) from the disclosure obligations imposed by the Constitution, statute, procedural rule, or court rule. [16]  Moreover, in most states, the ethical rule and the disclosure obligation do not reference each other, which results in inconsistent expectations and applications of the ethical rule. [17]  In addition, the very same ethical rule, with substantially similar language, is applied differently from state to state. [18]  Some states, however, have issued decisions that imply the constitutional and ethical requirements should be the same and that imposing different rules regarding disclosure of exculpatory evidence is unfair. [19]  These states appear disinclined to impose inconsistent obligations on prosecutors.

It is challenging to interpret the constitutional requirements and to define terms such as "favorable," "material," and "prejudicial" without also  **\*312**  considering broader disclosure obligations under the ethical rules. Many prosecutors rely on their offices for continuing legal education. Most offices incorporate *Brady* training at least annually to stay current on any new developments in this area. [20]  In fact, supervisors are legally responsible for training prosecutors on *Brady*. [21]  As ministers of justice,

the prosecutors' training and norms are shaped by criminal rules and statutes, case law, standards set by policymakers and practitioners, and ethical rules.[22] Nevertheless, prosecutors do not administer justice alone. Police officers investigate crimes, detectives write reports, laboratories conduct tests, and coroners conduct autopsies. Yet, prosecutors can be held responsible for the information possessed by such agencies that are considered part of the law enforcement team.[23] Further, the prosecutor's belief that evidence is not exculpatory may not protect the prosecutor from discipline.[24]

In his article, *The Relationship Between Prosecutorial Misconduct and Wrongful Convictions: Shaping Remedies for a Broken System*, Professor **\*313** Peter Joy argues for more accountability and effective remedies for prosecutorial misconduct.[25] Among Professor Joy's recommendations for transparency are open-file discovery, pretrial notice of the use of informants, and graduated discipline measures for prosecutorial misconduct.[26] He also suggests that bar disciplinary authorities should implement a system to review and investigate reported instances of prosecutorial misconduct.[27]

Many other scholars have written about overlapping and conflicting authority of *Brady* and our ethical rules, as well as the under-enforcement of our ethical rules to regulate prosecutorial misconduct.[28] After delving into **\*314** how a prosecutor's disclosure obligations differ under *Brady* as compared to under Model Rule 3.8 (and its state equivalents), this Article aims to take one step further by examining under what circumstances prosecutors face disciplinary action for failure to disclose information and whether leveling felony charges is the best approach to curbing any real or perceived prosecutorial misconduct. Part I provides an understanding of the nature and scope of a prosecutor's disclosure obligations under both constitutional and ethical standards, including an overview of the historical overlap and conflict inherent in the standards. Part II situates this issue in the present day, highlighting the national conversation and concern centered on prosecutorial misconduct. Part III examines available disciplinary data over the past 10 years, providing a clearer picture of the lack of enforcement of a prosecutor's ethical obligations. And, finally, Part IV argues against the use of the criminal justice system to regulate prosecutorial misconduct. Rather, this Article advocates for a revision to Model Rule 3.8 (and its state equivalents) to alleviate ambiguity related to the prosecutor's discovery obligations and to conform to constitutional requirements. It further supports current initiatives by certain states to incorporate open-file discovery and develop independent "prosecution integrity units."

## II. *BRADY* VERSUS THE ETHICAL RULES: A PUZZLE OF OVERLAP AND CONFLICT

Though the first ethical rule prescribing special responsibilities for prosecutors was enacted in 1908, subsequent rules governing prosecutors have remained significantly unchanged despite the fact that the law concerning *Brady* disclosure has evolved substantially.[29] Our ethical rules **\*315** advise that prosecutors are duty bound to seek justice.[30] In practice, this means that prosecutors, while representing the government, must also be vigilant to protect the accused's constitutional rights. Because of this overarching responsibility to seek justice, the prosecutor, arguably more than any other officer of the court, is more closely scrutinized during pretrial and trial proceedings. While the ethical rules for prosecutors have evolved, the disclosure obligations have remained intact without much variation despite several decades of developing case law.

### A. *A Prosecutor's Disclosure Obligations Under the Ethical Rules*

The original 32 Canons of Professional Ethics were adopted by the ABA in 1908, based on the Code of Ethics adopted by the Alabama State Bar Association in 1887.[31] Alabama's early code was borrowed from the lectures of the Honorable George Sharswood, Dean of the University of Pennsylvania Law School and later chief justice of the Supreme Court of Pennsylvania, and from a book published in 1846 by David Hoffman entitled *A Course of Legal Study, Addressed to Students and the Profession Generally*.[32] With respect to a prosecutor's disclosure obligations, the 1908 Canons of Professional Ethics noted, "The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible."[33]

Since its original adoption, the ABA incorporated a limited number of amendments on a piecemeal basis and then in 1969 adopted the Model Code of Professional Responsibility.[34] In section DR 7-103(B), the ABA further articulated a prosecutor's obligation to disclose exculpatory evidence:

A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or to a defendant who has no counsel, of the existence of evidence, known **\*316** to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense or reduce the punishment. [35]

In 1983, however, the ABA adopted the Model Rules of Professional Conduct, which replaced the Model Code of Professional Responsibility as the governing standards of professional responsibility for lawyers. [36] While retaining the disclosure obligations articulated in the 1908 Canons, Model Rule 3.8 expanded the ethical responsibilities of prosecutors, requiring prosecutors in subsection (d) to:

[M]ake timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal. [37]

Most states have adopted Model Rule 3.8(d) in some form. [38] Some **\*317** states have adopted the rule with variations primarily focused on whether the prosecutor's actions were willful, whether the defense must make a request, and the definition of "timely." [39] Specifically, 39 states have adopted the language in Model Rule 3.8(d) nearly verbatim. [40] Eight states and the District of Columbia have adopted language that is substantially similar, but some important differences are noteworthy. [41] For example, Alabama adds, "[n]ot willfully fail to" before "make timely disclosure." [42] Georgia did not adopt the language of the model rule relating specifically to information that must be disclosed before sentencing. [43] Louisiana includes a requirement to make timely disclosure of information the prosecutor "knows, or reasonably should know" tends to negate guilt or mitigate the offense. [44] Maine adds that **\*318** the information must be "known to the prosecutor after diligent inquiry and within the prosecutor's possession or control." [45] New Jersey removes reference to "or information" after "evidence." [46] North Carolina also adds the phrase "after a reasonably diligent inquiry." [47] South Dakota's rule replaces "tends to negate" with "tends to exculpate," deletes "or mitigates the offense," and replaces "mitigating information" with "exculpatory information." [48] The nuanced language of the rules may shed some light on Model Rule 3.8 enforcement.

States' ethical rules are also imposed on federal prosecutors. Pursuant to the McDade-Murtha Amendment, 28 U.S.C. § 530B(a), "An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." [49] Federal prosecutors are required to be licensed in at least one state and to adhere to the ethical rules of that licensure. [50] The Amendment was, in part, a reaction to federal prosecutors who were violating Rule 4.2, which prohibits attorneys from communicating with persons represented by counsel. [51] There is still a fair amount of controversy in the federal system about what type of conduct is "authorized by law" under this rule. [52]

**\*319** In addition to the Model Rules of Professional Conduct, a prosecutor's ethical obligations are also found in other sources. The Federal Rules of Criminal Procedure and its state equivalents, for example, require that prosecutors automatically disclose, as soon as practicable following the filing of charges, any material or information within the prosecutor's possession or control which tends to negate the guilt of the accused or would tend to reduce the punishment. [53] This requirement of Rule 16 of the Federal Rules of Criminal Procedure has been interpreted to extend to material and information in the possession or control of members of the prosecutor's staff and others who have participated in the investigation or evaluation of the case who regularly report to the prosecutor's office. [54] Although the Advisory Committee to the Federal Rules of Criminal Procedure specifically decided not to codify the *Brady* rule, [55] the Federal Rules do require the government to disclose documents and tangible objects "material to the preparation of his defense." [56] Upon written request, some states' procedural rules also require the prosecutor to disclose: (1) the defendant's oral, written, or recorded statements; (2) statements by any co-defendants; (3) the defendant's

prior criminal record; (4) documents and tangible objects intended to be used as evidence at trial or belonging to the defendant; (5) reports of examinations and tests; (6) a list of witnesses and addresses and their statements; (7) a summary report of any expert witnesses; and (8) police reports. [57]

In addition, many states have adopted the ABA Criminal Justice Section Standards, [58] which likewise articulate a prosecutor's disclosure **\*320** obligations. [59] The ABA created its first Criminal Justice Section Standards in 1974, including 17 volumes of black letter recommendations and comments. [60] In 1984, in *Strickland v. Washington*, the Supreme Court described the Standards as reflecting "[p]revailing norms of practice" and as "guides to determining what is reasonable." [61] The Standards continue to be an important source of authority for prosecutors, defense attorneys, judges, legislators, and scholars. [62] The Standards are drafted by a task force and are approved by both the Standards Committee and the Criminal Justice Section Council before being forwarded to the House of Delegates. [63] Standard 3-5.4, entitled Identification and Disclosure of Information and Evidence, states:

(a) After charges are filed if not before, the prosecutor should diligently seek to identify all information in the possession of the prosecution or its agents that tends to negate the guilt of the accused, mitigate the offense charged, impeach the government's witnesses or evidence, or reduce the likely punishment of the accused if convicted.

(b) The prosecutor should diligently advise other governmental agencies involved in the case of their continuing duty to identify, preserve, and disclose to the prosecutor information described in (a) above.

(c) Before trial of a criminal case, a prosecutor should make timely disclosure to the defense of information described in (a) above that is known to the prosecutor, regardless of whether the prosecutor believes it is likely to change the result of the proceeding, unless relieved of this responsibility by a court's protective order .... A prosecutor should not intentionally attempt to obscure information disclosed pursuant to this standard by including it without identification within a larger volume of materials.

 **\*321**  (d) The obligations to identify and disclose such information continue throughout the prosecution of a criminal case.

(e) A prosecutor should timely respond to legally proper discovery requests, and make a diligent effort to comply with legally proper disclosure obligations, unless otherwise authorized by a court. When the defense makes requests for specific information, the prosecutor should provide specific responses rather than merely a general acknowledgement of discovery obligations. Requests and responses should be tailored to the case and "boilerplate" requests and responses should be disfavored.

(f) The prosecutor should make prompt efforts to identify and disclose to the defense any physical evidence that has been gathered in the investigation, and provide the defense a reasonable opportunity to examine it.

(g) A prosecutor should not avoid pursuit of information or evidence because the prosecutor believes it will damage the prosecution's case or aid the accused.

(h) A prosecutor should determine whether additional statutes, rules or caselaw may govern or restrict the disclosure of information, and comply with these authorities absent court order. [64]

In addition, the National District Attorneys Association National Prosecution Standards explain the disclosure of exculpatory evidence as follows: "The prosecutor shall make timely disclosure of exculpatory or mitigating evidence, as required by law and/or applicable rules of ethical conduct." [65] These standards are designed as an aspirational guideline to professional conduct for prosecutors and to supplement existing rules of ethical conduct. [66] These standards are far more comprehensive than Model Rule 3.8 and specifically articulate:

> These standards are not intended to: (a) be used by the judiciary in determining whether a prosecutor committed error or engaged in **\*322** improper conduct; (b) be used by disciplinary agencies when passing upon allegations of violations of rules of ethical conduct; (c) create any right of action in any person; or (d) alter existing law in any respect. [67]

In short, the ethical rules, the Criminal Justice Standards, and the National District Attorneys National Prosecution Standards all provide ethical guidance for prosecutors. Some of these rules reference conduct that is otherwise "authorized by law." [68] *Brady v. Maryland* and the other case law that follows articulate disclosure of exculpatory evidence in a different way, particularly as it relates to the prosecutor's knowledge of exculpatory evidence and the impact at trial (i.e., its "materiality").

### B. *A Prosecutor's Disclosure Obligation under* **Brady**

In 1963, the Supreme Court decided *Brady v. Maryland*, which requires a prosecutor to disclose evidence favorable to the accused (commonly referred to as "the *Brady* rule"). [69] The *Brady* rule requires disclosure of documents and tangible objects that are "material" to the preparation of the defense. [70] *Brady* is a due process requirement. [71]

The trial of Brady and his companion Boblit significantly influenced, or at least emphasized, the scope of the prosecutor's discovery requirements. [72] Both were found guilty of first-degree murder and sentenced to death. [73] The defendants were tried separately. [74] Brady testified to his participation in the crime, but contended that Boblit committed the crime itself. [75] Brady's counsel conceded that Brady was guilty of murder but asked that the jury return a verdict "without capital punishment." [76] Prior to the trial, Brady's counsel requested to examine Boblit's statements to police. [77] The prosecution provided several of those statements, but withheld the July 9, 1958 statement in which Boblit admitted the actual homicide. [78] Brady's **\*323** counsel did not learn of this statement until after his conviction had been affirmed. [79] Brady moved for a new trial based on the newly discovered evidence, and the Maryland Court of Appeals denied the motion and remanded the case. [80] Brady petitioned for certiorari and the U.S. Supreme Court found that suppression of evidence favorable to the accused upon his or her request violated due process. [81] The Court further concluded that whether the prosecutor acted in good faith or bad faith is not part of a *Brady* analysis:

> A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile," to use the words of the Court of Appeals. [82]

Nine years later, in *Giglio v. United States*, the Court held the prosecution must also produce any impeachment evidence that is likely to cast doubt on the reliability of a witness whose testimony "may well be determinative of guilt or innocence." [83] Giglio

was convicted of passing forged money orders and sentenced to five years in prison. [84]  Upon discovery that the government's key witness, the co-conspirator and the only witness linking Giglio with the crime, had received a promise of leniency in exchange for his testimony, Giglio filed a motion for a new trial. [85]  The Court concluded that impeachment evidence must be disclosed to permit the defense to use it in cross-examining the witness. [86]  It was discovered that two U.S. attorneys handled the case and one was not aware that the other had made the  **\*324**  promise. [87]  Nevertheless, the Court determined that whether the nondisclosure was a result "of negligence or design," the prosecutor's office is an entity that is charged with the responsibility to communicate all relevant information on each case to every lawyer who deals with it. [88]

## 1. *Disclosure of Material Evidence*

The *Brady* Court characterized exculpatory evidence as "favorable to an accused" and "material either to guilt or punishment." [89]  Evidence is "material" for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [90]  A new trial will be granted when there is a *Brady* violation only if: (1) the evidence at issue is favorable to the accused; (2) the evidence was suppressed by the state; and (3) "the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." [91]  In the end, what constitutes a *Brady* violation is still debatable on each set of facts.

The concept of materiality was explored in *Wood v. Bartholomew.* [92]  The State failed to disclose that a witness had failed a polygraph test. [93]  The Supreme Court reiterated that evidence is material, such that failure to disclose it is a *Brady* violation and justifies setting aside conviction, only if there exists a reasonable probability that the result at trial would have been different had evidence been disclosed. [94]  The Court determined that the State's failure to disclose the fact that a witness had failed a polygraph test  **\*325**  did not deprive the defendant of "material" evidence under the *Brady* rule. [95]  In light of overwhelming evidence of guilt, there was not a reasonable likelihood that disclosure of the polygraph results would have resulted in a different outcome at trial. [96]

The Ninth Circuit--Court of Appeals, in *Benn v. Lambert*, affirmed the lower court's decision that the prosecutor violated *Brady* by not disclosing "multiple pieces of critical impeachment information" and commented on the interchangeable definitions in the *Brady* cases: "Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material.' Thus, for *Brady* purposes, the two terms have come to have the same meaning." [97]

In *Kyles v. Whitley*, the Court considered the net effect of state-suppressed evidence. [98]  Kyles was convicted of first-degree murder by a Louisiana jury and sentenced to death. [99]  Several pieces of information were withheld by the government, including witness statements and a computer printout of different cars and license plates on the scene. [100]  The Court determined that the cumulative effect of the withheld evidence raised a reasonable probability that its disclosure would have produced a different result at trial. [101]

In some cases, admissibility determines materiality as it relates to disclosure obligations. Increasingly, the majority rule is information is material if: (a) all or part of the information is admissible; (b) the information could lead to admissible evidence; (c) or the information would be an effective tool for cross-examination. [102]

The case law is clear that prosecutors have a duty to disclose exculpatory evidence, but the *Brady* rule does not require the prosecutor to deliver the entire file to defense counsel. [103]  Instead, the prosecutor is only required to disclose evidence favorable to the accused that, if suppressed,  **\*326**  would deprive him of a fair trial. [104]  In *Moore v. Illinois*, the Court noted that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." [105]  The possibility that an item may have helped the defense does not establish materiality in the constitutional sense. [106]

## 2. *Knowledge of the Evidence*

Federal Rule of Criminal Procedure 16(a) only applies to materials within the "possession, custody, or control of the government." [107] Courts have found, however, that the "possession, custody, or control" requirement includes materials in the hands of a governmental investigatory agency closely connected to the prosecutor. [108] The prosecution also has a continuing duty to disclose any evidence that is subject to discovery or inspection. [109]

It is the responsibility of the prosecutor to seek all exculpatory or impeachment information from all members of the prosecution team. [110] In fact, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." [111] The prosecution team includes all law enforcement officers involved in the investigation and may include regulatory (and other) agencies. [112]

Automatic disclosure pursuant to *Brady/Giglio* requires prosecutors, at a minimum, to search their files to identify *Brady* material and request similar searches of the files of relevant agencies. [113] Some courts have extended the duty of the prosecution to require inspection of police files for **\*327** evidence that may be exculpatory. [114] The prosecutor must also exercise a good faith effort to cause such material to be made available to the defense at least *in camera*. [115] For example, in *Strickler v. Greene*, a capital murder case, the prosecutor did not turn over certain evidence, primarily consisting of notes by witnesses that collectively demonstrated a lack of recall regarding their eyewitness accounts. [116] Some of these items were in the possession of law enforcement but were not contained in the prosecutor's file. [117] Despite the prosecutor's open-file policy, the court concluded that the prosecutor withheld exculpatory evidence. [118] A prosecutor is not required to have actual notice of exculpatory evidence. [119] If the information is in possession of the law enforcement agency or another agency involved in the investigation, the prosecutor is deemed to know about it. [120] Further, some courts have defined constructive possession to mean the prosecutor should have known about it. [121] Some questions courts consider when deciding which individuals and agencies are involved include: (1) is it a joint investigation (how many law enforcement agencies are involved); (2) did the agency play an active role in the investigation; (3) does the prosecutor know or have access to the information; (4) has the prosecutor, in fact, already obtained the information; (5) has information been shared with the agency particularly substantive case-related communications; (6) is the agency working on behalf of the prosecutor. [122]

## C. *The Imposition of Differing Standards*

*Brady* requires the prosecutor to turn over exculpatory and impeachment information that is *material* and favorable to the accused. [123] Model Rule 3.8(d) requires a prosecutor to timely disclose exculpatory and impeachment information *known to the prosecutor* that tends to negate **\*328** guilt. [124] As the ABA Standing Committee on Ethics and Professional Responsibility concluded in a 2009 formal opinion, "This ethical duty is separate from disclosure obligations imposed under the Constitution, statutes, procedural rules, court rules, or court orders." [125] While these disclosure obligations may overlap, concludes the opinion, Model Rule 3.8(d) is not a codification of *Brady v. Maryland*. [126] In fact, Model Rule 3.8 requires disclosure of evidence or information favorable to the defense without regard to materiality. [127] The formal opinion concluded that the prosecutor's ethical duty under Model Rule 3.8 is broader in scope than the constitutional requirements under *Brady*. [128] Essentially, *Brady* requires a determination that the evidence would likely produce a different outcome at trial (materiality), but the ethical rule requires disclosure without regard to the impact at trial. [129]

The Supreme Court also referenced this distinction in *Kyles v. Whitley*: "[T]he rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate." [130] And again, in *Cone v. Bell*, the Supreme Court reiterated, "Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations." [131]

**\*329** The ABA Commission on the Evaluation of the Rules of Professional Conduct, known as the Ethics 2000 Commission, was formed in 1997 to evaluate the ethical rules and recommend changes, including to Model Rule 3.8. [132] The Commission considered but rejected any changes to Model Rule 3.8(d). [133]

In light of these standards and case law, the question remains: What is the scope of the prosecutor's duty to disclose potentially exculpatory evidence? And does the prosecutor rely on the ethical rules, the Criminal Justice Standards, *Brady* and the cases that follow, or some combination of these authorities? Some high-profile examples underscore the critical differences.

## III. MISCONDUCT: PROSECUTORS IN THE SPOTLIGHT

The 2008 prosecution of Ted Stevens, the former U.S. Senator from Alaska, awakened controversy around the country concerning prosecutorial misconduct with respect to the failure to disclose evidence. [134] After trial, the defense alleged that prosecutors had concealed thousands of pages of evidence, including a note written by Senator Stevens, as well as impeachment evidence, including a government witness's illegal sex acts **\*330** with a minor. [135] The presiding judge ordered an independent investigation of the prosecutors and ultimately found what he called "shocking and serious *Brady* violations" resulting in the dismissal of the case just before sentencing. [136]

Other prosecutors in the spotlight include the famed Harry Connick Sr. when he was in the Orleans Parish District Attorney's office. [137] The *Connick* case was not an isolated incident; there is reason to believe that Connick and his prosecutors repeatedly ignored their disclosure obligations under *Brady*. [138] The Innocence Project New Orleans studied the tenure of Harry Connick from 1973-2002 and the 36 death sentences during that time:

> According to available records, favorable evidence was withheld **\*331** from nine of the 36 (25 [percent]) men sentenced to death in Orleans Parish from 1973-2002. Four of those men were eventually exonerated, having been released only after serving a collective 43 years on death row. In other words, one in every four men sent to death row by the New Orleans District Attorney's office from 1973-2002 was convicted after evidence that could have cast doubt on their guilt was withheld from them at trial. Four men, about 11 [percent], were completely innocent. [139]

The project also examined 25 noncapital cases in which allegations of evidence suppression were made:

> In 19 of these cases, courts found favorable evidence was indeed withheld, and in all others the court deemed that the allegations warranted an evidentiary hearing. Of these non-capital cases, four men were later found innocent of their crimes and released from life sentences after having served 70 collective years in Angola. Ten more had their convictions reversed. As a result, the State bore the expense of holding new trials for each of these men--a significant cost to taxpayers that would have been avoided had the District Attorney's office not withheld evidence during the initial trial. [140]

Following the *Connick* case, Louisiana defense attorneys filed several ethics complaints, and as of 2015, no actual action had been taken on the complaints with one exception. [141] In the case of Shareef Cousin, the Louisiana Supreme Court handed down a three-month suspension to the lead prosecutor, but the suspension was never served. [142]

A new study by Harvard Law School's Fair Punishment Project reports on four elected prosecutors in diverse jurisdictions who have gained notoriety for unethical practices. [143] Researchers reviewed state appellate court opinions in California, Louisiana, Missouri, and Tennessee for ones dealing with allegations of prosecutorial misconduct. [144] They measured and ranked the prosecutors based on certain criteria per capita, including **\*332** findings of prosecutorial misconduct and number of reversals. [145] One of the highest ranked for misconduct and reversals was the elected prosecutor from Shelby County,

Tennessee. [146] The Tennessee Board of Professional Responsibility recommended a public censure against the prosecutor, but the Board ultimately dismissed the petition and issued a private reprimand. [147] This July 2017 report again highlights the fact that misconduct and reversed convictions do not give rise to discipline. [148] The report calls for "[a] robust discussion about how to improve accountability and to address these injustices." [149]

## A. *Scrutiny by the Judiciary*

In the aftermath of the Ted Stevens case, a national conversation began criticizing prosecutors for widespread misconduct and corruption. [150] U.S. District Judge Emmett Sullivan, presiding over the Senator Stevens case, initiated an independent investigation into the prosecuting attorneys involved in this egregious behavior. [151] The prosecution team consisted of two attorneys from the Public Integrity Section of the Justice Department, two Washington, D.C.-based attorneys, and two assistant U.S. attorneys from Alaska. [152] During the hearing, Judge Sullivan held three of the prosecutors in contempt of court for failing to turn over documents to the defense. [153] Initially, the two prosecutors from Alaska were suspended, one for 40 days and one for 15 days. [154] However, only one day of suspension was actually served between both attorneys. [155] In 2015, the U.S. Merits Systems Protection Board rejected the suspensions concluding that the Department of Justice failed to follow their own procedures when handing down the  **\*333**  initial suspensions. [156] Of the remaining prosecutors, one left the government, and another committed suicide. [157]

A team of 12 lawyers successfully defended Senator Stevens. [158] He subsequently fought for awareness and new legislation that would hold prosecutors responsible for concealing evidence. [159] Stevens died in a plane crash in 2010. [160] In response to the Ted Stevens case, the Department of Justice issued new guidelines for federal prosecutors. [161]

The social and political landscape has changed in the 15 years since Harry Connick's tenure and the 9 years since the Ted Stevens case, and the training for prosecutors and law enforcement agencies has vastly improved. However, law enforcement agencies nationwide are still under the microscope for widespread police corruption and use of force. [162] The country is experiencing ongoing scenes of protests and civil disorder. [163] Mistrust of law enforcement has gained new prominence and sparked debate about racial profiling and the militarization of police. [164] Prosecutors, despite being hailed as ministers of justice, are not immune to this mistrust.

 **\*334**  In 2015, in a provocative law review preface, then-Ninth Circuit Judge Alex Kozinski questioned whether our justice system was fair. [165] Judge Kozinski's preface reported on what he called the "epidemic of *Brady* violations abroad in the land." [166] Judge Kozinski questioned the reliability of eyewitnesses, forensic evidence, confessions, jury instructions, and the objectivity of police and prosecutors. [167] Attorneys from the Department of Justice, Associate Deputy Attorney General Andrew Goldsmith and U.S. Attorney for the District of Colorado John Walsh, responded with a letter to the Georgetown Law Journal and highlighted what Judge Kozinski omitted--a section of the U.S. Attorneys' Manual which specifically describes the obligation to disclose exculpatory information "beyond that which is constitutionally and legally required." [168]

> We have both worked with many prosecutors during our combined thirty-three years at the Justice Department. We have served as line prosecutors and supervisors, and now hold positions with national responsibility. Throughout our careers, what has always struck us is the professionalism, integrity, and decency of our colleagues. They care deeply about the work that they do, not because they are trying to rack up convictions or long sentences, but because they seek to ensure that justice is done in each and every case they handle. This extends to the seriousness with which they take their discovery obligations. Our prosecutors comply with these obligations--because they are required to do so and because it is the right thing to do. It is a principle embedded not only in the Department's internal rules, but in the Department's culture. [169]

**\*335  B. *Response by the States***

Some states are addressing questions about prosecutorial integrity with new legislation and procedural requirements for prosecutors. In 2017, the California State Legislature passed a new law holding prosecutors criminally responsible for withholding evidence favorable to the defendant. [170]  In addition to the constitutional requirements under *Brady*, California Rule of Professional Conduct Rule 5-220 also requires: "A member shall not suppress evidence that the member or the member's client has a legal obligation to reveal or to produce." [171]  Additionally, effective January 1, 2017, section 141 of the California Penal Code was amended to read:

> (c) A prosecuting attorney who intentionally and in bad faith alters, modifies, or withholds any physical matter, digital image, video recording, or relevant exculpatory material or information, knowing that it is relevant and material to the outcome of the case, with the specific intent that the physical matter, digital image, video recording, or relevant exculpatory material or information will be concealed or destroyed, or fraudulently represented as the original evidence upon a trial, proceeding, or inquiry, is guilty of a felony punishable by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years. [172]

California's falsifying evidence law was a response to the state's famed "jailhouse informant scandal," where Orange County prosecutors were accused of violating defendants' rights by illegally obtaining and then withholding evidence gathered from jailhouse informants. [173]  Recently, a number of convictions have been reversed because of this scandal, including at least six murder and attempted murder cases in Orange County. [174]  Specifically, jail deputies were accused of identifying and developing informants, placing them in cells with or near inmates who were awaiting trial, and providing benefits in exchange for information. [175]  The deputies were accused of recording this information in a log, which prosecutors  **\*336**  insisted they did not know existed, even though verbatim information from the logs was used in applications for search warrants prepared by prosecutors. [176]  When they learned of the logs, prosecutors argued that the information was privileged. [177]  California courts have disagreed. In overturning multiple murder cases, courts have generally agreed with the public defenders' arguments that either the logs are not protected by the asserted privilege or the constitutional rights trump the privilege. [178]  In any event, the prosecutor is deemed to know about evidence in the possession of the prosecution team, which no doubt includes the jail deputies involved in the jailhouse informant scandal. [179]  Specifically, in the case of Scott Dekraai, a man who shot and killed his ex-wife and seven other people at a hair salon in 2011, Superior Court Judge Thomas Goethals found that the Orange County District Attorney's office committed misconduct in its use of the jail informant program. [180]

California also added a section to its penal code in 2016 requiring judges to report prosecutors who have withheld relevant or material exculpatory evidence under certain circumstances to disciplinary counsel. [181]  While judges are already required under ABA Model Code of Judicial Conduct Rule 2.15 to report misconduct, [182]  **\*337** section 1424.5 of the California Penal Code also provides judges with the discretion to disqualify the prosecuting attorney from further proceedings. [183]

Other states have enacted legislation to enforce disclosure of exculpatory evidence. "In 2013, the Texas Legislature enacted the Michael Morton Act ( ... effective January 1, 2014), which requires prosecutors to give defense attorneys any evidence that is relevant to the defendant's guilt or punishment." [184]  In 1987, Michael Morton was convicted of murdering his wife, and he served 25 years in prison. [185]  Prosecutors were found to have withheld information that would have exonerated Morton, including a transcript of a phone conversation of Morton's three-year-old son describing his mother's killer as a "monster" who was not his father. [186]  Prosecutors also withheld a bloody bandanna found at the crime scene that revealed the blood actually belonged to Mark Alan Norwood, who was eventually convicted of the murder in 2013. [187]  While Michael Morton was in prison, Mark Norwood murdered again. [188]  Williamson County District Attorney Ken Anderson was disciplined for withholding the evidence. [189]  He was disbarred and sentenced to 10 days in jail, which some have argued was "insultingly short" given the deprivation of liberty Morton experienced. [190]

These laws have been enacted in spite of the existing constitutional requirements, statutes, rules of procedure, and ethical rules guiding prosecutors' discovery practice.

**\*338  IV. *BRADY* VIOLATIONS RARELY LEAD TO DISCIPLINARY PROCEEDINGS**

A records request of all 50 state bar association discipline offices revealed the infrequency of discipline actions against prosecutors for violations of the state equivalents of Model Rule 3.8 of the Model Rules of Professional Conduct. [191] Unfortunately, a comprehensive list of disciplinary grievances filed under Model Rule 3.8 does not exist. Most states do not maintain public records of grievances filed, and only do so if the matter results in formal charges or discipline. [192] Most disciplinary processes allow an individual to file a grievance against an attorney with a detailed explanation. [193] In a typical scenario, the disciplinary office reviews the grievance to determine whether there has been a violation of that state's rules of professional conduct. [194] After an initial investigation, the office will determine whether there is enough evidence of unprofessional conduct [195] and whether additional investigation is required. [196] If there is no violation or insufficient evidence to prove a violation occurred, the grievance is dismissed. [197] If the disciplinary authority determines a violation has occurred, the attorney may receive private discipline, which is not typically available to the public or even the grievant. [198] If a violation results in sanctions, the grievant will receive notice in writing, and the sanction may be  **\*339**  published or recorded as part of the attorney's discipline record with the state bar. [199] Sanctions may range from public reprimand to disbarment. [200] Many states maintain their disciplinary records in a manner that is challenging to search--whether manually due to paper filing systems or electronically due to limited search criteria or cumbersome search mechanisms via online portals. [201] Some states do not maintain records in a searchable format by rule number; an attorney's name is required. [202] Some states did provide a summary of formal charges under their version of Model Rule 3.8(d), and other discipline cases were located in the searchable databases. [203]

Over half of the states have had fewer than three disciplinary actions related to their specific version of Model Rule 3.8(d). [204] At least 14 of these states have had no complaints or actions in the last 10 years relating to this rule. [205] North Carolina, Illinois, and Iowa have investigated approximately nine complaints per state in the last 10 years. [206] Discipline is dependent on the timing of disclosure, as well as the knowledge or intent of the prosecutor. [207] Jurisdictions have imposed discipline that ranges from public reprimand or censure to a six-month suspension from the practice of law. [208] If the prosecutor intentionally withheld information, sanctions commonly result. [209] If the omission was inadvertent, the disciplinary authority tends to impose a suspension or public reprimand as punishment rather than disbarment. [210] The Supreme Courts of Louisiana and North Dakota have  **\*340**  interpreted the disclosure requirements of prosecutors more broadly. [211] Other courts have decided that it would be confusing for prosecutors if they were required to comply with two different disclosure standards. [212]

In his article *Prosecutorial Ethics as Usual*, Professor Bruce Green explores why the ABA is disinclined to adopt rules to better define prosecutor conduct. [213] He notes that prosecutors' offices and bar associations have "filled in gaps by developing guidelines for prosecutorial conduct, that, unlike disciplinary rules, are not meant to be enforceable in the disciplinary context." [214] As it relates to Model Rule 3.8(d), Professor Green notes that the ethical rule broadens the disclosure requirement under the Due Process Clause, but disciplinary authorities do not enforce it. [215]

**A. Brady *Violations Far Outstrip Disciplinary Actions***

The lack of clarity around the prosecutor's disclosure obligations may explain the considerable discrepancy between the number of *Brady* violations and the number of disciplinary actions. In Iowa, there have been several disciplinary complaints filed, but very few have been validated and investigated. [216] Scholars have commented on the ineffectiveness of ethical rules:

> The nondisclosure of favorable evidence can result in a constitutional violation as well as a breach of a statute, rule of evidence, or ethical rule for disclosure. State and federal rules of criminal procedure play an important part in the prosecutor's duty to disclose evidence, as does the Jencks Act. The constitutional duty to disclose exculpatory evidence is distinct and co-exists with these procedural rules of discovery. It is important to remember

that a violation of these statutory and procedural requirements for disclosure requires a **\*341** separate analysis. Therefore, a violation of one of the statutory discovery rules is not necessarily a constitutional violation. The Supreme Court made an important point by deciding the *Brady* line of cases solely in reference to due process rather than ethical or statutory duties. Implicit in these decisions is the fact that the constitutional remedy is necessary because of the lack of effectiveness of the ethical rules. [217]

Discipline cases in some states have provided clear guidance on the scope of the ethical responsibilities under respective state versions of Model Rule 3.8, but the analysis sometimes differs. [218] In a 2015 decision from the District of Columbia, the Board on Professional Responsibility found that a federal prosecutor failed to disclose certain statements by a police officer in a drive-by-shooting case and that such statements may have been potentially exculpatory as prior inconsistent statements. [219] Specifically, the police officer told the prosecutor that when he first interviewed the victim at the hospital, he did not know who shot him. [220] The prosecutor took notes during this conversation and there was an arrow pointing to this note. [221] The prosecutor did not disclose the substance of this conversation. [222] The case went to trial and hinged on the testimony of three eyewitnesses to the shooting. [223] The court declared a mistrial when the jury was unable to reach a verdict. [224] Another prosecutor handled the new trial and the note was finally disclosed. [225] Bar counsel charged the first prosecutor with a violation of D.C.'s Rule 3.8(e) for his failure to disclose the note. [226]

Rule 3.8(e) of the District of Columbia Rules of Professional Conduct prohibits a prosecutor in a criminal case from intentionally failing to disclose to the defense any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused. [227] The rule **\*342** reads as follows:

> The prosecutor in a criminal case shall not: ... (e) Intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense, or in connection with sentencing, intentionally fail to disclose to the defense upon request any unprivileged mitigating information known to the prosecutor and not reasonably available to the defense, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal. [228]

Notably, with the benefit of the exculpatory evidence at the second trial, the defendant was convicted and his conviction was upheld on appeal. [229] In his own disciplinary action, the prosecutor argued that because the information was not "material" and would not have affected (or did not affect) the outcome at trial, he was not obligated to disclose the information under *Brady*. [230] The prosecutor pointed to the Comment to D.C. Rule 3.8 for authority to apply the *Brady* line of cases' materiality standard:

> Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to Prosecution Function, which in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense. This rule is intended to be a distillation of some, but not all, of the professional obligations imposed on prosecutors by applicable law. *The rule, however, is not intended either to restrict or to expand the obligations of prosecutors derived from the United States Constitution, federal or District of Columbia statutes, and court rules of procedure.* [231]

The Board of Professional Responsibility disagreed with the prosecutor's analysis, which the Board called a "retrospective materiality analysis," and found that this was not the proper test for deciding whether the prosecutor violated D.C.'s iteration of Rule 3.8(e). [232] Similarly, the reviewing court concluded that ethical responsibilities, while they may overlap with a prosecutor's constitutional obligations or other obligations **\*343** under statutes or court rules, cannot and should not rely on a retrospective view. [233] The court relied on *Commonwealth v. Tuma*, concluding that a disciplinary case is different from an appeal in a criminal case. [234] The court concluded that D.C.'s Rule 3.8(e) requires a prosecutor to disclose all potentially exculpatory

information in his or her possession regardless of whether that information would meet the materiality requirements of *Brady* and its progeny. [235]

However, while the Board recommended a 30-day suspension, the District of Columbia Court of Appeals declined to sanction the prosecutor given "the confusion regarding the correct interpretation of a prosecutor's obligations under the rule." [236]  The court was squarely considering whether the ethical disclosure obligations imposed on prosecutors require disclosure of information that may not be material to the outcome. [237]  The D.C. rule also requires that the prosecutor "intentionally" have failed to disclose. [238]  Most state disciplinary codes require knowledge by including the words "information known to the prosecutor" rather than "intentionally." [239]  The ABA rule has no intentionality or willfulness requirements. [240]

Similarly, an ethics opinion from the Virginia State Bar concludes: "Rule 3.8(d) does not refer to or incorporate ... the *Brady* standard for disclosure." [241]  The opinion points out three primary differences between *Brady* and Virginia's Rule 3.8(d): (1) the Rule references all evidence, rather than material evidence; (2) the Rule does not impute knowledge to the prosecutor; and (3) the Rule requires earlier disclosure than *Brady* **\*344** requires. [242]

The Utah Supreme Court has also distinguished the due process duty under *Brady* and the ethical duty. In *In re Matter of Larsen*, the court affirmed the discipline of a prosecutor who did not disclose to defense counsel that he had shown a photograph of the defendant to eyewitnesses (without showing any other photographs) 10 days before trial in the underlying robbery case. [243]  The court clarified that the two sets of rules are different, and though the prosecutor did disclose the eyewitness identification during trial, which may have met the *Brady* standard, the disclosure was not timely under the state's ethical rule. [244]  The court upheld the six-month suspension. [245]

The Supreme Court of Ohio has determined that the state's ethical rule imposes no requirement on a prosecutor to disclose information that he or she is not required to disclose by applicable law, such as *Brady v. Maryland* or the rules of criminal procedure. [246]  The Board of Commissioners on Grievances and Discipline reprimanded an attorney for failing to disclose reports by two social workers. [247]  The alleged crime was rape and the reports called into question the victim's age and consent. [248]  The prosecutor was suspended from practice for one year with six months suspended. [249]  In reversing the discipline order, the Supreme Court of Ohio declined to expand the scope of discovery beyond that which is legally required. [250]

The Colorado Supreme Court also declined to impose inconsistent obligations. In *In re Attorney C.*, the prosecutor failed to disclose a letter from the victim before the accused's preliminary hearing. [251]  The letter recanted relevant facts surrounding the battery charge. [252]  While the prosecutor knew the letter was exculpatory, she acted under the belief that it was not material to the preliminary hearing. [253]  Relying on the ABA  **\*345** Criminal Justice Standards, the Colorado Supreme Court held that the state's Rule 3.8(d) "requires prosecutors to disclose exculpatory evidence to the defense in advance of any critical stage of the proceeding" and that "a prosecutor only violates Rule 3.8(d) if he or she acts intentionally." [254]

> We have explicitly adopted a materiality standard with respect to our procedural rules, and we are disinclined to impose inconsistent obligations upon prosecutors. We therefore also adopt a materiality standard as to the latter, such that we read Rule 3.8(d) as containing a requirement that a prosecutor disclose exculpatory, outcome-determinative evidence that tends to negate the guilt or mitigate the punishment of the accused. [255]

In sorting out the differences between Rule 16 disclosure obligations, ABA Criminal Justice Standards, and the state's Rule 3.8(d), the court imposed consistent definitions. [256]

> The ABA standard anticipated that the rule would address only the most serious of cases in which conduct occurs that reflects upon the character of the prosecutor: conduct that cannot be fully addressed by orders relating to

the underlying case. We agree that grievance proceedings should be limited to those circumstances in which a prosecutor intentionally withholds exculpatory evidence in violation of the rule. [257]

The Wisconsin Supreme Court has concluded that a prosecutor's ethical duty under SCR 20:3.8(f), the state's disclosure rule, is consistent with the constitutional requirements imposed in *Brady*. [258]   In *In re Riek*, the Office of Lawyer Regulation argued that the disciplinary rules are broader in scope than the rule under *Brady* and require disclosure without regard to materiality. [259] The prosecutor failed to disclose that another suspect admitted possession of the drugs, until four days before trial, a fact the defense already knew. [260]   The Wisconsin Supreme Court rejected the analysis under the 2009 ABA Formal Opinion, which states the ethical rule is **\*346** broader than the rule in *Brady*. [261]   The court pointed to several jurisdictions that have not adopted the ABA's view:

> The ABA Opinion, however, has not been universally adopted; indeed, it has received some pointed criticism .... Some jurisdictions explicitly align their ethics rules on prosecutorial disclosure with federal constitutional standards. [262]   At least three other jurisdictions have "rendered decisions construing their equivalent of Rule 3.8(d) consistent with the requirements of *Brady* and its progeny. *See, e.g.,* D.C. RULES OF PROF'L CONDUCT 3.8 cmt. 1 (2012) (clarifying that their comparable ethics rule "is not intended either to restrict or to expand the obligations of prosecutors derived from the United States Constitution, federal or District of Columbia statutes, and court rules of procedure."); *see also* N.C. RULES OF PROF'L CONDUCT 3.8(d) (2012) (requiring timely disclosure of "all evidence or information required to be disclosed by applicable law, rules of procedure, or court opinions."). [263]

In short, the Wisconsin Supreme Court refused to impose inconsistent disclosure obligations on prosecutors. [264]

The District of Columbia has also aligned its Rule 3.8(e) with disclosure obligations under the Constitution. [265]   Similarly, North Carolina's comment to Rule 3.8(d) cites directly to a prosecutor's disclosure obligations under *Brady*. [266]

**\*347  B. *Findings of Prosecutorial Misconduct Rarely Invoke Disciplinary Proceedings***

Under Model Rule 8.4(c) and (d), it is professional misconduct for a lawyer to engage in conduct "involving dishonesty, fraud, deceit or misrepresentation" or "that is prejudicial to the administration of justice." [267]   Comment 1 to Model Rule 3.8 further provides that "a systematic abuse of prosecutorial discretion could constitute a violation of Rule 8.4." [268] *Brady* issues are significant in the context of prosecutorial misconduct. An Innocence Project study from 2010 on prosecutorial misconduct looked at documented appeals and civil suits alleging prosecutorial misconduct. [269]   The research identified 11,452 documented appeals from 1970-2002. [270]   Of the misconduct allegations, 41 percent involved *Brady* violations. [271]   Of the *Brady* violations, 27 percent resulted in court findings of error. [272]   Nearly one-quarter of the *Brady* violations resulted in overturned convictions. [273]

A March 2016 Innocence Project study entitled *Prosecutorial Oversight: A National Dialogue in the Wake of* Connick v. Thompson conducted a judicial case law review of prosecutorial misconduct. [274]   Researchers identified 660 criminal cases in which courts confirmed prosecutorial misconduct in Arizona, California, Pennsylvania, New York, and Texas, and only one prosecutor was disciplined. [275]   In 2017, the National Registry of Exonerations reported that 70 of 166 exonerations in 2016 involved what the report characterizes as "official misconduct." [276]   This report defines official misconduct as police, prosecutors, or other **\*348** government officials significantly abusing their authority or the judicial process in a manner that contributes to a conviction. [277]

In 2009, prosecutors and the ABA Criminal Justice Section urged the ABA House of Delegates and courts to distinguish between prosecutorial *misconduct* and prosecutorial *error*. [278]  The resolution acknowledges that courts have broad authority to reprimand, sanction, and disqualify prosecutors, or refer them to disciplinary authorities; conduct determined to be "prosecutorial misconduct" may be the result of an innocent mistake by the individual attorney. [279]  The resolution describes a substantive concern that judicial findings of attorney misconduct are not preceded by notice and a fair opportunity to be heard: "A public finding that an attorney engaged in 'misconduct' operates as a sanction with adverse impact on that person's reputation, whether or not so intended. This is both a substantive and procedural concern applicable to all lawyers and judges." [280]

The report points out that without an opportunity to be heard, an informal finding could result in long-term consequences for the attorney's reputation. [281]  Also, in some of the findings, the prosecutor's state of mind was not relevant to the claim. [282]  In the case of a law enforcement agency withholding certain evidence and knowledge of that evidence being imputed to the prosecutor, a court could reverse a conviction for "prosecutorial misconduct" even if the prosecutor did not have knowledge of the evidence. [283]  The report cautions courts not to "collapse the distinction between the governmental misconduct to challenge a conviction and the professional conduct of the individual lawyer." [284]  In short, the report calls for a fair process to determine how to properly characterize the conduct. [285]

## *349  V. PROSECUTORS AND POLICE ARE EXPLORING NEW INITIATIVES TO ACHIEVE TRANSPARENCY

Proposed solutions to achieve more transparency in criminal prosecutions include open-file discovery, standardized procedures for discovery, and conviction integrity units. [286]  Open-file discovery is one proposed solution, though the efficacy of an open-file system has been questioned. [287]  Open-file discovery requires the prosecutor to provide the defense with everything in the prosecution's file without regard to materiality. [288]  There is a national trend toward more open discovery laws. [289]  Ohio expanded its rules of criminal procedure in 2010 to accelerate the timing of the exchange of materials. [290]  Texas and North Carolina have also enacted open discovery statutes. [291]

The New York State Bar Association formed a task force in 2012 to reform criminal discovery rules. [292]  The task force drafted a bill requiring prosecutors to turn over police reports, witness names and statements, and grand jury testimony in specific, expedited phases. [293]  The New York court system already passed a new court rule that asks judges to issue an order at the outset of all criminal cases reminding prosecutors of their requirements under *Brady* and to hold lawyers in contempt for violations. [294]  The draft  *350  order for prosecutors specifies categories of favorable information subject to disclosure and addresses the timing of disclosure. [295]

Scholars argue open-file discovery simply shifts the prosecutor's burden to the defense to identify and synthesize critical evidence. [296]  Open-file discovery also does not resolve questions about possession, custody, or control of information, or the problem of exculpatory evidence that is in the hands of a law enforcement agency but unknown to the prosecutor. Commentators suggest that "open file" just means prosecutors will comply with their existing discovery obligations, but prosecutors are generally unwilling to engage in true open-file discovery. [297]

The Duke lacrosse case revived discussions in favor of open-file discovery. [298]  Three Duke University lacrosse players were charged in 2006 with sexually assaulting Crystal Mangum, an exotic dancer hired to perform at a team party on March 13, 2006. [299]  Michael B. Nifong, Durham's district attorney at the time, filed rape charges, but Mangum changed her story many times. [300]  Nifong also withheld DNA evidence from the lab report and made false statements to the court about his knowledge of potentially exculpatory evidence. [301]  "N.C. Attorney General Roy Cooper ultimately dropped all charges against the players and declared them innocent after an investigation  *351  by one of his special prosecutors." [302]  The state bar's three-member disciplinary panel unanimously found Nifong committed acts of fraud, dishonesty, deceit, or misrepresentation; making false statements of material fact before a judge; making false statements of material fact before bar investigators; and lying about withholding exculpatory DNA evidence, among other violations. [303]  "The players sued the city, the police department, other

officers and Nifong in 2007 ....” [304] The case settled, and the city made a $50,000 grant to the North Carolina Innocence Inquiry Commission. [305]

In 2011, North Carolina signed a bill into law that requires prosecutors to share their files in all felony prosecutions, including "a complete copy of the complete files related to the investigation of the crimes committed," also encompassing the files of investigatory agencies. [306]

Another trend is the establishment of conviction integrity units or prosecutorial integrity units. [307] San Diego County, California, is credited with creating the nation's first conviction integrity unit in 2000. [308] According to the National Registry of Exonerations, there were 29 conviction integrity units in the United States in 2016--more than double the number in 2013 and almost five times the number in 2011. [309] The Innocence Project has developed a best practices guide for conviction integrity units to better **\*352** define the requirements of such units. [310]

In her comment *Discovery Audits: Model Rule 3.8(d) and the Prosecutor's Duty to Disclose*, Christina Parajon proposes an audit-type regulatory model to evaluate prosecutors' discovery practices. [311] Such a system has its roots in administrative law and utilizes external, independent agency reviewing bodies to audit prosecutors' files for violations of Model Rule 3.8(d) much like the Department of Justice Office of Professional Responsibility. [312]

In 2011, Attorney General Eric Holder created a Professional Misconduct Review Unit to handle disciplinary actions for career attorneys at the Department of Justice. [313] The unit is responsible for disciplinary and state bar actions relating to Office of Professional Responsibility findings of professional misconduct. [314] Holder created the unit to administer a more efficient and uniform disciplinary system. [315]

The creative systems described above are important tools to achieving transparency in criminal discovery. Combined with harmonizing the ethical guidelines for prosecutors that are disconnected over a myriad of authorities, prosecutors will benefit from the clarity, and defendants and the judiciary will benefit from the accountability.

## VI. HARMONIZING THE ETHICAL RULES WITH *BRADY*'S CONSTITUTIONAL REQUIREMENTS

Imposing different standards on prosecutors leads to uncertainty and incongruent application and enforcement. If the ethics rules and *Brady* requirements insisted on the same standards, prosecutors might avoid sanctions and discipline. In addition to creating clear expectations, adopting **\*353** the same requirements and holding prosecutors accountable may prevent state legislatures from imposing criminal sanctions prosecutors.

The ABA should also attempt to devise more comprehensive rules concerning the special obligations of prosecutors. As Professor Green notes, it is intriguing that the ABA was inclined to include a special rule for prosecutors but offers an incomplete list of special obligations. [316]

> Although the normative expectations are different for prosecutors, it may have seemed too difficult to draft provisions that fairly articulate either the desired standard of conduct or a minimally acceptable one, or to reach agreement on what the distinctive provisions should be. It may have seemed unnecessary to clutter up the disciplinary code with provisions specifically aimed at a small subgroup of practitioners such as prosecutors. This may have been because it was not sufficiently important to enforce prosecutors' special obligations, because these obligations could be adequately enforced outside the disciplinary process, or because these obligations could be enforced by disciplinary agencies under existing rules. [317]

To provide more equity in discipline actions, states should follow the lead of several states that have harmonized their ethical rules with the constitutional requirements in *Brady* and its progeny. [318] Then as *Brady* evolves, so do the ethics rules. Judicial rules should also give judges discretion in finding *Brady* violations and prosecutorial misconduct, like section 1424.5 of the

California Penal Code. [319] Ethical rules should also deliberately incorporate ethical guidance provided by bar associations dedicated to the special obligations of prosecutors, such as the ABA Criminal Justice Standards and the National District Attorneys Association National Prosecution Standards. [320] Rather than foregoing responsibility for such standards under the disciplinary process, the ABA Model Rules should incorporate them. [321]

Once the rules are harmonized, state legislatures and authorities will have more confidence in the checks and balances on prosecutors' handling of cases, and there will be no need for criminal penalties aimed at **354** prosecutors.

## VII. CONCLUSION

Prosecutors are proclaimed ministers of justice and are increasingly under the microscope for what has been described as an epidemic of prosecutorial misconduct. [322] State bar disciplinary authorities either are not paying attention or feel feeble in the shadow of overturned convictions and discovery sanctions. [323] State legislatures are passing laws directing criminal penalties at prosecutors for discovery violations. [324] If ethical rules were consistent with constitutional requirements, prosecutors' offices could develop policies and procedures to comply with both. There would be less confusion caused by overlapping rules and more attention focused on meeting disclosure obligations informed by due process requirements. Movements like open-file discovery and conviction integrity units would increase efficiency and facilitate equity in disciplinary actions. Prosecutors and law enforcement agencies could improve training, and disciplinary authorities would have clearer mandates. Prosecutors would be more accountable, due process requirements would be guarded, and a culture of compliance would be created.

### Footnotes

[a1] Director of Experiential Learning, Associate Professor at Concordia University School of Law; J.D., University of Missouri-Columbia; former Assistant City Attorney and advisor to the professional development and standards division of the Boise Police Department, including the Office of Internal Affairs, Planning, and Training. I am grateful to Angela Perkins, J.D., Concordia University School of Law, for her research support and to Jessica McBride, J.D., Concordia University School of Law, for her assistance gathering data from state bar associations and for her contributions to this Article.

[1] United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013) (en banc) (Kozinski, J., dissenting) ("There is an epidemic of *Brady* violations abroad in the land. Only judges can put a stop to it."). Olsen was convicted in federal court of "knowingly developing a biological agent for use as a weapon in violation of 18 U.S.C. § 175." *Id.* A forensic scientist with the Washington State Police analyzed the poisonous pills. *Id.* The prosecutor failed to disclose the contents of a report by Washington State Patrol calling into question the forensic scientist's handling of evidence while he was employed by the Montana State Crime Laboratory. *Id.* at 627. The forensic scientist was ultimately "terminated, and the Washington Court of Appeals affirmed the termination based on a 'finding that [the scientist] was incompetent and committed gross misconduct.'" *Id.* at 627 (quoting Melnikoff v. Wash. State Patrol, No. 35404-7-II, 2008 WL 40158, at *11 (Wash. Ct. App. Jan. 2, 2008)). The Ninth Circuit dismissed the complaint on the grounds that the contents of the omitted report were not material. *Id.* at 628 (citing United States v. Olsen, 704 F.3d 1172, 1183-87 (9th Cir. 2013)). In his dissenting opinion (which was joined by Judges Pregerson, Reinhardt, Thomas, and Watford) Judge Kozinski cites to 29 cases in at least 9 districts and 13 states where prosecutors have been accused of *Brady* violations. *Id.* at 631-32. Calling for sanctions for the prosecutor and his supervisor, Judge Kozinski found a clear *Brady* violation because the evidence could have been used to impeach the forensic scientist's testimony. *Id.* at 633.

[2] *See Our Start*, INNOCENCE PROJECT, https://25years.innocenceproject.org/start/ (last visited Feb. 9, 2018). The Innocence Project is a network of independent organizations across the country that uses DNA technology to prove that people who have been wrongfully convicted are innocent. *Id.* "Barry Scheck and Peter Neufeld met as public defenders at the Bronx Legal Aid Society" and later "started the Innocence Project as a legal clinic at Benjamin N. Cardozo School of Law." *Id.* The project now employs 80 staff members in 11 different departments and is credited with helping to create wrongful conviction compensation laws in 32 states, and more than 100 other laws to prevent wrongful conviction and to support exonerees. *Our Impact*, INNOCENCE PROJECT, https://25years.innocenceproject.org/impact/ (last visited Feb. 9, 2018).

3    *E.g.*, Emily Bazelon, *She Was Convicted of Killing Her Mother. Prosecutors Withheld the Evidence that Would Have Freed Her.*, N.Y. TIMES MAG. (Aug. 1, 2017), https://www.nytimes.com/2017/08/01/magazine/she-was-convicted-of-killing-her-mother-prosecutors-withheld-the-evidence-that-would-have-freed-her.html; Tony Saavedra, *Dozens of Convictions Tossed Out of Southern California Courts Because of Prosecutors' Bad Behavior, Harvard Study Says*, ORANGE COUNTY REG. (Sept. 11, 2017), http://www.ocregister.com/2017/07/28/harvard-study-prosecutor-misconduct-taintsjusticein-southern-california/; Beth Schwartzapfel, *Defendants Kept in the Dark About Evidence, Until It's Too Late*, N.Y. TIMES (Aug. 7, 2017) https://www.nytimes.com/2017/08/07/nyregion/defendants-kept-in-the-dark-about-evidence-until-its-too-late.html.

4    *See, e.g.*, Christopher Goffard, *Prosecutors Who Withhold or Tamper with Evidence Now Face Felony Charges*, L.A. TIMES (Oct. 3, 2016), http://www.latimes.com/local/lanow/la-me-prosecutor-misconduct-20161003-snap-story.html.

5    United States v. Agurs, 427 U.S. 97, 110 (1976).

6    Thomas P. Sullivan & Maurice Possley, *The Chronic Failure to Discipline Prosecutors for Misconduct: Proposals for Reform*, 105 J. CRIM. L. & CRIMINOLOGY 881, 890-92 (2015).

7    *Compare* Brady v. Maryland, 373 U.S. 83, 87 (1963), *with*MODEL RULES OF PROF'L CONDUCTr. 3.8(d) (AM. BAR ASS'N 2015).

8    *Brady*, 373 U.S. at 87.

9    *E.g.*, MODEL RULES OF PROF'L CONDUCT 3.8(d).

10    *Brady*, 373 U.S. at 87-88.

11    *See*CAL. PENAL CODE § 141(c) (West 2018).

12    *Id.* ("A prosecuting attorney who intentionally and in bad faith alters, modifies, or withholds any physical matter, digital image, video recording, or relevant exculpatory material or information, knowing that it is relevant and material to the outcome of the case, with the specific intent that the physical matter, digital image, video recording, or relevant exculpatory material or information will be concealed or destroyed, or fraudulently represented as the original evidence upon a trial, proceeding, or inquiry, is guilty of a felony punishable by imprisonment ... for 16 months, or two or three years.").

13    *Id.*

14    *See, e.g.*, Kyles v. Whitley, 514 U.S. 419, 421-22 (1995) (finding the defendant was entitled to a new trial because of *Brady* violations).

15    *See, e.g.*, Larsen v. Utah State Bar, 379 P.3d 1209, 1217 (Utah 2016) (upholding an attorney's suspension resulting from failure to disclose exculpatory evidence).

16    *See, e.g., id.*; In re Feland, 820 N.W.2d 672, 678 (N.D. 2012).

17    *See, e.g.*, In re Feland, 820 N.W.2d at 678.

18    *Compare* id. at 677-78, *with* In re Riek, 834 N.W.2d 384, 389-90 (Wis. 2013).

19    *E.g.*, In re Riek, 834 N.W.2d at 389-90; In re Attorney C., 47 P.3d 1167, 1174 (Colo. 2002) (en banc).

20    *See, e.g.*, Rob Kepple, *Brady Training FAQs*, 44 TEX. DISTRICT & COUNTY ATT'YS ASS'N, no. 4, July-Aug. 2014, https://www.tdcaa.com/journal/brady-training-faqs.

LEVELING FELONY CHARGES AT PROSECUTORS FOR..., 68 Drake L. Rev. 397...

Case 9:21-cr-00029-DEC   Document 84-1   Filed 03/02/22   Page 20 of 35

21     *See* Connick v. Thompson, 563 U.S. 51, 60 (2011). A local government's decision not to train employees about their legal duty to avoid violating citizens' rights may rise to the level of a violation under 42 U.S.C. § 1983, but the failure to train must amount to "deliberate indifference to the rights of persons with whom the employees come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989); *see also* *Connick*, 563 U.S. at 60. Thompson was prosecuted for attempted armed robbery. *Connick*, 563 U.S. at 54. Prosecutors failed to disclose a crime lab report to Thompson's counsel. *Id.* Thompson brought an action under 42 U.S.C. § 1983 against the prosecutors claiming the office had failed to train them. *Id.* The jury found Orleans Parish District Attorney Harry Connick Sr. was liable for failure to train. *Id.* The U.S. Court of Appeals for the Fifth Circuit affirmed. *Id.* The U.S. Supreme Court held a district attorney's office is not liable under § 1983 for a single *Brady* violation. *Id.* A pattern of similar constitutional violations is required. *Id.*

22     *See, e.g., Prosecutors' Justice Initiative*, PROSECUTING ATT'YS ASS'N MICH., https://www.michiganprosecutor.org/justice-initiative (last visited Feb. 9, 2018).

23     Kyles v. Whitley, 514 U.S. 419, 438 (1995) ("In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.'") (alteration in original) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)).

24     *In re* Jordan, 913 So. 2d 775, 783-84 (La. 2005) (suspending prosecutor for failing to disclose murder witness's statement though prosecutor believed the statement was inculpatory rather than exculpatory).

25     Peter A. Joy, *The Relationship Between Prosecutorial Misconduct and Wrongful Convictions: Shaping Remedies for a Broken System*, 2006 WIS. L. REV. 399, 401.

26     *Id.* at 424-25.

27     *Id.* at 427.

28     *See, e.g.,* Alafair S. Burke, *Revisiting Prosecutorial Disclosure*, 84 IND. L.J. 481, 499 (2009) (arguing for a rule that would make prosecutors disclose all exculpatory information whether or not material); Peter J. Henning, *Prosecutorial Misconduct and Constitutional Remedies*, 77 Wash. L. L.Q. 713, 830-31 (1999) (arguing that prosecutorial misconduct must be addressed outside the criminal case and directed at the prosecutor); Alex Kozinski, *Criminal Law 2.0*, 44 GEO. L.J. ANN. REV. CRIM. PROC. iii, xxvii (2015) (advocating the adoption of "standardized, rigorous procedures for dealing with the government's disclosure obligations"); Niki Kuckes, *The State of Rule 3.8: Prosecutorial Ethics Reform Since Ethics 2000*, 22 GEO. J. LEGAL ETHICS 427, 430 (2009) (arguing that Model Rule 3.8 is incomplete and vague); Kevin C. McMunigal, *The (Lack Of) Enforcement of Prosecutorial Disclosure Rules*, 38 HOFSTRA L. REV. 847, 851-55 (2010) (explaining how the rules are at odds with each other); Michael S. Ross, *Alternative Forums for Ethics Disputes*, CRIM. JUST., Spring 1996, at 42, 43 (describing why establishing the attorney's "state of mind" presents a hurdle in discipline cases); Joseph R. Weeks, *No Wrong Without a Remedy: The Effective Enforcement of the Duty of Prosecutors to Disclose Exculpatory Evidence*, 22 OKLA. CITY U. L. REV. 833, 835 (1997) (arguing that there is almost nothing that prevents the prosecutor disposed to withholding evidence from doing so); Edward L. Wilkinson, *Brady and Ethics: A Prosecutor's Evidentiary Duties to the Defense Under the Due Process Clause and Their Relation to the State Bar Rules*, 61 TEX. B.J. 435, 440 (1998) (concluding that a prosecutor could violate one set of rules without violating the other); Ellen Yaroshevksy, *Wrongful Convictions: It Is Time to Take Prosecution Discipline Seriously*, 8 UDC L. REV. 275, 276 (2004) (describing how few public prosecutors are brought before disciplinary committees); Lisa M. Kurcias, Note, *Prosecutor's Duty to Disclose Exculpatory Evidence*, 69 FORDHAM L. REV. 1205, 1223-24 (2000) (arguing in favor of an ethical standard higher than that for a *Brady* violation); Casey P. McFaden, Note, *Prosecutorial Misconduct*, 14 Geo. J. LEGAL ETHICS 1211, 1211-12 (2001) (discussing the scope of Model Rule 3.8 and its application through case law in various jurisdictions); Christina Parajon, Comment, *Discovery Audits: Model Rule 3.8(d) and the Prosecutor's Duty to Disclose*, 119 YALE L.J. 1339, 1344 (2010) (advocating a well-designed audit system); Judy McKee, *Ethics Corner: The Interaction Between Rule 3.8(d) and the Constitutional Requirements of Brady and Giglio*, NAT'L ASS'N ATT'Y'S GEN., May 2017, http://www.naag.org/publications/nagtri-journal/volume-2-issue-2/ethics-corner-the-

interaction-between-rule-3.8d-and-the-constitutional-requirements-of-brady-and-giglio.php (explaining the differences in the ethical rules and constitutional requirements).

29    *Compare*COMM. ON CODE OF PROF'L ETHICS, CANONS OF PROF'L ETHICS CANON 5 (1908) ("The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible."), *with*MODEL CODE OF PROF'L RESPONSIBILITY EC 7-13 (AM. BAR ASS'NN 1980) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict." (footnote omitted)), *and*MODEL RULES OF PROF'L CONDUCTr. 3.8 cmt. 1 (AM. BAR ASS'N 2015) ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.").

30    NAT'L PROSECUTION STANDARDS r. 1- 1.1 - r. 1-1.2 (3d ed.); CRIMINAL JUSTICE SECTION STANDARDS: PROSECUTION FUNCTION Standard 3-1.2(b) (AM. BAR ASS'N 2002).

31    AM. BAR ASS'N, FINAL REPORT OF THE COMMITTEE ON CODE OF PROF'L ETHICS 567-69 (1908), http://www.americanbar.org/content/dam/aba/migrated/2011_build/professional_responsibility/1908_canons_ethics.authcheckdam.pdf.

32    *Id.*; *see also*DAVID HOFFMAN, A COURSE OF LEGAL STUDY, ADDRESSED TO STUDENTS AND THE PROFESSION GENERALLY*passim* (2d ed. 1846).

33    COMM. ON CODE OF PROF'L ETHICS, *supra* note 29.

34    MODEL CODE OF PROF'L RESPONSIBILITY Preface.

35    *Id.* at DR 7-103(B).

36    MODEL RULES OF PROF'L CONDUCT Preface (AM. BAR ASS'N 2015).

37    *Id.* at r. 3.8(d).

38    NIKI KUCKES, REPORT TO THE ABA COMMISSION ON EVALUATION OF THE RULES OF PROFESSIONAL CONDUCT CONCERNING RULE 3.8 OF THE ABA MODEL RULES OF PROFESSIONAL RESPONSIBILITY 4 (1999); *e.g.*, ALASKA RULES OF PROF'L CONDUCTr. 3.8(d) (2017); ARIZ. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); ARK. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); COLO. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); CONN. RULES OF PROF. CONDUCT r. 3.8(d) (2017); DEL. RULES OF PROF'L CONDUCTr. 3.8(d)(1) (2017); FLA. RULES OF PROF'L CONDUCT r. 4-3.8(c) (2017); HAW. RULES OF PROF'L CONDUCTr. 3.8(b) (2017); IDAHO RULES OF PROF'L CONDUCTr. 3.8(d) (2017); ILL. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); IND. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); IOWA RULES OF PROF'L CONDUCT r. 32:3.8(d) (2017); KAN. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); KY. RULES OF PROF'L CONDUCT r. 3.130(3.8) (c) (2017); MD. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); MASS. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); MICH. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); MINN. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); MISS. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); MO. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); MONT. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); NEB. RULES OF PROF'L CONDUCT r. § 3-503.8(d) (2017); NEV. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); N.H. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); N.J. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); N.M. RULES OF PROF'L CONDUCT. r. 16-308(D) (2017); N.C. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); OKLA. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); OR. RULES OF PROF'L CONDUCT r. 3.8(b) (2017); PA. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); R.I. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); S.C. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); S.D. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); TENN. RULES OF PROF'L. CONDUCTr. 3.8(d) (2017); TEX. RULES OF PROF'L CONDUCT r. 3.09(d) (2017); UTAH RULES OF PROF'L CONDUCTr. 3.8(d) (2017); VT. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); WASH. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); W. VA. RULES OF PROF'L CONDUCTr. 3.8(d) (2017); WYO. RULES OF PROF'L CONDUCTr. 3.8(d) (2017).

39    AM. BAR ASS'N, VARIATIONS OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT: RULE 3.8: SPECIAL RESPONSIBILITIES OF A PROSECUTOR*passim* (2017) [hereinafter AM. BAR ASS'N, VARIATIONS], https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/mrpc_3_8.authcheckdam.pdf; *e.g.*, D.C. RULES OF PROF'L CONDUCT r. 3.8(e) (2017) (including "intentionally"

fails to disclose to the defense); LA. RULES OF PROF'L CONDUCTr. 3.8(d) (2017) (including requirement that prosecutor knows or should have known the evidence tends to negate guilt or mitigates offense); WIS. RULES OF PROF'L CONDUCT r. 20:3.8 (2017) (showing the rule interpreted in *In re Riek, 834 N.W.2d 384, 390 (Wis. 2013)*, as consistent with *Brady*).

40   *See supra* note 38.

41   *Compare*MODEL RULES OF PROF'L CONDUCTr. 3.8(d), *with*ALA. RULES OF PROF'L CONDUCTr. 3.8(1)(d) (2017), *and*DEL. RULES PROF'L CONDUCTr. 3.8(d), *and*D.C. RULES OF PROF'L CONDUCT r. 3.8(e), *and*GA. RULES OF PROF'L CONDUCTr. 3.8(d) (2017), *and*LA. RULES OF PROF'L CONDUCTr. 3.8(d), *and*N.Y. RULES OF PROF'L CONDUCTr. 3.8(d) (2017), *and*N.C. RULES OF PROF'L CONDUCTr. 3.8(d), *and*OHIO RULES OF PROF'L CONDUCTr. 3.8(d) (2017), *and*VA. RULES OF PROF'L CONDUCT R. 3.8(d) (2017).

42   *Compare*MODEL RULES OF PROF'L CONDUCTr. 3.8(d), *with*ALA. RULES OF PROF'L CONDUCTr. 3.8(1)(d) ("The prosecutor in a criminal case shall: ... Not willfully fail to make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.").

43   *Compare*MODEL RULES OF PROF'L CONDUCTr. 3.8(d), *with*GA. RULES OF PROF'L CONDUCTr. 3.8(d).

44   *Compare*MODEL RULES OF PROF'L CONDUCTr. 3.8(d), *with*LA. RULES OF PROF'L. CONDUCTr. 3.8(d).

45   *Compare*MODEL RULES OF PROF'L CONDUCTr. 3.8(d), *with*ME. RULES OF PROF'L CONDUCTr. 3.8(b) (2017).

46   *Compare*MODEL RULES OF PROF'L CONDUCTr. 3.8(d), *with*N.J. RULES OF PROF'L CONDUCTr. 3.8(d) (2017).

47   *Compare*MODEL RULES OF PROF'L CONDUCTr. 3.8(d), *with*N.C. RULES OF PROF'L CONDUCTr. 3.8(d) (2017).

48   *Compare*MODEL RULES OF PROF'L CONDUCTr. 3.8(d), *with*S.D. RULES OF PROF'L CONDUCTr. 3.8(d) (2017).

49   28 U.S.C. § 530B(a) (2012).

50   CHARLES DOYLE, CONG. RESEARCH SERV., MCDADE-MURTHA AMENDMENT: ETHICAL STANDARDS FOR JUSTICE DEPARTMENT ATTORNEYS 11 (2001).

51   *Id.* at 12-13; *see also*MODEL RULES OF PROF'L CONDUCT r. 4.2 ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.").

52   *See, e.g.*, United States v. Ferrara, 847 F. Supp. 964, 968-69 (D.D.C. 1993), *aff'd on jurisdictional grounds*, 54 F.3d 825 (D.C. Cir. 1995); *In re* Doe, 801 F. Supp. 478, 486-88 (D.N.M. 1992) (remanding related case arising out of similar facts to the New Mexico Disciplinary Board); United States v. Lopez, 765 F. Supp. 1433, 1447-50 (N.D. Cal. 1991) (finding California rule prohibiting communication with represented persons applies to DOJ attorneys), *vacated on other grounds*, 4 F.3d 1455 (9th Cir. 1993); *In re* Howes, 940 P.2d 159, 167-68 (N.M. 1997) (finding violation of New Mexico rule prohibiting communication with represented persons in disciplinary proceedings against the prosecutor in *Ferrara*); *In re* Twitty, 2 Cal. State Bar Ct. Rptr. 664, 673-74 (1994) (finding violation of California rule prohibiting communications with represented persons in disciplinary proceedings against defense counsel arising out of the *Lopez* case).

53   FED. R. CRIM. P. 16(c).

54   *See id.*; *e.g.*, United States v. Jordan, 316 F.3d 1215, 1249-51 (11th Cir. 2003).

55   FED. R. CRIM. P. 16 advisory committee's note to 1974 amendments.

56     FED. R. CRIM. P. 16(c); *see also* CHARLES A. WRIGHT & PETER J. HENNING, FEDERAL PRACTICE AND PROCEDURE: FEDERAL RULES OF CRIMINAL PROCEDURE § 254, at 113-19 (2009 & Supp. 2017) (discussing "the fact that the government intended to use the evidence at trial was sufficient proof of its materiality").

57     *See, e.g.*, IDAHO R. CRIM. P. 16(b).

58     Martin Marcus, *The Making of the ABA Criminal Justice Standards, Forty Years of Excellence*, CRIM. JUST., Winter 2009, at 10, 11 (citing Lauran A. Arn, *Implementation of the ABA Standards for Criminal Justice: A Progress Report*, 12 AM. CRIM. L. REV. 477, 478 (1975)).

59     CRIMINAL JUSTICE SECTION STANDARDS: PROSECUTION FUNCTION Standard 3-5.4(a)-(h) (AM. BAR ASS'N 2002).

60     Marcus, *supra* note 58, at 13.

61     Strickland v. Washington, 466 U.S. 668, 688 (1984), *superseded by statute*, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, *as recognized in* United States v. Williams, Nos. 2:12-cr-162-TFM, 2:15-cv-461-TFM, 2015 WL 4255574 (W.D. Pa. July 14, 2015).

62     Marcus, *supra* note 58, at 10 (citing William H. Erickson & William J. Jameson, *Monitoring and Updating the ABA Standards: The Continuing Responsibility*, 12 AM. CRIM. L. REV. 469, 470 (1975)).

63     *Id.* at 14-15.

64     CRIMINAL JUSTICE SECTION STANDARDS: PROSECUTION FUNCTION Standard 3-5.4 (4th ed.).

65     NAT'L DIST. ATT'YS ASS'N, NATIONAL PROSECUTION STANDARDS § 2-8.4, at 29 (3d ed. 2009), http://www.ndaa.org/pdf/NDAA%20NPS%C203rd%C20Ed.%C20w%C20Revised%20Commentary.pdf.

66     *Id.* at 10.

67     *Id.*

68     *See supra* notes 51-52 and accompanying text.

69     Brady v. Maryland, 373 U.S. 83, 87 (1963).

70     *See id.*

71     *Id.*

72     *See id.* at 87-88.

73     *Id.* at 84.

74     *Id.*

75     *Id.*

76     *Id.*

77     *Id.*

78     *Id.*

79     *Id.*

80     Brady v. State, 174 A.2d 167, 171-72 (Md. Ct. App. 1961), *aff'd*, 373 U.S. 83 (1963).

81　　*Brady*, 373 U.S. at 87.

82　　*Id.* at 87-88 (citing *Brady*, 174 A.2d at 169).

83　　Giglio v. United States, 405 U.S. 150, 154-55 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).

84　　*Id.* at 150.

85　　*Id.* at 151-52.

86　　*Id.* at 154-55. Appellate courts have interpreted this to require disclosure of impeachment evidence in time to permit the defense to use it effectively in cross-examining the witness. *See, e.g.*, United States v. Bueno-Sierra, 99 F.3d 375, 379-80 (11th Cir. 1996); United States v. Higgs, 713 F.2d 39, 43-44 (3d Cir. 1983).

87　　*Giglio*, 405 U.S. at 152-53.

88　　*Id.* at 154 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." (quoting *Napue*, 360 U.S. at 269)). The court does not, however "automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Id.* (quoting United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968)).

89　　Brady v. Maryland, 373 U.S. 83, 87 (1963).

90　　United States v. Bagley, 473 U.S. 667, 682 (1985); *see also* Kyles v. Whitley, 514 U.S. 419, 435-37 (1995).

91　　Strickler v. Greene, 527 U.S. 263, 281-82 (1999); *Bagley*, 473 U.S. at 678.

92　　Wood v. Bartholomew, 516 U.S. 1, 5 (1995) (per curiam).

93　　*Id.* at 2.

94　　*Id.* at 5-6 (citing *Kyles*, 514 U.S. at 433-34; *Bagley*, 473 U.S. at 682 (plurality opinion); *Bagley*, 473 U.S. at 685 (White, J., concurring in part and concurring in judgment)).

95　　*Id.* at 8.

96　　*Id.*

97　　Benn v. Lambert, 283 F.3d 1040, 1053-54, 1053 n.9 (9th Cir. 2002).

98　　*Kyles*, 514 U.S. at 421-22.

99　　*Id.* at 421.

100　　*Id.* at 428-29.

101　　*Id.* at 439-41.

102    *See, e.g.,* U.S. ATTORNEYS' MANUAL § 9-5-001(B)(1), (C) (U.S. DEP'T OF JUSTICE 2006).

103    *Kyles,* 514 U.S. at 437.

104    *Id.* at 434; Brady v. Maryland, 373 U.S. 83, 87 (1963).

105    Moore v. Illinois, 408 U.S. 786, 795 (1972).

106    *Id.* at 794-96.

107    FED. R. CRIM. P. 16(a).

108    *See, e.g.,* United States v. Jordan, 316 F.3d 1215, 1249-51 (11th Cir. 2003); United States v. Scruggs, 583 F.2d 238, 242 (5th Cir. 1978).

109    FED. R. CRIM. P. 16(c). ("Continuing Duty to Disclose: A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if: (1) the evidence or material is subject to discovery or inspection under this rule; and (2) the other party previously requested, or the court ordered, its production.").

110    Strickler v. Greene, 527 U.S. 263, 280-81 (1999).

111    Kyles v. Whitley, 514 U.S. 419, 437 (1995).

112    *See id.*

113    *Id.* at 437-38.

114    *See, e.g.,* United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991).

115    *Strickler,* 527 U.S. at 280.

116    *Id.* at 273-74.

117    *Id.* at 273-75.

118    *Id.* at 285.

119    *Id.* at 280-81.

120    *Id.;* Kyles v. Whitley, 514 U.S. 419, 437-38 (1995).

121    *Strickler,* 527 U.S. at 281-81; *Kyles,* 514 U.S. at 437-38; United States v. Joseph, 996 F.2d 36, 39 (3d Cir. 1993).

122    *See* Anne Bowen Poulin, *Convictions Based on Lies: Defining Due Process Protection,* 116 PENN ST. L. REV. 331, 360-68 (2011) (footnotes omitted) (discussing approaches taken by courts to determine when knowledge is imputed to prosecutors).

123    Brady v. Maryland, 373 U.S. 83, 87 (1963).

124    MODEL RULES OF PROF'L CONDUCT r. 3.8(d) (AM. BAR. ASS'N 2015).

125    ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 09-454, at 1 (2009).

126    *Id.* at 3 (footnote omitted).

127    *Id.* at 4 (footnotes omitted).

128    *Id.* (footnote omitted).

129    *Id.* (footnote omitted).

130    Kyles v. Whitley, 514 U.S. 419, 437 (1995).

131    Cone v. Bell, 556 U.S. 449, 470 n.15 (2009); *accord* Baker v. State, 238 P.3d 10, 12 (Okla. Crim. App. 2010) (citing OKLA. RULES OF PROF'L CONDUCT r. 3.8(d) (2017)) ("If there is a question as to whether particular information should be revealed in response to a discovery motion, the prosecutor should present the question to the trial judge for determination."). Comment 9 to Model Rule 3.8 provides a good faith exception to certain prosecutorial disclosure requirements. MODEL RULES OF PROF'L CONDUCT r. 3.8 cmt. 9 (AM. BAR ASS'N 2015) ("A prosecutor's independent judgment, made in good faith that the new evidence is not of such nature as to trigger the obligations of sections (g) and (h), though subsequently determined to have been erroneous, does not constitute a violation of this Rule."). A similar provision does not exist for section (d). *See id.*

132    Charlotte Stretch, *Overview of Ethics 2000 Commission and Report*, ABA, https://www.americanbar.org/groups/ professional_responsibility/policy/ethics_2000_commission.html (follow "Overview of Commission and Report") (last visited Feb. 25, 2018).

133    Kurcias, *supra* note 28, at 1206 (explaining that while the Ethics 2000 Commission rejected changes to the text of Model Rule 3.8(d), it did recommend adding the comment "[e]vidence tending to negate the guilt of the accused includes evidence that materially tends to impeach a government witness," which would clarify that impeachment evidence is included under the prosecutor's ethical duty to disclose, but only where the evidence is material to the case); *Commission on Evaluation of Rules of Professional Conduct: Meeting Minutes: Friday, December 10, Through Sunday, December 12, 1999, Amelia Island, Florida*, ABA, https://www.americanbar.org/groups/professional_responsibility/ policy/ethics_2000_commission/121099mtg.html (last visited Feb. 25, 2018).

134    *See, e.g.*, Carrie Johnson, *Report: Prosecutors Hid Evidence in Ted Stevens Case*, NPR (Mar. 15, 2012), https:// www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case. The Department of Justice brought public corruption charges against Senator Stevens as he embarked on his seventh term. United States v. Stevens, No. 08-231(EGS), 2008 WL 8743218, at *1 (D. D.C. Dec. 19, 2008). Prosecutors alleged that Senator Stevens had concealed the fact that he had not paid full value for renovations to his Alaska cabin. *Id.* The jury found Stevens guilty. *Id.*

135    *In re* Special Proceedings, 842 F. Supp. 2d 232, 255 n.23 (D.D.C. 2012); Del Quentin Wilber & Sari Horwitz, *Prosecutors Concealed Evidence in Ted Stevens Case, Report Finds*, WASH. POST (Mar. 15, 2012), https://www.washingtonpost.com/local/crime/prosecutors-concealed-evidence-in-ted-stevens-case-report-finds/2012/03/15/gIQAJ5GNFS_story.html?utm_term=.577fbb47df5b.

136    Transcript of Motion Hearing at 6, United State v. Stevens, 593 F. Supp. 2d 177 (No. 08-231(EGS)); *see Stevens*, 2009 WL 6525926, at *1; Lisa Rein, *Review Board Clears U.S. Prosecutors Accused of Botching Sen. Ted Stevens's Corruption Trial*, WASH. POST (Jan. 14, 2015), https://www.washingtonpost.com/news/federal-eye/wp/2015/01/14/ panelclearsu-s-prosecutors-accused-of-botching-sen-ted-stevenss-corruptiontrial/?utm_term=.348af11985d0.

137    *See* Connick v. Thompson, 563 U.S. 51, 54-56 (2011). Defendant Thompson was prosecuted for attempted armed robbery. *Id.* at 54. He was convicted and served nearly two decades on death row. *Id.* at 55. Prosecutors failed to disclose a crime lab report. *Id.* Thompson brought a 42 U.S.C. § 1983 case against the prosecutors. *Id.* at 56. The jury found the prosecutor's office liable for failure to train. *Id.* A panel of the Fifth Circuit affirmed. *Id.* at 58. The U.S. Supreme Court set aside the $14 million civil verdict that was awarded to Thompson and held that the

LEVELING FELONY CHARGES AT PROSECUTORS FOR..., 68 Drake L. Rev. 397...

Case 9:21-cr-00029-DEC   Document 84-1   Filed 03/02/22   Page 27 of 35

prosecutor's office is not liable under § 1983 for a single violation of *Brady*. *Id.* at 55. "On March 29, 2011, Justice Clarence Thomas issued the majority 5-4 decision finding that the prosecutor's office could not be held liable, ultimately granting prosecutors broad immunity for their misconduct." *Prosecutorial Oversight: A National Dialogue in the Wake of* Connick v. Thompson, INNOCENCE PROJECT (Mar. 29, 2016), https://www.innocenceproject.org/prosecutorial-oversight-national-dialogue-wake-connick-v-thompson/; *see id.* at 54, 71-72. Instead, a pattern of constitutional violations is required. *Connick*, 563 U.S. at 72.

138  *Innocence Project New Orleans: During Harry Connick's Tenure, Orleans Parish District Attorney's Office Regularly Suppressed Crucial Evidence in Cases, Costing Taxpayers Millions of Dollars, Sending Innocent Men to Prison and Exacerbating the Crime Problem in New Orleans*, LA. PUB. DEFENDER BOARD, http://lpdb.la.gov/Serving%20The%20Public/Reports/txtfiles/pdf/IPNO%20Study%C20on%C20the%C20Orleans%C27%C20DA%C27s%20Office.pdf (last visited Feb. 25, 2018) [hereinafter *Innocence Project New Orleans*].

139  *Id.*

140  *Id.*

141  Radley Balko, *New Orleans's Persistent Prosecutor Problem*, WASH. POST (Oct. 27, 2015), https://www.washingtonpost.com/news/the-watch/wp/2015/10/27/new-orleanss-persistent-prosecutor-problem/?utm_term=.8d968acf4c73.

142  *Innocence Project New Orleans*, *supra* note 138.

143  *The Recidivists: New Report on Rates of Prosecutorial Misconduct*, FAIR PUNISHMENT PROJECT, http://fairpunishment.org/new-report-on-rates-of-prosecutorial-misconduct/ (last updated Aug. 9, 2017).

144  *Id.*

145  *Id.*

146  *Id.*

147  *Id.*

148  *See id.*

149  *Id.*

150  *See, e.g.*, Anna Stolley Persky, *A Cautionary Tale: The Ted Stevens Prosecution*, WASH. LAW. (Oct. 2009), https://www.dcbar.org/bar-resources/publications/washington-lawyer/articles/october-2009-ted-stevens.cfm.

151  United States v. Stevens, No. 08-cr-231(EGS), 2009 WL 6525926, at *1 (D.D.C. Apr. 7, 2009).

152  Persky, *supra* note 150.

153  *Id.*

154  Rein, *supra* note 136.

155  Goeke v. DOJ, No. SF-0752-12-0598-I-1, 2013 WL 5917709, at *4-5 (M.S.P.B. Apr. 5, 2013).

156  *Id.* at *1-2.

157  Spencer S. Hsu, *Judge Lifts Civil Contempt Findings Against Justice Department Lawyers in Ted Stevens Case*, WASH. POST (Oct. 12, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/10/12/AR2010101206934.html; Charlie Savage, *Stevens Case Prosecutor Kills Himself*, N.Y. TIMES (Sept. 27, 2010), http://www.nytimes.com/2010/09/28/us/politics/28stevens.html.

158     *Recalling the Injustice Done to Sen. Ted Stevens: Commentary,* ROLLCALL, (Oct. 28, 2014), https://www.rollcall.com/news/recalling_the_injustice_done_to_sen_ted_stevens_commentary-237407-1.html.

159     Lisa Demer, *Rally by Friends of Stevens Seeks Prosecutor Accountability*, ANCHORAGE DAILY NEWS (Apr. 3, 2012), https://www.adn.com/alaska-news/article/rally-friends-stevens-seeks-prosecutor-accountability/2012/04/04/ (discussing rallies held by Alaskans for Justice, started by friends of U.S. Senator Ted Stevens, to demand prosecutorial accountability and the firing of the two prosecutors and FBI agent who aided in his botched prosecution).

160     *Recalling the Injustice Done to Sen. Ted Stevens: Commentary*, *supra* note 158.

161     *Id.*

162     *See, e.g.*, Catherine Shoichet, Alina Machado & Javier De Diego, *Did Police Use Excessive Force? 3 Cases in the Spotlight*, CNN (Apr. 10, 2015), https://www.cnn.com/2015/04/09/us/police-use-of-force-cases/index.html.

163     *Protests Against Police Violence Continue Across U.S*, CBS NEWS (July 11, 2016), http://www.cbsnews.com/news/protests-against-police-violence-continue-across-us/ (highlighting protests in Colorado, Georgia, Illinois, Kentucky, Louisiana, and Tennessee).

164     *See, e.g.*, *id.*

165     Kozinski, *supra* note 28, at xiii.

166     *Id.* at viii (quoting United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013) (en banc) (Kozinski, J., dissenting from denial of rehearing en banc)). In the article, then-Judge Kozinski recognized that, with few exceptions, federal prosecutors are "fairminded, forthright and highly conscientious," but questioned whether prosecutors could be trusted to turn over material favorable to the defense and concluded that there is an "epidemic of *Brady* violations abroad in the land." *Id.* at xxii, viii (quoting *Olsen*, 737 F.3d at 626 (en banc) (Kozinski, J., dissenting from denial of rehearing en banc)).

167     *Id. passim.*

168     Letter from Andrew D. Goldsmith, Assoc. Deputy Att'y Gen. & John F. Walsh, U.S. Att'y to The Georgetown Law Journal 2 (Nov. 4, 2015), https://georgetownlawjournal.org/articles/157/justice-department-s-response-to/pdf (quoting U.S. ATTORNEY'S MANUAL § 9-5.001 (U.S. DEP'T OF JUSTICE 2006)).

169     *Id.*

170     CAL. PENAL CODE § 141 (West 2018).

171     CAL. RULES OF PROF'L CONDUCT r. 5-220 (2017).

172     CAL. PENAL CODE § 141(c).

173     Lorelei Laird, *California Makes It a Felony for Prosecutors to Withhold or Alter Exculpatory Evidence*, ABA J. (Oct. 5, 2016), http://www.abajournal.com/news/article/california_makes_it_a_felony_for_prosecutors_to_withhold_or_alter_exculpato.

174     Saavedra, *supra* note 3.

175     Laird, *supra* note 173.

176     *Id.*; Matt Ferner, *Orange County Sheriff's Department Admitted to Cultivating 'Hundreds of Jailhouse Informants,' Lawyer Says*, HUFFINGTON POST (Mar. 31, 2017), https://www.huffingtonpost.com/entry/oc-informant-scandal-brief_us_58ddc7f8e4b05eae031ea9b3. *But see* Matt Ferner, *Key Witnesses in a California Jailhouse Snitch Scandal Refuse to Testify*, HUFFINGTON POST (June 2, 2017), https://www.huffingtonpost.com/entry/orange-county-sheriff-jailhouse-informant-scandal_us_5930f470e4b02478cb9a1ea7.

177     *See, e.g.*, *In re* Rodriguez, No. G053326, 2017 WL 2705349, at \*27 (Cal. Ct. App. June 23, 2017); People v. Dekraai, No. 12ZF0128, 2017 WL 4330504, at \*10-13 (Cal. Super. Ct.

Aug. 18, 2017); Lorelei Laird, *Secret Snitches: California Case Uncovers Long-Standing Practice of Planting Jailhouse Informants*, ABA J. (May 2016), http://www.abajournal.com/magazine/article/secret_snitches_california_case_uncovers_long_standing_practice_of_planting [hereinafter Laird, *Secret Snitches*].

178

*See, e.g.,* 🚩 *In re Rodriguez*, 2017 WL 2705349, at * 27; *Dekraai*, 2017 WL 4330504, at *10-13; Saavedra, *supra* note 3.

179

*See* 🔖 Kyles v. Whitley, 514 U.S. 419, 437-38 (1995).

180

*Dekraai*, 2017 WL 4330504, at *1-2; *see also* Laird, *Secret Snitches*, *supra* note 177.

181

CAL. PENAL CODE § 1424.5(a)(1) (West 2018).

182

MODEL CODE OF JUDICIAL CONDUCT r. 2.15(B) (AM. BAR ASS'N 1980) ("A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question regarding the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate authority.").

183

CAL. PENAL CODE § 1424.5(a)(b)(1). This law requires judges to make a finding, based on clear and convincing evidence, that a prosecutor has deliberately and intentionally withheld relevant or material exculpatory evidence and report the violation to the State Bar of California. *Id.* § 1424.5(a)(1). The judge may hold an evidentiary hearing and may disqualify the prosecutor from a case. *Id.* § 1424.5(a)(2).

184

🔖 TEX. CODE CRIM. PROC. ANN. art. 39.14 (West 2018); *see also* Johnathan Silver, *How Michael Morton's Wrongful Conviction Has Brought Others Justice*, TEX. TRIB. (Aug. 13, 2016), www.texastribune.org/2016/08/13/michael-morton-murder-casereverberatesacross-tex/.

185

Silver, *supra* note 184.

186

Pamela Colloff, *Innocent Man, Part Two*, TEX. MONTHLY (Dec. 2012), https://www.texasmonthly.com/articles/the-innocent-man-part-two/.

187

*Id.*

188

*Id.*

189

*A Prosecutor Is Punished,* N.Y. TIMES (Nov. 8, 2013), http://www.nytimes.com/2013/11/09/opinion/a-prosecutor-is-punished.html.

190

*Id.*

191

*See* MODEL RULES OF PROF'L CONDUCT r. 3.8(d) (AM. BAR ASS'N 2015). The Author sent a letter to every state bar association requesting any publicly available information regarding disciplinary action taken against attorneys (including when and why the disciplinary action was taken and the final outcome) under Model Rule 3.8(d). Twenty-seven states responded to the letter and either provided specific responses or directed us to an online, searchable database. The summaries provided are not complete enough to represent an empirical analysis but do provide a synopsis of the responses. Responses are on file with the Author.

192

*See* Debra Moss Curtis, *Attorney Discipline Nationwide: A Comparative Analysis of Process and Statistics*, 35 J. LEGAL PROF. 209 *passim* (2011) (providing a state-by-state analysis of attorney grievance systems).

193

*Id.*

194

*See id.*

195

*See id.* Some bar counsel's offices use a standard of clear and convincing evidence. *Compare The Discipline Process*, ST. B. AZ. http://www.azbar.org/WorkingWithLawyers/discproc.cfm (last visited Feb. 25, 2018), *with For the Public: Lawyer Regulation: Filing a Grievance*, WIS. CT. SYS., https://www.wicourts.gov/services/public/lawyerreg/file.htm (last visited Feb. 18, 2018).

LEVELING FELONY CHARGES AT PROSECUTORS FOR..., 68 Drake L. Rev. 397...

Case 9:21-cr-00029-DEC Document 84-1 Filed 03/02/22 Page 30 of 35

196     *See* Curtis, *supra* note 192 *passim*.

197     *See id.*

198     Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 GEO. J. LEGAL ETHICS 1, 19-20 (2007).

199     *Id.*

200     *See* Curtis, *supra* note 192 *passim*.

201     *See* Levin, *supra* note 198, at 20-21.

202     *See id.*

203     *Supra* note 144.

204     *See supra* note 191.

205     *See supra* note 191

206     *See supra* note 191.

207     *See supra* note 191.

208     *In re* Jordan, 913 So. 2d 775, 784 (La. 2005); *see, e.g.,* *In re* Jordan, 91 P.3d 1168, 1175 (Kan. 2004) (public censure); *In re* Grant, 541 S.E.2d 540, 540 (S.C. 2001) (public reprimand by consent); Comm. On Prof'l Ethics & Conduct of Iowa State Bar Ass'n v. Ramey, 512 N.W.2d 569, 572 (Iowa 1994) (indefinite suspension with no possibility of reinstatement for three months); Office of Disciplinary Counsel v. Jones, 613 N.E.2d 178, 180 (Ohio 1993) (six-month suspension).

209     *See supra* note 191.

210     *See supra* note 191.

211     *See, e.g.,* *In re* Feland, 820 N.W.2d 672, 680 (N.D. 2012); *In re Jordan*, 913 So. 2d at 783.

212     *See, e.g., In re* Riek, 834 N.W.2d 384, 390 (Wis. 2013); Disciplinary Counsel v. Kellogg-Martin, 923 N.E.2d 125, 130 (Ohio 2010); *In re* Att'y C., 47 P.3d 1167, 1171 (Colo. 2002) (en banc).

213     Bruce A. Green, *Prosecutorial Ethics as Usual*, 2003 U. ILL. L. REV. 1573, 1575 (2003) (offering an analysis of why prosecutorial work is different from other attorneys and positing that new ethical rules are needed).

214     *Id.* at 1580.

215     *Id.* at 1592-93 (noting also that the rule fails to clarify that the duty imposed by the ethical rules goes beyond the duty imposed by constitutional law).

216     *See supra* note 191.

217     Stephen P. Jones, *The Prosecutor's Constitutional Duty to Disclose Exculpatory Evidence*, 25 U. MEM. L. REV. 735, 745-47 (1995) (footnotes omitted).

218     *See supra* notes 207-12 and accompanying text.

219     *In re* Kline, 113 A.3d 202, 204-06 (D.C. 2015).

220    *Id.* at 205.

221    *Id.*

222    *Id.*

223    *Id.*

224    *Id.*

225    *Id.*

226    *Id.* at 206.

227    D.C. RULES OF PROF'L CONDUCT r. 3.8(e) (2017).

228    *Id.*

229    *In re Kline*, 113 A.3d at 205-06.

230    *Id.* at 206.

231    *Id.* at 209 (emphasis added) (quoting D.C. RULES OF PROF'L CONDUCT r. 3.8 cmt. 1).

232    *Id.* at 205.

233    *Id.* at 208-09.

234    *Id.* at 210 ("'In *Brady* cases ... an appellate court sits not as a disciplinary committee of the state bar--but rather as a court of review, ensuring only that the criminal conviction satisfies the threshold requirements of due process.' By contrast, ethical rules are designed to guide behavior, whereas appellate review of criminal cases is to ensure, after the fact, that a criminal defendant has received a fair trial." (quoting *Commonwealth v. Tuma*, 740 S.E.2d 14, 20 n.2 (Va. 2013)).

235    *Id.* at 213.

236    *Id.* at 204.

237    *Id.*

238    *Id.* at 207 (citing D.C. RULES OF PROF'L CONDUCT r. 3.8(e) (2017)).

239    *See* AM. BAR ASS'N, VARIATIONS, *supra* note 39 *passim*.

240    *Compare* D.C. RULES OF PROF'L CONDUCT r. 3.8(e) (2017), *with* MODEL RULES OF PROF'L CONDUCT r. 3.8(d) (AM. BAR ASS'N 2015).

241    Va. State Bar, Legal Ethics Op. 1862, at 2 (2012), https://www.vsb.org/docs/LEO/1862.pdf (last visited Aug. 17, 2017).

242    *Id.*

243    *Larsen v. Utah State Bar*, 379 P.3d 1209, 1212, 1216 (Utah 2016).

244    *Id.*

245    *Id.* at 1217.

246    *Disciplinary Counsel v. Kellogg-Martin*, 923 N.E.2d 125, 130 (Ohio 2010).

247    *Id.* at 127.

248    *Id.* at 128.

249    *Id.* at 132-33.

250    *Id.* at 130.

251    *In re* Att'y C., 47 P.3d 1167, 1168 (Colo. 2002) (en banc).

252    *Id.*

253    *Id.*

254    *Id.* (citing COLO. RULES OF PROF'L CONDUCT r. 3.8(d) (2017)).

255    *Id.* at 1171.

256    *Id.*

257    *Id.* at 1174.

258    *In re* Riek, 834 N.W.2d 384, 390 (Wis. 2013).

259    *Id.* at 389.

260    *Id.* at 387.

261    *Id.* at 390 (declining to establish an ethical standard broader than *Brady*, which requires that the evidence be material).

262    *Id.*

263    *Id.*

264    *Id.*

265    *See* D.C. RULES OF PROF'L CONDUCT r. 3.8 cmt. 1 (2017) (clarifying that the rule "is not intended either to restrict or to expand the obligations of prosecutors derived from the United States Constitution, federal or District of Columbia statutes, and court rules of procedure"). *But see* *In re* Kline, 113 A.3d 202, 209 (D.C. 2015) ("However, to the extent Rule 3.8 addresses matters (such as disclosure) that also are subject to requirements 'derived from the United States Constitution, federal or District of Columbia statutes, [or] court rules of procedure,' the rule should not be read as an interpretation of those requirements that either expands or contracts what our court has heretofore (or hereafter) interpreted them to mean." (alteration in original) (quoting D.C. RULES OF PROF'L CONDUCT r. 3.8 cmt. 1)).

266    N.C. RULES OF PROF'L CONDUCT r. 3.8(d) (2017) (requiring timely disclosure of "all evidence or information required to be disclosed by applicable law, rules of procedure, or court opinions").

267    MODEL RULES OF PROF'L CONDUCT r. 8.4(c) & (d) (AM. BAR ASS'N 2015).

268    *Id.* at r. 3.8 cmt. 1.

269    EMILY WEST, COURT FINDINGS ON PROSECUTORIAL MISCONDUCT CLAIMS IN POST-CONVICTION APPEALS AND CIVIL SUITS: AMONG THE FIRST 255 DNA EXONERATION CASES 1 (2010), https://www.nacdl.org/WorkArea/DownloadAsset.aspx?id=21946.

270    *Id.*

271    *Id.* at 4.

LEVELING FELONY CHARGES AT PROSECUTORS FOR..., 68 Drake L. Rev. 397...

Case 9:21-cr-00029-DEC Document 84-1 Filed 03/02/22 Page 33 of 35

272    *Id.* at 5.

273    *Id.*

274    LAWANNA KIMBRO ET AL., PROSECUTORIAL OVERSIGHT: A NATIONAL DIALOGUE IN THE WAKE OF *CONNICK V. THOMPSON* 12 (2016), https://www.innocenceproject.org/wp-content/uploads/2016/04/IP-Prosecutorial-Oversight-Report_09.pdf.

275    *Id.*

276    NAT'L REGISTRY OF EXONERATIONS, EXONERATIONS IN 2016 at 6 (2017), https://www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2016.pdf.

277    *See id.*

278    ANTHONY JOSEPH, REPORT TO THE HOUSE OF DELEGATES 1 (2009), http://www.masonlec.org/site/files/2012/04/Howard_ABA-Resolution-ProscutorialMisconduct.pdf.

279    *Id.* at 2, 4. The Department of Justice requires that whenever there is a judicial finding of misconduct, the matter be reported to the Office of Professional Responsibility by department employees. *DOJ: OPR: Fiscal Year 2004 Annual Report*, U.S. DEP'T JUST., https://www.justice.gov/opr/doj-opr-fiscal-year-2004-annual-report (last visited Feb. 18, 2018).

280    JOSEPH, *supra* note 278, at 2.

281    *Id.* at 2-3.

282    *Id.* at 3.

283    *Id.*

284    *Id.*

285    *Id.* at 4.

286    *See e.g.*, Kozinski, *supra* note 28, at xxvi-xxx. Judge Kozinski's solutions include: (1) open-file discovery; (2) standardized procedures for discovery and eyewitness identification; (3) video recording all suspect interviews; (4) strict limits on jailhouse informants; (5) uniform procedures for certifying expert witnesses; and (6) establishment of conviction integrity units (could this be a new initiative?) and independent prosecutorial integrity units. *Id.* at xxvi-xxxii.

287    *See, e.g.*, Brian P. Fox, Note, *An Argument Against Open-File Discovery in Criminal Cases*, 89 NOTRE DAME L. REV. 425, 427 (2013).

288    *Id.* at 426.

289    *See* Jenia I. Turner & Allison D. Redlich, *Two Models of Pre-Plea Discovery in Criminal Cases: An Empirical Comparison*, 73 WASH. & LEE L. REV. 285, 288 n.5 (2016) (citing N.C. GEN. STAT. ANN. § 15A-903 (West 2018); TEX. CODE CRIM. PROC. ANN. art. 39.14 (West 2018); ARIZ. R. CRIM. P. 15.1; COLO. R. CRIM. P. 16; N.J. CT. R. 3:13-3; OHIO R. CRIM. P 16).

290    OHIO R. CRIM. P. 16(A) staff notes, div. (A).

291    N.C. GEN. STAT. ANN. § 15A-903; TEX. CODE CRIM. PROC. ANN. art. 39.14.

292    N.Y. STATE BAR ASS'N, REPORT OF THE TASK FORCE ON CRIMINAL DISCOVERY 5 (2015), https://www.legal-aid.org/media/217437/nysba_discovery_reform_report.pdf.

293    *Id.* at 31-32.

294   Memorandum from John W. McConnell, to All Interested Persons on Request for Public Comment on Proposed Model Orders Regarding Disclosure Obligations of Prosecutors and Defense Counsel in Criminal Matters (Apr. 6, 2017) [hereinafter Memorandum from John W. McConnell], https://www.nycourts.gov/rules/comments/PDF/ModelOrders-DisclosureObligationsCriminalMatters.pdf; Beth Schwartzapfel, *New York Courts Remind Prosecutors to Show Their Evidence*, ABA J. (Nov. 10, 2017), http://www.abajournal.com/news/article/new_york_courts_remind_prosecutors_to_show_their_evidence.

295   Memorandum from John W. McConnell, *supra* note 294, at app. B.

296   *See, e.g.*, Fox, *supra* note 287, at 428.

297   Ira Mickenberg, *A Practical Guide to Brady Motions: Getting What You Want Getting What You Need* at 1, N. C. COURT SYSTEM OFF. OF INDIGENT DEFENSE SERVS., http://www.ncids.org/Defender%20Training/2008%20New%C20Felony%C20Defender%20Training/BradyHandout.pdf (last visited Mar. 13, 2018).

298   *See, e.g.*, Robert P. Mosteller, *Exculpatory Evidence, Ethics, and the Road to the Disbarment of Mike Nifong: The Critical Importance of Full Open-File Discover*, 15 GEO. MASON L. REV. 257, 259 (2008).

299   Anne Blythe, *City of Durham Settles Long-Running Lawsuit with Former Duke Lacrosse Players*, CHARLOTTE OBSERVER (May 16, 2014), http://www.charlotteobserver.com/news/local/crime/article9122669.html#storylink=cpy.

300   *Id.*

301   *Duke Lacrosse Prosecutor Disbarred*, CNN.COM L. CTR. (June 17, 2007), http://www.cnn.com/2007/LAW/06/16/duke.lacrosse/.

302   Blythe, *supra* note 299.

303   Mosteller, *supra* note 298, at 292.

304   Blythe, *supra* note 299.

305   *Id.*

306   N.C. GEN. STAT. ANN. § 15A-903(c) (West 2018); *Open and Shut: North Carolina Strengthens Its Open Discovery Law*, EVIDENCEPROF BLOG (June 3, 2011), http://lawprofessors.typepad.com/evidenceprof/2011/06/back-in-2004-north-carolina-governor-mike-easley-signed-a-bill-into-law-that-required-prosecutors-to-share-their-files.html.

307   CTR. FOR PROSECUTOR INTEGRITY, CONVICTION INTEGRITY UNITS: VANGUARD OF CRIMINAL JUSTICE REFORM 2-5 (2014), http://www.prosecutorintegrity.org/wp-content/uploads/2014/12/Conviction-Integrity-Units.pdf. Various district attorneys' offices in 12 states (as well as the U.S. Attorney's Office in Washington, D.C.) have established conviction integrity units for the purpose of identifying and investigating wrongful conviction claims, often in collaboration with local innocence projects. *Id.*

308   Inger H. Chandler, *Conviction Integrity Review Units*, CRIM. JUST., Summer 2016, at 14, 14. Dallas County and Harris County, Texas, followed in 2007 and 2009, respectively, including the reestablishment of Santa Clara County's unit in 2011. *Id.* at 14-15.

309   NAT'L REGISTRY OF EXONERATIONS, *supra* note 276, at 2.

310   *Conviction Integrity Unit Best Practices*, INNOCENCE PROJECT (Oct. 15, 2015), https://www.innocenceproject.org/wp-content/uploads/2016/09/Conviction-Integrity-Unit.pdf. "There are two aspects to developing best practices for Conviction Integrity Units (CIU): 1) Individual case re-investigation of potential miscarriages of justice; and 2) Developing policies, practices, and reforms to apply and respond to the lessons learned from the re-investigations."*Id.* at 1.

311   Parajon, *supra* note 28, at 1344.

312   *Id.* at 1344-47.

313    *Attorney General Creates Professional Misconduct Review Unit, Appoints Kevin Ohlson Chief*, U.S. DOJ (Jan. 18, 2011), https://www.justice.gov/opa/pr/attorney-general-creates-professional-misconduct-review-unit-appoints-kevin-ohlson-chief.

314    *Id.*

315    *Id.*

316    Green, *supra* note 213, at 1579.

317    *Id.* at 1578.

318    *See supra* Part IV.A.

319    *See* CAL. PENAL CODE § 1424.5(a)(1) (West 2018).

320    *See supra* Part II.A.

321    *See supra* note 55.

322    *See supra* Part III.

323    *But see* Radley Balko, *The Untouchables: America's Misbehaving Prosecutors, and the System that Protects Them*, HUFFINGTON POST (Aug. 1, 2013), https://www.huffingtonpost.com/2013/08/01/prosecutorial-misconduct-new-orleanslouisiana_n_3529891.html.

324    *See supra* Part III.B.

**66 DRAKELR 307**

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.