1   JoAnn Jett Corson
    Registered Diplomate Reporter
2   Certified Realtime Reporter
    P. O. Box 8006
3   Missoula, Montana 59807-8006
    406/829-7123 office
4   joann_corson@mtd.uscourts.gov

5   United States Court Reporter

6

7

8

9               **IN THE UNITED STATES DISTRICT COURT**
                   **FOR THE DISTRICT OF MONTANA**
10                      **MISSOULA DIVISION**

11  UNITED STATES OF AMERICA,        )
                          Plaintiff,)   No. CR 21-29-M-DLC
12      vs.                          )
                                     )   **TRANSCRIPT OF**
13  MICHAEL BLAKE DeFRANCE,          )   **HEARING ON MOTIONS**
                          Defendant.)
14  _____ )

15

16        **BEFORE THE HONORABLE DANA L. CHRISTENSEN**
             **UNITED STATES DISTRICT COURT JUDGE**
17             **FOR THE DISTRICT OF MONTANA**

18
            Russell Smith United States Courthouse
19                    201 East Broadway
                   Missoula, Montana 59802
20              Wednesday, February 23, 2022
                   01:32:38 to 03:37:23
21

22

23

24
            Proceedings recorded by machine shorthand
25     Transcript produced by computer-assisted transcription

## APPEARANCES

For the Plaintiff:          MS. JENNIFER S. CLARK
                            Assistant U.S. Attorney
                            P.O. Box 8329
                            Missoula, Montana 59807

For the Defendant:          MR. MICHAEL DONAHOE
                            Attorney at Law
                            Federal Defenders of Montana
                            50 West 14th Street, Suite 300
                            Helena, Montana 59624

                            MR. ANTHONY R. GALLAGHER
                            Attorney at Law
                            Federal Defenders of Montana
                            104 2nd Street South, Suite 301
                            Great Falls, Montana 59401

## CONTENTS

Proceedings ..........................................    3

Argument re: Defendant's Motions to Dismiss and Notice
of Public Authority Defense, Estoppel Defense, and
Innocent Intent Defense under Fed.R.Crim.P. Rule 12.3
        By Mr. Donahoe ...................................    5
        By Ms. Clark .....................................   27
        By Mr. Donahoe ...................................   56

Argument re: Plaintiff's Motions *in Limine*
        By Ms. Clark .....................................   61

Reporter's Certificate ................................   70

## EXHIBITS

For the Plaintiff:                                  Received

1   09/16/21 ATF email string with attachments,
    ECF Document 63 ...................................   56

2   09/16/21 - 09/17/21 DOJ and ATF email string,
    ECF Document 69-2 .................................   56

        *REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
affirmative responses.  "Huh-uh" and "Hm-umm" indicate
negative responses.*

PROCEEDINGS

(Open court.)

(Defendant present.)

THE COURT: Please be seated.

Amanda, would you please call the matter on the Court's calendar?

THE CLERK: This is the time set for a motion hearing in Case No. CR 21-29-M-DLC, *United States of America v. Michael Blake DeFrance*.

THE COURT: Ms. Clark, Mr. Donahoe, Mr. DeFrance, good afternoon.

I have a number of motions that are pending, and I have grouped them into three groups:

Group No. 1 is the United States' motion *in limine*, and that consists of Documents 34, 35, and 45. And I realize some of the briefing that's been filed covers multiple issues, so I don't mean to be entirely exact.

Group 2 that I've put together is the United States' notice of denial of public authority and motion *in limine* to preclude defenses of public authority, entrapment by estoppel, and innocent intent, and the primary briefing on that motion is Document 27, which was the original notice of public authority defense, estoppel defense, and innocent intent defense that was provided by Mr. Donahoe on Mr. DeFrance's behalf. Document 28, Document 36, and Document 37 are the

primary briefs relating to that motion.

And then Group 3 is the defendant's fourth motion to dismiss indictment. A lot of briefing on that subject. First of all, we've got the second superseding indictment, Document 54. Then we've got Documents 62, 63, 69, 70, 72, 73, 73-1, 74. And then, of course, we've got defendant DeFrance's optional supplement brief, which is Document 78; the attached transcript, 79; and the United States' reply to defendant's optional supplemental brief, Document 80.

I would propose, in terms of order, that we start, Mr. Donahoe, with your motion to dismiss the indictment, which is based on four different grounds, and then we will proceed to argument on -- we're gonna do this in the reverse order that I described. Then we'll go to argument on, Ms. Clark, the United States' notice of denial of public authority and the related motion *in limine*. And then we'll finish up with the government's motion *in limine* on the admissibility of certain evidence. Okay?

So, Mr. Donahoe, you have the floor.

Mr. Gallagher, welcome, sir.

MR. GALLAGHER: Thank you very much, Your Honor.

THE COURT: You are nearing the end of an illustrious career.

MR. GALLAGHER: Yes, Your Honor. I'm beginning to fade away.

1          THE COURT:  And I am intending to be present at the

2    event, in my official capacity, wherein your long service will

3    be acknowledged.

4          MR. GALLAGHER:  Thank you very much, Your Honor.

5          THE COURT:  Mr. Donahoe.

6          MR. DONAHOE:  Thank you, Your Honor.

7          So if we're doing these in the reverse order --

8          THE COURT:  Yeah.

9          MR. DONAHOE:  -- yeah, and this actually makes sense

10   to me.  I struggled with this; I mean, trying to organize

11   this.  In some ways, you could almost start anywhere, but this

12   is a good place to start.

13         So some arguments are tougher to make than others,

14   and, you know, this is a difficult argument because I've

15   worked here for a long time and I have a good relationship, I

16   think, with the U.S. attorney's office.  But in my view, as

17   expressed in the papers, we had some kind of breakdown here in

18   the discovery process that I think impaired my ability to

19   think about the case, think it through, discuss it with my

20   client, file papers in an appropriate, prompt fashion.

21         This motion to dismiss addresses the documents that

22   were furnished in November -- November 19, I think -- of last

23   year, and that would be ECF 63.  And, in summary, those

24   documents consist of email correspondence and some analysis by

25   some NICS examiners.

1     And I use that term, "NICS," that acronym; I think
2 the Court knows what I'm referring to.
3     THE COURT:  N-I-C-S.
4     MR. DONAHOE:  Yeah.  And they go to Mr. DeFrance
5 filling out those 4473s.
6     Now in the beginning of the case, in July when I got
7 the case, just through ordinary gumshoe investigation,
8 determined that we should probably visit that pawnshop.  And I
9 sent somebody out there, and the investigator went out there
10 and collected those forms.  And I had them for a little while,
11 and I didn't know exactly what meaning they had.
12     But finally, after due consideration, decided that
13 in terms of the defense to the charge as it then existed, the
14 possession charge, they certainly would be relevant because
15 they seemed to suggest that Mr. DeFrance had been proceeded on
16 those five occasions.
17     THE COURT:  Relevant or exculpatory?
18     MR. DONAHOE:  Well, I'll start out with relevance.
19 And I'm trying to guide the Court through my thinking about
20 those documents in isolation without anything that the
21 government may have come along and given me later.  You know,
22 they were certainly relevant at the time; I just didn't know
23 how.  I'll get to ECF 63.
24     But I just want to convey to the Court that for me
25 as a defense lawyer, it was an agonizing decision to produce

those documents because there was uncertainty connected with them.  I mean, I didn't know what was underneath the documents.  I'll be up-front:  I didn't know that -- the rules, the administrative rules -- that certain documents get purged in that process.  I didn't know that.

But after thinking that through, discussing it with colleagues in my office, we decided disclosure was appropriate, the notice of defenses was appropriate, and the public authority defense was appropriate.  And I just lifted, basically, the jury instruction out -- I even put the comment, I think, in the notice from the Ninth Circuit from the jury instruction -- and went through that and was prepared to argue that.  And the government's response to that immediately was, "This would not be relevant."

And I am going to get to this motion to dismiss here.

THE COURT:  Yeah.  That's fine.

MR. DONAHOE:  Okay.  I'm not trying to tread water here.

So -- and, you know, I expected that.  I mean, I kind of expected that, that that would be the thinking on the government's side; that, "Okay.  So you have these forms.  So what?  You know, it doesn't really mean anything.  It doesn't bless all these transactions.  You know, there's other stuff going on here."

And -- but then we get to ECF 63. Now I'm kind of, in my view, fighting for my life to keep these defenses alive, and I don't have ECF 63. And we go through that whole period. I guess I could have counted the days, but, you know, all of that pretty much gets briefed, and none of this material is disclosed. I don't get it until two months out. And finally I get it, and I look at the significance of it.

Let's go to the Supreme Court's decision in *Abramski*. It says in part that the 4473 process is to ensure the identity of the purchaser and to see if the individual is qualified to possess a firearm. That's language almost directly from that opinion, Justice Kagan's opinion.

So here in ECF 63, I'm fortified by the 4473s because apparently there has been process, independent administrative process on each and every one of those transactions, two of which were proceeded directly. There was no wait. Right out of the chute. And then there were the other ones that were delayed. But apparently the law is that if they just wait the requisite time under the Brady Bill, the transaction can take place if they don't hear anything different.

Now all of the papers -- I think we know one thing, and I'm, I'm here to be corrected if I'm wrong about this, and Ms. Clark can correct me if I'm wrong. But it seems to me that once those NICS numbers are assigned to each of those

1  individual transactions, some technician in the order of

2  Mr. Feuerstein or Ms. Pickles [*sic*], in ECF 63 -- I'm not

3  saying it was them, but somebody looked at Mr. DeFrance's

4  background and, at least on two occasions, said he was not a

5  prohibited person due to that PFMA.  Do we know that for sure?

6  Probably not, because the documents have been destroyed.

7      So that leads me to the motion to dismiss.  That

8  stuff was exculpatory.

9      THE COURT:  So what was -- what do you argue was

10 exculpatory?  The fact that your client may have been

11 proceeded, the emails concerning what might have happened in

12 the NICS checks, or the deleted records, or something else?

13     MR. DONAHOE:  I, I think all of that.  The

14 components of the process would be that some government

15 technician who is responsible for examining those documents,

16 either the delayed ones or the proceeded ones, put their

17 blessing of authority on those transactions, and they were

18 allowed to proceed forward.

19     So if you go to *Abramski* and the 4473, the

20 purpose -- one of the purposes of the 4473 is to see if the

21 person is qualified to possess a firearm.  The answer in each

22 and every one of those cases, transactions, is yes as to

23 Mr. DeFrance from a government agent.

24     If you go back to the notice of public authority and

25 look at the comment section, you can see that there's -- they

1    talk about government agent, federal firearms dealer, and

2    those things kind of get to be interchangeable things.  But

3    here we have two.  We have the FFL on-site at the pawnshop,

4    and then we have the government people that are checking the

5    record.

6            And we don't know, today, what record was checked,

7    but I think it's a fair assumption, a good, solid assumption,

8    that documents were looked at and some government person said,

9    "This is a go.  Let him carry on with the transaction."

10           Now if that's the case, he walks out of the pawnshop

11   possessing the firearm, the charge as it existed kind of way

12   back when.  And the government is holding on to ECF 63 and all

13   of that discussion in there.  And instead of giving it to me

14   when we're in the midst of the fight about whether we should

15   have the right to present the public authority defense or the

16   lack of intent defense, there's this elongated delay.

17           And my argument here on the motion to dismiss,

18   especially under that *LaDeau* case from the Sixth Circuit that

19   I noticed up yesterday -- they break down this vindictiveness

20   analysis in granular detail.  And I think that delay, in and

21   of itself, supports the presumption of vindictiveness because

22   the government wanted time just like I needed time.

23           When I got the 4473s -- I'm an experienced trial

24   lawyer in this court, and I had to think through, in a careful

25   fashion, what I was gonna do with those documents and finally

elected, in my client's behalf, to produce them.

When the government got ECF 63, they likewise waited to calculate, and they calculated, "How are we gonna fix this? How are we gonna change this?" And now if we go to *LaDeau*, they have to change the theory.

We're not talking now, under the second superseding indictment, about possession. It's almost irrelevant. What we're talking about here is a false statement, and they need to make that false statement allegation because I have torpedoed their possession case with ECF 63 documents and the 4473s.

So if that's true, I think that's -- and *LaDeau* talks about this, the two ways that you can show vindictiveness, either presumptively or objectively. And I think at this point, this record reflects objective evidence of vindictiveness.

This indictment, the change in theory with added statutory penalties that Your Honor could impose -- in theory, consecutively, if you wanted to -- is just over the top here.

THE COURT: Well, let me just explore that last comment a little bit.

Assuming the case proceeds to trial and Mr. DeFrance were convicted on all counts, wouldn't grouping apply such that your client's exposure to punishment has not been increased as a result of the second superseding indictment?

MR. DONAHOE:  You know, I don't know that grouping
would apply, because the false statement would still get
calculated under 2K2.1, I think.  I've been down that road.  I
think the false statement guideline -- there is a false
statement guideline --

THE COURT:  Right.

MR. DONAHOE:  -- but it wouldn't apply.  So I, I
don't know necessarily that they would be grouped.

And it's an -- I guess, to me, that's an academic
point.  What I'm trying to get across is -- and I understand
Your Honor's point.  Like, "So what?"

THE COURT:  Well, no, it's not, it's not "So what?"
It goes to the issue of vindictive prosecution.  And one of
the things that is addressed in those cases is whether or not
the subsequent indictment or charging document increases the
defendant's exposure to punishment, and that's why I asked the
question.

MR. DONAHOE:  Okay.  And I guess my response to that
is if you take as a given -- and I know it's a big "given,"
but if you'd just entertain the thought, Your Honor -- the
noticing up of the defenses in combination with ECF 63, those
documents, and imagine Pickles and Feuerstein on the stand as
to the possession count in isolation, I think there's
substantial chance that Mr. DeFrance walks out with me at the
end of the trial.  Because he went to the store, filled out

the documents, they were checked, they were authorized, and he left the store.

Now if that's true, all we have here -- let's say that happened. Let's do it that way. Let's hypothesize that that happened. If that happened, could the government come back and say, "Wait a second. He lied on the form. We're gonna charge him with that now"? After the acquittal? No. They can't, because they would be changing theory.

And my argument is the waiting and the calculation, it's just not coincidence here. That's what the government wanted. They wanted to weaken the defense as it got stronger. They wanted to weaken that defense to the point of it being essentially meaningless so that the central issue at the trial of Mr. DeFrance would be that he lied.

And I haven't really even addressed the fact that Mr. Feuerstein, in ECF 63, the NICS examiner, one of them, says, "Typically what we do here is we contact the individual, get the guns back, let his attorney know," and so on.

And I realize that the government says, well, that never insulates a person from prosecution, if he or she lied. Well, that's fine, but if we have the process failing to the point that he walks out with the guns -- let's assume that he had been delayed and then denied. We had one of those cases. We had the *Meech* case, is the way that worked. He was delayed, and I think then he was denied in the next check. So

13

that's fine.  And we'll take Mr. Meech.  He could have, had he

wanted to, argued about that if he had actually been given the

gun.  I guess that's what Mr. Feuerstein is saying.  He's

saying, "We have an appeal process here."

Mr. DeFrance gets none of that.  We have a post hoc

determination of his ineligibility after the fact that

somebody, apparently presumptively, proceeded him on five

occasions.  And now the government wants to come in

administratively and reverse that entire process and say, "Oh,

no.  Really, what he did, he just lied.  We, we missed it."

And I think what we need to think about here is

their work in checking his answers, Mr. DeFrance's answers on

the form, is independent of the answer.  Their work involves

looking at the documents, checking the reports.  You can see

that from ECF 63.  That's how they go about that.

So they're completely two different processes.  You

just don't get off and say, "Well, he lied."  Well, you know

what?  Maybe he didn't.  Who was the NICS examiner that

proceeded him on the two occasions that we know about?  And

where are those documents?  Did somebody look at them and say,

"That Montana statute is overbroad"?

I listened to the recording of Jermain, the police

interview, and she says they were only in a dating

relationship.  Sorry, it doesn't count under federal law.

That is entirely possible here.  And if that is so, the

movement, the knee-jerk movement to bring additional charges
based on falsification, defalcation, "You lied on the forms,"
I mean, I just -- I think it's wrong.  It shouldn't have
happened.

And I don't know if that was built by consensus in
Ms. Clark's office or it was her independent decision.  I
don't know any of that.  But, to me, it's wrong, and those
counts should not go forward.

In fact, I don't think the prosecution should go
forward because, in some manner of speaking, I think this is a
left-handed concession by the government that between ECF 63
and the 4473s, he was proceeded.  The government gave him
permission to go forward and possess guns.  That's what they
told him, and they can't turn around and just undo all of
that.  We can't put the toothpaste back in the tube.

So I think -- you know, this is hard to tease out,
these vindictiveness cases.  I was in law school when
*Blackledge v. Perry* was decided.  You know, those cases go
back a long way, and there's not a ton of them.  They're
pretty unique.  And I recognize that I'm up against a barrier
here in that the discussion in *LaDeau* -- you know, I'll cop to
that -- it talks about how in the context of a pretrial
matter, it's difficult for me to make the showing.

But here -- and I used that phrasing in some of the
briefing -- we have a straight line between my defense and

1  those documents.  And the nondisclosure for two months, to me,

2  is meaningful.  And it's also meaningful to me that the

3  administrative appeal is just completely tossed.

4          THE COURT:  Do you have any authority for your

5  argument that an administrative approval collaterally estops

6  the government from bringing criminal charges in the future?

7          MR. DONAHOE:  No, but that *Sanders* case that

8  Ms. Clark cited in her footnote in a piece of the briefing --

9  I can't remember which ECF number it is, but the Fourth

10 Circuit case that goes into some detail about how the NICS

11 process works.  I mean, I just don't see -- I'm assuming that

12 if we had Feuerstein and Pickles as witnesses, they would

13 identify themselves as government employees who routinely work

14 in some kind of Brady Bill office and check documents.

15         THE COURT:  So, in answer to my question, it sounds

16 like there is -- you have no authority.

17         MR. DONAHOE:  A criminal law case that said that --

18         THE COURT:  Is there any authority for the

19 proposition that an administrative approval collaterally

20 estops the government from bringing criminal charges in the

21 future?

22         MR. DONAHOE:  I think that *Tallmadge* case from the

23 Ninth Circuit -- it's older.  It's cited somewhere in the

24 briefing -- could fit snuggly within that proposition, or the

25 proposition could fit snuggly within it.

THE COURT:  Okay.  So let me ask you a hypothetical.
Let's suppose you applied -- not you but someone you know
applied fraudulently for a COVID-relief loan and was approved.
Would that preclude the government from prosecuting that
individual for having engaged in fraudulently obtaining the
loan?

        MR. DONAHOE:  No, I don't think so, but I see a
distinction between the NICS process and that process.

        THE COURT:  What's the distinction?

        MR. DONAHOE:  The distinction is that we're looking
at particular documents to determine a particular status.  In
the Court's fraud hypothetical, we're just generally thinking
about qualifications of a financial nature that are easily
distorted by lies or deceit.

        Here, that goes back to my -- the independence
argument between what he answers and what the NICS people do.
They are fixated expressly on the background that he presents
to them.  When the 4473s -- let's take the delayed ones.  When
they were delayed -- if we go back to *Meech*, we know the NICS
number is assigned and then somebody starts pulling documents
and looking at papers, maybe even calling the court.  I'm sure
they don't really have any restriction.  Maybe there's
administrative rules on what they can check and not check.
But somebody is looking expressly at what his background is.

        And I'm saying if -- and I'm not even assuming there

was a mistake.  I think it's entirely conceivable that if you look at the 2011 version of the Montana PFMA statute -- we've been through that, Your Honor, and Your Honor has considered that at length in a 42-page order.

THE COURT:  Yeah.

MR. DONAHOE:  Yeah, that it's overbroad and so on.

I think ECF 63 in its totality tells us that those technicians are doing the same thing that we do, and they're looking at those relationships --

THE COURT:  You're saying that a technician, sitting in a cubicle someplace far away from Montana, when they were evaluating whether or not Mr. DeFrance should get a firearm at the pawnshop, did a comparison between the federal statute and the state of Montana statute --

MR. DONAHOE:  Yeah.

THE COURT:  -- on partner/family member assault?

MR. DONAHOE:  Absolutely.  I think that's, that that's what those ECF 63 documents reflect.  They get into that level of detail.  And at some point, somebody said, at least on two occasions, "You're good to go."

THE COURT:  You make the argument, Mr. Donahoe, that your client was denied administrative procedural due process rights to contest his status as a prohibited person because he was not denied clearance to proceed in his transactions which would have afforded him an opportunity for an administrative

appeal.  You make that argument.

Do you have any authority for the proposition that the availability of an administrative application or approval process requires the government to allow a potential defendant to exhaust that process before criminal charges are brought?

MR. DONAHOE:  I think the case that I cited, *Zinermon v. Burch*, stands for that proposition as a general matter.  And I know for sure, in many contexts, exhaustion is required.

THE COURT:  What contexts?

MR. DONAHOE:  Habeas context.

THE COURT:  Yeah.

MR. DONAHOE:  You can't bring a claim --

THE COURT:  Right.  I know.

MR. DONAHOE:  -- unless you exhaust.

THE COURT:  Okay.

MR. DONAHOE:  So that would seem to be the reverse of that.  If you must exhaust to bring the claim, you should be able to exhaust to preserve a claim.

THE COURT:  Okay.  So just so that I understand the *Brady* argument, I asked you earlier about which of the documents you claim were exculpatory, and I gave you three possibilities and then an open possibility.  First possibility, the fact that your client may have been proceeded; the emails concerning what might have happened in

1   the NICS checks; or deleted records.  And did I understand you

2   correctly:  You're saying all of those you believe are

3   exculpatory?

4           MR. DONAHOE:  I do.

5           THE COURT:  Okay.  In your briefing, and I don't

6   know -- I just -- I need, I need to sort out why this, why

7   this was mentioned.  You suggest in the briefing that the new

8   charges arose in the context of plea negotiations.  Now I

9   don't need to tell anybody at counsel table that I can't get

10  involved in plea negotiations --

11          MR. DONAHOE:  Right.

12          THE COURT:  -- so I don't want to know anything

13  about the substance of plea negotiations.

14          But you do make that, you do make that comment in

15  the brief, and I'm wondering whether or not you can address

16  that comment as it relates to the vindictive prosecution

17  claim.

18          MR. DONAHOE:  Sure.  So I guess -- I appreciate that

19  Your Honor read it to that level of detail.

20          THE COURT:  I've read everything very carefully.

21          MR. DONAHOE:  Yeah.

22          THE COURT:  More than once.

23          MR. DONAHOE:  I can tell that.

24          And, you know, in some ways, I almost want to

25  apologize because I can go -- you know, I can go.

1          THE COURT:  You probably --

2          MR. DONAHOE:  But the point here --

3          THE COURT:  You probably shouldn't state that on the

4     record.

5          MR. DONAHOE:  Right.  Probably shouldn't.

6          I guess the point that I was trying to make was --

7     it was important for me to make a distinction as to just

8     simple nondisclosure vis-a-vis disclosure in the context of

9     plea negotiations.  And I guess the point I was trying to make

10    in relation to the vindictiveness concept was that if the

11    Court could be persuaded that this information was not

12    disclosed during a time where discussions were underway, that

13    could be meaningful for two reasons.

14         First, the obvious one, that I should be entitled to

15    that, to exculpatory information, in that context --

16         THE COURT:  Oh, I see.

17         MR. DONAHOE:  -- if that makes sense.

18         THE COURT:  Yeah.  No, I see.  Okay.  Yeah.

19         MR. DONAHOE:  And then, second, it goes to

20    vindictiveness because it shows the calculation.  It shows the

21    delay was for a reason.  "We're gonna figure this out, but, in

22    the meanwhile, maybe we can just treat this as any ordinary

23    matter and prompt the guilty plea."

24         Let's assume that the guilty plea had been prompted.

25    Under the cases, as I understand them, there would have been

maybe no duty to turn over ECF 63 at that point in time if the case resolved. I have an argument against that. That's the Seventh Circuit case that says there's a difference between impeachment information and exculpatory information. But it just shows the calculated nature.

THE COURT: When did the government -- okay. When did the U.S. attorney's office take possession of or have possession of ECF 63 --

MR. DONAHOE: September --

THE COURT: -- vis-a-vis when they produced it to you?

MR. DONAHOE: September 16 they had possession of it. They gave it to us on November 19.

THE COURT: Okay.

MR. DONAHOE: Yeah. And I had -- and we had just had a hearing, I think, on the first set of motions.

THE COURT: Right.

MR. DONAHOE: Right.

THE COURT: And I gave you an opportunity to file a supplemental brief.

MR. DONAHOE: Right.

THE COURT: Because obviously we are pretrial.

MR. DONAHOE: Right.

THE COURT: In fact, we don't even have a trial setting.

MR. DONAHOE:  Yeah, still.  Yeah.

So, I mean, that's where we are.  You know, I wish it was easier, but it's a claim that I thought I needed to bring.

In fact, I will give Ms. Clark some credit here and say after the 4473s were disclosed -- and I don't have a record of this.  It's just completely from memory, but I know it was post-disclosure of those forms.  And we were talking about, you know, trying to resolve the case -- throughout the period we've tried to resolve the case -- and once we talked about that stuff, Ms. Clark, to her credit, said, "You know, I think what's gonna have to happen, I'm gonna have to charge him with falsifying the forms."

And my intuitive response in the moment was, "You can't do that."

And she said, "Why not?"

And I said, "Because it would be vindictive.  Have you ever read the vindictiveness cases?"

And she said, "No, but, you know, I could do it," or however we ended it.  It wasn't, you know, like a heated conversation or anything like that.  It was just kind of academic.

But, you know, I put it on the table before, and that's my recollection, before the indictment actually came out, and I was actually surprised that that indictment was

brought.

THE COURT: Don't sit down yet.

You provided me with, in Document 81, with the Sixth Circuit case in *United States v. LaDeau* --

MR. DONAHOE: Right.

THE COURT: JoAnn, that's L-a-D-e-a-u.

-- where, I mean, the facts in that case involved a dismissal of a case by the Court -- or involved a suppression of evidence which made the charge that was existing at that time no longer supportable by any evidence. And then the government obtained a superseding indictment which increased the potential sentence that the defendant was facing and was based -- was not based on any new evidence that the government had obtained since the original initial indictment.

Wasn't the providing of the forms that your client had completed, wasn't that new evidence?

MR. DONAHOE: Yeah, I, I could reason my way to that conclusion, yes. I mean, it was something apparently the government didn't know.

THE COURT: Right.

MR. DONAHOE: So, yes.

THE COURT: And how did you get those forms? You went to the pawnshop directly?

MR. DONAHOE: Just went and asked them.

THE COURT: Right.

1          MR. DONAHOE:  And they said, "Yeah, we keep them,"

 2    which makes sense because -- I've become more conversant with

 3    this in the past couple of years.  You know, they have to have

 4    that stuff, and they had them right there and were willing to

 5    supply them.  Yeah.

 6          But that *LaDeau* case, the guy had successfully

 7    suppressed --

 8          THE COURT:  Right.

 9          MR. DONAHOE:  -- and then they changed the theory.

10          THE COURT:  Right.  They charged a conspiracy with

11    his brother.

12          MR. DONAHOE:  Right.  And instead of the possession,

13    then the receipt, and that bumped the penalty.

14          THE COURT:  Yeah.

15          MR. DONAHOE:  And I know we don't have all those

16    moving parts in here.

17          THE COURT:  Well, I think you cite this case to me

18    for the proposition that pretrial, that in the pretrial

19    context, a presumption of vindictiveness can arise.

20          MR. DONAHOE:  It can arise, although --

21          THE COURT:  And that's clear from this case.  It's

22    harder, as you can concede.

23          MR. DONAHOE:  Right.  And I think there's a Ninth

24    Circuit decision I had cited previously that talked about

25    that, that it's rare.

1              THE COURT:  Um-hmm.

         2              MR. DONAHOE:  But -- and that's why I'm trying to

         3    make this connection between the 4473s, ECF 63, the notice of

         4    public authority, and intent.  And, remember, we haven't

         5    talked about *Rehaif* here, either.  I mean, that goes -- ECF 63

         6    goes directly to his intent, the knowledge of his status.  I

         7    mean, he's thinking, "I'm not prohibited."

         8              THE COURT:  Right, which -- and, Mr. Donahoe, by

         9    making this comment, I don't mean to suggest I've decided what

        10    I'm gonna do on your motion to dismiss.  But these are all --

        11    you have defenses in this case if this case goes to trial --

        12              MR. DONAHOE:  Yeah.

        13              THE COURT:  -- based on the documents at ECF 63.

        14              MR. DONAHOE:  Right.

        15              THE COURT:  Yeah.

        16              MR. DONAHOE:  But I think they're, as to the

        17    original charges that were brought --

        18              THE COURT:  However we characterize -- I decide to

        19    characterize that defense.

        20              MR. DONAHOE:  Right.

        21              THE COURT:  But you are entitled to present a

        22    defense.

        23              MR. DONAHOE:  Right.  But they are -- that defense

        24    is weaker.

        25              THE COURT:  I understand your argument.

1          MR. DONAHOE:  Yeah.

2          THE COURT:  Yeah.  Okay.  Thank you.

3          MR. DONAHOE:  Thank you.

4          THE COURT:  Ms. Clark.

5          We're, we're focusing on the motion to dismiss.

6     We'll get to the motions *in limine* next.

7          MS. CLARK:  Thank you, Judge.

8          THE COURT:  And, Mr. Donahoe, I'll give you a chance

9     to rebut on this, and then we'll go to the motions *in limine*.

10         MS. CLARK:  May I approach, Your Honor, to provide

11    you --

12         THE COURT:  Sure.

13         MS. CLARK:  I have what I've marked as Government's

14    Exhibits 1 and 2.  They are attachments that Mr. Donahoe

15    provided to the Court with his briefing.  I wanted to provide

16    them for ease of reference for you while we have our

17    discussion.

18         THE COURT:  Okay.

19         MS. CLARK:  And I've provided a copy to Mr. Donahoe.

20         THE COURT:  All right.

21         MS. CLARK:  (Handing.)

22         THE COURT:  Exhibit 1 and 2, do you want to indicate

23    on the record what they are?  They look familiar.

24         MS. CLARK:  Yes, Judge.

25         Exhibit 1 is filed with the Court as Document 63.

THE COURT:  Okay.

MS. CLARK:  And Exhibit 2 is filed with the Court as Document 69-2.

THE COURT:  Correct.  Thank you.

MS. CLARK:  Thank you.

So I just wanted to start by identifying what exactly the issues are here today, because there's a lot going on in the motions.

It boils down to the emails from ATF Analysts Pickles and Feuerstein regarding the 4473 forms that were provided by the defendant that we've provided again as Exhibits 1 and 2.

And in these emails -- one distinction to talk about is the difference between ATF and NICS.  I think that's been a blurred line through this briefing.  And, in fact, when I first started this, I was confused about the distinction as well and had reached out to ATF to explain to me the meaning of the 4473 forms because it's an ATF form.

I learned that the FBI is the agency that oversees NICS, which is the entity that reviews the 4473 information to make the determination whether or not somebody is prohibited from having a firearm.  And that's a separate entity from ATF, and, in ATF, they have a denial branch which Mr. Pickles and Mr. Feuerstein work for, and that branch handles denials.

So if NICS denies a person from getting a firearm --

let's say it's the delayed situation -- where they're delayed,
they receive the firearm in three days, but that investigation
continues and NICS determines that they're prohibited, they
turn that information over to ATF for further investigation.

THE COURT: Can I ask a stupid question? I should
probably know the answer to this. If I go to the pawnshop to
buy a firearm and I fill out the form, is there a waiting
period?

MS. CLARK: That depends, Judge. While you're at
the pawnshop or a store --

THE COURT: Right.

MS. CLARK: -- and you fill out the form, they
contact NICS right then.

THE COURT: How do they contact NICS?

MS. CLARK: They contact them through the phone.
They have a code that they provide NICS that they are the FFL
that they purport to be.

THE COURT: Okay.

MS. CLARK: They provide the information that the
purchaser has provided to them on the ATF Form 4473, and NICS
will run that through different databases: NCIC, the
Triple I -- I'm forgetting the other one. It could come back
immediately as a proceed.

THE COURT: So they don't -- the pawnshop does not
fax/email the form? They call and indicate what's on the

```
1   form.

2           MS. CLARK:  That's my understanding.  They might fax

3   the form.  I know that they give them that information.

4           THE COURT:  Okay.  And so the response, then, can be

5   immediate.

6           MS. CLARK:  Correct.

7           THE COURT:  And the response comes from which

8   entity?

9           MS. CLARK:  From FBI NICS.

10          THE COURT:  Okay.  Thank you.

11          MS. CLARK:  Yes.

12          And so when I reached out to -- how this all kind of

13  came down was that we received the 4473 forms from

14  Mr. Donahoe.  I called our local ATF agent and said, "Can you

15  help me?  Explain this to me."  He referred me -- or he

16  actually reached out to Mr. Feuerstein, who works for ATF in

17  Billings who is their analyst for the ATF.

18          Mr. Feuerstein then reached out to Mr. Pickles, who

19  works in the same department that Mr. Feuerstein does for the

20  ATF, and Mr. Pickles wrote these emails.  And you'll see the

21  emails from both Mr. Feuerstein, myself, and Mr. Pickles.

22          THE COURT:  And I've, I've read them.

23          MS. CLARK:  And I wanted to just kind of touch on --

24  I mean, this is basically what is at issue here, are the

25  contents of these emails.
```

1          What Mr. Pickles did was explain the process that

2   NICS goes through and the three potential results and what

3   occurs after each one.

4          Why I provided Exhibit 2 is that this one contains

5   further in the email chain.  There's a lot of reference in the

6   briefing to just Exhibit 63, and I'll talk about this a little

7   bit more, the significance of these emails.

8          But what Mr. Pickles notes for each transaction is

9   that Mr. DeFrance wasn't denied a firearm because, in the

10  system that he was reviewing, those records had been purged,

11  and that is based on the Code of Federal Regulations.  So he

12  made the determination that he was never denied.  And then he

13  disclosed further in those emails that the identifying

14  information that NICS received from the 4473s had been purged

15  from the system based on that federal regulation.

16         The second part of this motion was the vindictive

17  prosecution, about us bringing additional charges in relation

18  to his affirmative defense.  And then the third one is the

19  administrative process, that he should have been afforded an

20  administrative process rather than a criminal prosecution.

21         THE COURT:  Well, let's, let's focus on the first

22  part of the motion.

23         Here is how I would characterize the argument that's

24  being made by Mr. DeFrance:  That the government should be

25  sanctioned for its *Brady* violation in failing to disclose the

materials filed under seal as Document 63 until November 19, 2021, despite the fact that the government possessed these documents since sometime in September. That's, that's the first issue.

The second issue, as I understand it, is that Mr. DeFrance was denied an administrative procedural due process right.

The third issue is that the government is collaterally estopped from proving that Mr. DeFrance is a prohibited person because, given the loss of records relating to his firearms transactions, it is possible that the ATF proceeded him in all five transactions.

And the fourth argument that I've noted here is that the second superseding indictment is a vindictive prosecution because the government added three false statement counts after Mr. DeFrance provided notice of his defenses under Federal Rule of Criminal Procedure 12.3.

So have you fully addressed the first issue regarding the *Brady* violation?

MS. CLARK: No, Your Honor.

THE COURT: All right. Okay. And you can take these in any way that you want, but that's what I understand to be Mr. Donahoe's -- in essence, his four arguments for dismissal.

MS. CLARK: Yeah. Agreed.

1          THE COURT:  Okay.

2          MS. CLARK:  And I just wanted to start off that the

3     government takes its discovery obligations seriously.  I don't

4     want any of our arguments here today to be construed that we

5     don't take them seriously.  The U.S. attorney's office, as

6     well as the Missoula County attorney's office, would go to

7     great lengths to ensure that evidence was provided to

8     defendants, especially if it was favorable to them.

9          The Court is well aware that we have obligations,

10    and there are four obligations put upon us regarding this

11    disclosure: *Brady v. Maryland*, *Giglio v. United States*,

12    *Jencks v. United States*, and Rule 16.  And since we're here

13    today -- we're only here on an alleged *Brady* violation, so

14    that's what we'll address.  And *Brady* is a serious allegation

15    that should not be taken lightly, but it also shouldn't be

16    expanded so broadly that it waters it down.

17         So when I was doing the research on this, I was kind

18    of shocked by some of the case law based on what my

19    understanding was of *Brady*, and it turns out that the evidence

20    provided during a trial at the close of a case in chief does

21    not violate *Brady* if the defendant receives it and is able to

22    use it, and that was in *United States v. Gordon*, a Ninth

23    Circuit case.  That, to me, seemed shocking because that was a

24    late disclosure.

25         The other thing that I learned was that additional

charges can be threatened during plea negotiations and then
ultimately be charged, and that's not considered vindictive.

THE COURT:  That's made clear in *LaDeau*.

MS. CLARK:  Yeah.  And that was a shock to me as
well.  That seemed that that would be a vin- -- you know,
potentially vindictive, but legally it is not.

Typically *Brady* issues arise post-trial -- that's
where we see it -- because there's been a prejudice to the
defendant.

The facts in this case certainly don't rise to a
*Brady* violation.  They're not even similar to the references
of the cases that we just talked about.  And certainly those
cases that I just mentioned are not ways that I practice, nor
that I intend to practice.

Looking specifically at *Brady*, there's basically
three elements:  It must have favorable evidence to the
defendant that is material either to guilt or punishment, and
that evidence can be impeachment or exculpatory; that evidence
has to be suppressed by the government; and the prejudice must
ensue to the defendant.  Failure to meet one of these elements
is fatal to a *Brady* claim.

So, first, I wanted to look at:  Is this information
in the emails favorable to the defendant?  There might be some
that is favorable, but it's certainly not material.  In the
emails, we have ATF agents reviewing the NICS information, and

they stated that DeFrance was never denied a firearm in a firearms transaction. That certainly could be considered favorable evidence.

However, the opinions the ATF made about NICS and that they possibly mishandled or inappropriately determined that he was not a prohibited person are not favorable to the defendant; therefore, that doesn't qualify as a *Brady* material.

And the ATF emails are not impeachment material because these aren't testifying witnesses, again going back to the distinction between the NICS and ATF. If we were to bring in anybody in this case to discuss the 4473s, those would be NICS employees. The ATF, like I stated before, is a separate entity.

Now looking at Mr. Pickles' emails, the information contained in those are not exculpatory or favorable to Mr. DeFrance. The emails -- he looks at the transactions from the FFL point of view, and that's why looking at Exhibit 2 is important.

The defendant misreads these emails to say that all of these transactions were done legally, and I believe that what I've come to the conclusion is that he's arguing or inferring that Mr. DeFrance was legally able to possess the firearms. What Mr. Pickles, if you look at -- the emails contained in Exhibit 2 go on to further kind of ferret this

out and explain.  It refers to the FFL's ability to transfer a firearm after a defendant has been delayed and no response is ever received from NICS.  And in one of the emails, he calls that an open status, and that's on page 3 of Exhibit 2.

He talks about, "A delayed (or open) [transaction] occurs when FBI NICS does not have the necessary information to proceed or deny a subject.  The firearm can be legally transferred after 3 business days if the [transaction] has been delayed.  If NICS never makes a proceed or denied determination, [that information] is purged off of the NICS system after 88 days," and NICS will no longer have any of that information.

It then goes on to distinguish that big box stores usually do not transfer unless they get a proceed, so if someone is delayed and left open, they do not complete the transaction, but a lot of the smaller FFLs will make that transaction on the third business day.  And what he's referencing is that's legal for them to do so.

So when you read these emails in context, it's clear that Mr. Pickles is commenting on the lawfulness of the FFLs to transfer to Mr. DeFrance, after three days, the firearms that were delayed.  He's not commenting on the lawfulness of him to possess the firearms.  He didn't have any of that information before him.  He didn't have the prior conviction documents.  He was just simply outlining what he saw on the

4473 forms and in their system.

THE COURT: Would the government, would the government have discovered Mr. DeFrance's 4473 forms if he had not filed them in support of his affirmative defenses?

MS. CLARK: I asked our ATF agents if we would have been able to find them. They said not likely that we would because -- well, if we could run -- if we had the gun and we had the serial number, potentially we could find that information, but it was never done.

THE COURT: Okay.

MS. CLARK: The other thing that the defendant takes out of context is that the defendant was possibly proceeded on five occasions. Mr. Donahoe stated to the Court that he basically went to the store, filled out the documents, they were checked, and he walked out of the store, and that he was proceeded on two occasions, which is not completely accurate. Mr. DeFrance was delayed on all five of these transactions. Two of them, after the three days, NICS responded with a proceed. The other ones were left open.

What Mr. Pickles was referring to and what -- if I can go back to Exhibit 1, on the second page he lists out all of those documents -- or all those transactions, and he's looking at the ATF NICS records that he has access to. And in looking at that system, he can't tell what happened because those documents had been purged. He's not saying that it was

potentially that he was proceeded or not.  And, in fact, when
you go down to the bottom, he says:  In summary, he doesn't
see that he was ever denied.  "The subject was proceeded twice
and left in a delayed status on the other three transactions,
and I can only assume that those . . . were never resolved."
So this information is not exculpatory or beneficial to
Mr. DeFrance in the way that Mr. Donahoe is arguing.

And what Mr. Donahoe or the defense ignores in this
is the accuracy of their own evidence contained in the 4473s
because, as required by law, the pawnshop has to record the
NICS determinations on the 4473 forms.  And we went through
that in the briefing and showed where, in the forms, the FFL
had noted that he was delayed and that there was no response
received; that he was delayed, and that they received a
proceed response.

So in arguing that he could have been proceeded five
times, he's in essence saying that Cash 1 Pawn was inaccurate
in their recordkeeping, and I don't think that's a fair
statement of what they do.  I think they take their job very
seriously as well.

So based on that, there is, in essence, no favorable
or exculpatory information in the emails that are at issue
here.  But aside from that, even if we assume that all of this
information is favorable to the defendant, nothing has been
suppressed from the defendant.  It's all been disclosed.

1      I was looking at the cases; it's certainly -- and I
2  think Mr. Donahoe raised this, too -- if the government has a
3  question about it, it should be disclosed.  Here, the
4  defendant has obtained all the information that's necessary
5  for any of his defenses.  He obtained that information on the
6  4473s that he obtained from Cash 1 Pawn.  Those forms all show
7  that he was never denied a firearm through his transactions,
8  and each of the 4473s except for one had the NICS response
9  attached, and all five of them have the NICS response noted on
10  the form.
11      The ATF emails that we're discussing were all
12  provided to the defense.  The government maintains that these
13  emails was just the process of the government learning about
14  the case and that they're not subject to disclosure, but, in
15  an abundance of caution, they were disclosed.  And even if the
16  Court disagrees, these emails do not qualify as a *Brady*
17  violation because they're disclosed prior to trial and
18  available for the defendant to use the information.
19      Further, the information in the emails that the NICS
20  documents were purged cannot be new information to
21  Mr. Donahoe.  Even as he stated today, he's an experienced
22  defense lawyer who has been with the office -- he's been with
23  the Federal Defenders since 1993, and I'm sure he's had
24  numerous firearms cases.
25      He has acknowledged in the briefing that he knew

NICS assigned transaction numbers to each of their cases, and it would stand to reason that he knew the record retention policy as well.

But even if he didn't, the fact that this information would be purged upon a proceed or a delayed notification is public information that's contained in the Code of Federal Regulations. This information can't be *Brady* because it was available to the defense, and the defendant could have obtained this information in another place than -- aside from the government.

Additionally, all of the information that was purged is identifying information or court records. All of those records are still available through Sanders County, and those had already been provided to the defense in discovery.

So to be suppressed, that information must not have been discoverable through the defendant's due diligence, which, we see through his diligence he obtained the 4473 forms. So as to this element, the defendant has failed to show any evidence has been suppressed.

And, finally, and I think the bigger one here is that the defendant has not shown prejudice. In setting aside our arguments and the motions *in limine* and whether or not those are admissible, Mr. DeFrance still has his defenses available to him. He provided these forms to show that he was allowed to purchase firearms; or some of them, I think, were

actually redemptions that he had pawned at the pawnshop.  But

he was able to recover those firearms after the partner/family

member assault conviction, and nothing in the ATF emails

impacts his ability to present this defense.  He may use this

defense to argue that he didn't know that he belonged to the

prohibited category or class.

The other thing that's troubling is the NICS

determinations aren't provided to the defendant.  Those are

all in the records that are maintained at the store.  At most,

he knew that he received the firearm, but he doesn't know what

that ultimate conclusion was.  What he knew is that he

received the firearm.

Further, the NICS determinations aren't admissible

in Court.  We cited the *Hewlett* case and we presented the

*Sanders* case for reasoning that why those aren't admissible in

court is because mistakes can be made.  In the *Sanders* case,

the NICS examiner went to lengths to try to determine if that

person was prohibited, but, due to a variety of different

reasons, the fact that he was arrested in one county and

charged in another, the records didn't come to his attention.

The NICS examiner also reached out to the county attorney's

office or the prosecutor's office to try to get that

information and received no response.

I know from working at the county attorney's office

here, we often got emails or faxes from NICS where they were

trying to figure out what the underlying offense was. If we
didn't get back to them, they didn't have that information,
and I don't know from county to county what happens there,
and --

THE COURT: On that subject, has there been any
discovery, or could there be any discovery into what records
NICS had on Mr. DeFrance at the time of these transactions;
for example, whether they had records of his PFMA conviction?

MS. CLARK: I think --

THE COURT: The question is: Has there been any
discovery on that? Second question is: Or could there be
discovery on that?

MS. CLARK: Certainly, Judge. That was one of the
issues we were trying to resolve through the communications,
to determine --

THE COURT: Through your emails.

MS. CLARK: Um-hmm.

In discussions, I, I don't think we'll ever know
what they looked at at the time because that information is
purged, but we can know what information they typically
request or obtain, which would be court records, the NCIC,
judgments. They request police reports from police agencies,
law enforcement agencies, documents from county attorneys' or
prosecutors' offices. We don't know in this case what they
looked at, but those are the types of records that they could

1    seek out to make that determination.

2           THE COURT:  Refresh my memory:  In what court was

3    the PFMA issued?

4           MS. CLARK:  It was in Sanders County.

5           THE COURT:  In district court?

6           MS. CLARK:  No, it was in justice court.

7           THE COURT:  State justice court.

8           MS. CLARK:  Um-hmm.

9           THE COURT:  Do you know whether or not they have any

10   records of -- I mean, if you got an inquiry from NICS when you

11   were at the county attorney's office, would you maintain any

12   record of that, or would you just answer it?

13          MS. CLARK:  To my knowledge -- so it didn't go to

14   me.  I only would see them occasionally on the fax machine and

15   knew who handled those.  I don't believe that she kept a

16   record of those, but I can't be for sure.

17          THE COURT:  Okay.

18          MS. CLARK:  So -- but talking about the NICS

19   determinations admissible as evidence in court, where I

20   started was with *Sanders*, but there are issues.  It is not a

21   perfect system.  I think the Court even noted about the people

22   working in the cubicle and what they're going through.  I

23   think they do make that effort to determine if it's a

24   qualifying conviction, but they are only as good as what they

25   can get.

1    I also suspect it's only as good as the person you

2    get.  I think they have a high volume of records that they're

3    looking through and applications and -- I mean, I'm not gonna

4    say that Mr. DeFrance can't rely on what he knew, that he

5    received that firearm, because we don't know what NICS did.

6         THE COURT:  Right.  But a smaller FFL could get, as

7    you described it to me, could get a response back from NICS

8    while the customer is arguably still in the, in the pawnshop.

9         MS. CLARK:  Correct.  If, if they're delayed or --

10   they could get a proceed or they could get a delayed.

11        THE COURT:  And so that's a relatively short period

12   of time.  How is that person in that cubicle going to be

13   looking into or contacting justice courts in remote Montana

14   counties to determine what sort of PFMA order might be in

15   place?

16        MS. CLARK:  Well, and that's why we have delayeds,

17   and I think Mr. DeFrance was delayed five times because they

18   didn't have that readily at their fingertips.  For somebody

19   that doesn't have a criminal record and goes in -- like

20   Your Honor would go in, you could potentially receive a

21   proceed immediately.  But if there's something that comes up

22   that they need to investigate further, that's where you get

23   the delay.

24        THE COURT:  Get the delay.  Okay.

25        MS. CLARK:  And then after three days, the FFL, if

1    they haven't heard back from NICS, can give them the firearm.

2              THE COURT:  Yeah.

3              MS. CLARK:  They have basically 88 days to complete

4    that investigation.  I'm not sure if they can extend it past

5    that because they have to purge those records by law in

6    88 days.

7              THE COURT:  And if something comes up within that

8    88-day period, what happens?

9              MS. CLARK:  If it's a denial --

10             THE COURT:  Yeah.

11             MS. CLARK:  -- they will contact the ATF denial

12   branch, and then that's where ATF will then go out and contact

13   the person that has received that firearm, notify them that

14   they're denied, attempt to get that firearm back, and then

15   potentially charges can be filed.

16             THE COURT:  Okay.  I gotcha.

17             MS. CLARK:  So basically for the purposes of this

18   argument today, all of that information is contained in the

19   4473s:  that he was delayed, that he was proceeded, that he

20   didn't get a response.  All of that information, none of it

21   was suppressed.

22             There was some discussion about Mr. Feuerstein and

23   Mr. Pickles' testimony.  Their opinions, our position is, are

24   not admissible in trial because they aren't the entity that

25   reviews the documents.  Their opinions, if they're saying he

is a prohibited person, is a question of fact for the jury,
and so they would not be -- so there's no prejudice to the
defendant there.

Looking at *Strickler v. Greene*, that case held that
a real *Brady* violation doesn't occur unless there is a
nondisclosure so serious that there is a probability the
suppressed evidence would have produced a different verdict.
Here, as the Court noted, we don't have a trial date set.  The
defendant has received all of this information with sufficient
time to use it.

And the fact that the Court offered him further
briefing and he -- to show how this information was -- that
the timing of this disclosure prejudices him, he didn't do
that.  He had an opportunity to weave into his motions the
information that he obtained from the emails, and he failed to
do that.  Rather, he pontificated through his briefing that he
would have made different arguments, but he never made those
arguments.

He had previously filed a motion with this Court for
leave to file additional briefing, which happened in December,
and the Court granted that motion.  And then Your Honor
allowed him again to file a supplemental brief to bring up any
other issues that this new information would have raised.  But
rather than do that, he just again brought up things that he
could have done.  He never addressed them.  And because he

hasn't done it, it further shows he's not prejudiced by the timing of the disclosure of this information.

If you don't need anything else on *Brady*, I will move on to vindictiveness.

THE COURT: You can move on.

MS. CLARK: Okay.

So under the vindictiveness claim, Mr. DeFrance has not met the heavy burden to establish that the government filed the second superseding indictment as vindictive.

Two methods for him to prove vindictiveness is the actual or presumed. We've heard no evidence of actual vindictiveness. Under the facts of this case, he also has not shown that this Court should presume the filing of the second superseding information was vindictive. Under *United States v. Saltzman*, "[t]o determine whether the presumption of vindictiveness applies, 'the court must examine the prosecutor's actions in the context of the entire proceedings,'" or, as in this case, the prosecution may have been provided with additional information that provided the basis for further prosecution.

Case law is clear that presumptions of prosecutorial vindictiveness are typically not applied in a pretrial setting. One of the cases that pops up a lot is *United States v. Goodwin*, which talks about a prosecutor's ability to remain free before trial to exercise his broad discretion "to

determine the extent of the societal interest in the prosecution." *Goodwin* reaffirmed prosecutorial discretion in pretrial skirmishes and removed the affirmative defense of vindictive prosecution.

I noted in the briefing that the defendant argued that you can never have -- or that *United States v. Kent* said that you could -- the vindictive prosecution should be presumed if it doesn't arise from plea negotiations. In reading *Kent* again, a Ninth Circuit case, it says it does not stand for the proposition that vindictive prosecution should be presumed if enhanced charges do not arise from plea negotiation; that although it often occurs in conjunction with failed plea negotiations, prosecutors may add pretrial charges for any number of reasons.

Which brings us to *LaDeau* that Mr. Donahoe provided to us yesterday. There, the Court found a presumption of vindictiveness because the charges were brought after the government lost a motion to suppress. Additionally, the facts in that case is that the new or superseding indictment was brought 13 months after the original indictment.

The Court in *LaDeau* said there's little reason to suspect that the prosecutor's view of the case changed significantly between the two indictments because the government already possessed all of the information and evidence. The only thing that changed in that case was

suppression.

And "[a] prosecutor who adds on extra charges after the exercise of a procedural right is arguably acting less vindictively than a prosecutor who substitutes a more severe charge for a less severe one," which is the discussion that you had with Mr. Donahoe about the grouping of the charges in this case. And it is cited in one of our briefs, the statute -- or, excuse me, the guideline that would apply, that these cases or sentences would group.

In *LaDeau*, the prosecutor brought more serious charges that had a heftier penalty. That was another factor that weighed in the Court's decision that that indictment was vindictive.

So consideration of "circumstances such as 'governmental discovery of previously unknown evidence' . . . may suffice to rebut a presumption of vindictiveness," and that's stated in *LaDeau* at page 572.

And that case stated that if the defendant establishes that, one, a stake in deterring the exercise of his rights and, two, a prosecutor's conduct was somehow unreasonable, then the Court may presume improper vindictive motive.

Here, when the defendant files an affirmative defense motion of public authority and entrapment, he provided the 4473 forms to support that motion. Unfortunately for him,

those forms also disclosed other crimes that had been committed by the defendant, which the government was unaware.

He wants to rely on the fact that he received the gun after completing the 4473 as his defense but wants the government to ignore the fact that he didn't provide relevant information to the FFL, which led in part to the receipt of those firearms. Had he marked on the form that he had a misdemeanor crime of domestic violence, the transaction would have ended there, and we wouldn't even be here.

The defendant argues that the filing of the charges were to punish him, and that rather than await the Court's ruling on the motion *in limine* to prevent or prohibit his notice defenses, the government elected to strike preemptively. However, if the government had waited, it most certainly would have been a presumption of vindictiveness, much like that found in *LaDeau*. Rather, the government indicted on the false statements shortly after receiving that information, information that it received and could not have used earlier. And, under *LaDeau*, that weighs against the presumption of vindictiveness.

In talking about the timing of the disclosure, certainly Mr. Donahoe had those documents and took some time to review them before he decided to turn them over. Likewise, we reviewed those documents and discussed it in our office, whether or not this would support a charge for false

statements.  Partly, the emails were a result of that
discussion, and then ultimately the decision was made to bring
a second superseding indictment.

I just wanted to note that on September 1, the
defense filed its affirmative defenses, and on September 7,
the United States filed the denial and notice -- provided
notice in there that he had committed a crime by his false
statements on the 4473s, way before we received any of this
information from the ATF emails.

Mr. Donahoe had argued that, you know, it was a
knee-jerk bringing of additional charges, but as I've relayed
to the Court, we took our time to make sure that those were
valid charges.  Hence, one of his arguments was in relation to
the dates, certainly, that were in the superseding indictment,
and I kind of laughed at his brief because he talked about
how, I think, conniving or calculated it was.

And, in essence, what happened was we were planning
to take it to grand jury sooner, and we didn't because we were
still making sure that those were viable charges.  As a result
of that, the statute of limitations elapsed on another one of
those.  That's why there's only three.  That one was included
in that first -- the possession, and we didn't go back and
amend that.

So that, in part, since -- well, I'd say looking at
the emails, Mr. Donahoe certainly has an issue with when this

1  information was disclosed.  We contend that not only is it not

2  *Brady*, the filing of those charges were not vindictive.

3       The final argument that he had was on the

4  administrative process.  The Court noted there's no authority

5  that the government is estopped if it doesn't have an

6  administrative proceeding prior to filing of criminal charges.

7  In fact, case law states that those can exist or proceed

8  parallelly, and they are not exclusive of each other.

9       THE COURT:  So, Ms. Clark, I just want to understand

10  what you said to me regarding the government's ability to get

11  the 4473 forms.

12       The answer seemed to me to be that -- well, do you

13  think, do you think there was a point in time when the

14  government could have gotten the 4473 forms in the life of

15  this case?

16       MS. CLARK:  Potentially, yes.

17       THE COURT:  And when would that have been?

18       MS. CLARK:  If, if I'm recalling what I had talked

19  to the ATF officer about, if they knew where he had purchased

20  the firearms, once they had those firearms and that he was the

21  purchaser, they could have gone and gotten those forms from

22  the FFL.

23       THE COURT:  But those forms are purged at a certain

24  point in time.

25       MS. CLARK:  From the NICS system.

1          THE COURT:  From NICS.

2          MS. CLARK:  But the FFL, or Cash 1 Pawn in this

3   instance, maintains those.  They're required to maintain those

4   forms.

5          THE COURT:  You could have gotten them from the FFL.

6          MS. CLARK:  Um-hmm.  It's one of those things I've

7   struggled with when I've talked to the agents, because they

8   tell me that they couldn't get the forms; like, go out, let's

9   say, "I know Mr. DeFrance.  I want to know if he has guns."

10  They couldn't just do a search and find if he's purchased a

11  gun or not.  They would need more information to go get those

12  forms.

13         THE COURT:  So the information you would need to

14  know is where he purchased the guns.

15         MS. CLARK:  Correct.  And I think -- we had this

16  back-and-forth with the agent and me, because I'm like, "Well,

17  if you have the gun and you have the serial number, can you do

18  a trace?"  So if I purchase a gun, I believe they can do a

19  trace.  They can determine I purchased the gun.  I think it

20  shows on that form where I purchased that gun.  They could go,

21  then, and get the forms.  If I purchase a gun and then I sell

22  it to Your Honor and then they recover that gun, they're not

23  gonna be able to find anything.

24         THE COURT:  Yeah.  It just -- it seems to me that if

25  the government had the ability to get the 4473 forms and that

wasn't done, doesn't that weaken your argument that the
government couldn't have filed the false statement charges
before Mr. Donahoe raised the defense?  Follow me?

MS. CLARK:  Yes.

THE COURT:  But I'm, but I'm not -- I'm confused as
to when, under the facts of this case, you could have tracked
down the 4473 forms or how you would have done that, "you"
being the government.

MS. CLARK:  Correct.

THE COURT:  Yeah.

MS. CLARK:  And I would want to again verify this
with my agents.  My opinion, I would think if we had the guns,
we had the serial numbers, that we could do a trace and figure
out who originally purchased those guns, and then potentially
go to that location and get the 4473s.  So if the government
was looking for additional charges, it probably could have
done that sooner.

THE COURT:  But at that time, you weren't looking
for additional charges.

MS. CLARK:  No, Your Honor.

THE COURT:  Okay.  Do you want to briefly address
this administrative process?

MS. CLARK:  Just that --

THE COURT:  I mean, it's fully briefed.

MS. CLARK:  Yeah.  There is no authority that the

1 administrative process has to conclude prior to criminal

2 charges being brought. They're completely separate

3 procedures, and they're allowed to proceed independently of

4 each other. So I don't think that's a basis for . . .

5 THE COURT: Okay. Let me just look at my notes here

6 to see if there's anything that I want to ask you on this

7 subject.

8 No, I think I've asked you everything I want to ask

9 you on this particular grouping of briefs.

10 MS. CLARK: Okay.

11 THE COURT: Is there anything else you wish to add?

12 MS. CLARK: No, Your Honor. I think we've summed it

13 up pretty well in all of the briefing in this case and would

14 rely on the briefing for any further argument.

15 THE COURT: All right. Thank you, Ms. Clark.

16 MS. CLARK: Thank you.

17 THE COURT: Mr. Donahoe, do you want to briefly

18 rebut?

19 THE CLERK: Are we admitting Government's 1 and 2?

20 THE COURT: What's that?

21 THE CLERK: Are we admitting Government's 1 and 2?

22 THE COURT: Government's Exhibits 1 and 2, I'm going

23 to go ahead and file in the record. They're simply exhibits

24 marking documents that are already in the record; Exhibit 1

25 being Document 63, Exhibit 2 being Document 69-2. But because

1    they were referred to as Government's Exhibits 1 and 2, they

2    will be admitted in that manner and become part of the record.

3          (Exhibits 1 and 2 were received in evidence.)

4              THE COURT:  Mr. Donahoe.

5              MR. DONAHOE:  Thank you.

6              So it apparently turns out to be important here, the

7    timing issue.  See, and that's the problem here.  You know,

8    they had this material two months before they gave it to us.

9    My notice of defenses was a live issue and being briefed.  Had

10   I had that, I'm asking for a hearing on all of the material in

11   ECF 63 and calling those people as witnesses.

12             Mr. Feuerstein says, in ECF 63, "Well, I was correct

13   they have been purged and NICS did not complete their

14   investigation properly, thus they allowed a prohibited person

15   to have the firearms."

16             And it goes on from there.  Somebody looked at

17   something.  All of this business about the NICS and the FBI

18   and the ATF, to me, that's the government.  They're

19   (indicating) the government.

20             If they had the gun, and they did because Detective

21   Baker had one of them, or one or more of them collected at the

22   search warrant when it was served, they had the serial

23   numbers.  I've never been given any indication that there was

24   a serial number missing from that firearm, the one that was

25   collected during the day of the search.  Then they back-trace

it.  If they could do that, then that information was in
possession of the government.

And that goes back to *LaDeau*:  "The charge in the
superseding indictment was based on the same conduct
underlying the charge in the initial indictment, the
prosecution obtained no evidence supporting the superseding
indictment that it did not already possess prior to obtaining
the initial indictment."

If they could have back-traced that, and the
government is the government is the government, then I'm just
not seeing that.

Ms. Clark made a statement here and said if he had
just told the truth and said he had been convicted of a PFMA.
Let's hold up here a second.  That 4473 has directions in it.
When you turn to those directions, it gives you a fairly
extensive description of what PFMAs might count and which ones
don't.  So it's just not this generic, "Yeah, I was convicted
of a domestic assault."  You have to go through some kind of
process.

At some point we know that some government person
went through some kind of documents.  Feuerstein says that.
They purged documents, and they never completed the
investigation properly.  I don't even know what that means.
What that means to me is that the guy checked the right box,
the government didn't do its independent work properly, and he

possessed a firearm.

The bottom line is I could have corrected or added or edited or supplemented my notice of defenses --

THE COURT: But you --

MR. DONAHOE: -- early in time.

THE COURT: But you can still -- we're in the pretrial.

MR. DONAHOE: And I understand that we are, and I understand that that's a difficult thing for me to overcome. But I think where the rubber meets the road here is why wait two months and then bring more charges that completely change the theory of the case, reduce to an irrelevancy the possession charge, and say he just didn't tell the truth?

It's just, objectively, regardless of presumption or not, that's vindictive. Why would you do that? He had freestanding defenses that he could bring based on information that was never disclosed that would have enhanced his ability to convince the Court that these were appropriate defenses.

Let's assume for a second that no superseding indictment was on the table for additional charges, the information was disclosed, and I came forward and said, "Look, Your Honor, the government gave me this in September. It actually supports my previous notice of defenses here, and it seems very germane to this entire discussion. Maybe we should have a hearing on this." We could have done that.

1          We can't -- we couldn't do any of that in that whole
2     period.  I mean, if you want to think about speedy trial time,
3     that whole two months was wasted.  All of that timing is
4     wasted.  And this business about, "Just as long as we get it
5     to you before the trial, the morning of the trial," I'm sorry;
6     you know, maybe I need to do more research or something, but
7     it seems to me that the disclosure should be made in a timely
8     fashion so that it can be utilized at the appropriate time in
9     the course of the litigation.  You don't get to say, "Well, I
10    gave it to you just before we called the first witness."  What
11    would have happened if they had given this to me a week before
12    trial?

13          THE COURT:  Yeah, but they didn't.

14          MR. DONAHOE:  Okay.  I get that.

15          And the last thing is that I would have had the
16    opportunity to brief this and brief this and brief that and
17    brief this.  All right.  I did what the Court ordered.  I
18    filed briefs of a substantive nature, explaining how I would
19    have amended or argued differently.  One of those theories
20    clearly in this briefing, since the disclosure of this
21    information, is that I would have altered my as-applied
22    challenge; that in the unique circumstances of this case, he
23    did not have adequate notice that he was a prohibited person.
24    The prosecution shouldn't be brought on that ground.  That
25    could have been made a component of my vagueness challenge,

```
 1   and all of that briefing was going on during that two-month
 2   period.
 3          To say that I would not have introduced that concept
 4   into this discussion -- I mean, it's in the record now.  I've
 5   explained that.  That claim should be reevaluated.  How could
 6   a person conduct a transaction on five different occasions
 7   successfully and then come to find that he's a prohibited
 8   person in the eyes of the government?
 9          And I think that would conclude my discussion.
10          THE COURT:  All right.
11          MR. DONAHOE:  Thank you.
12          THE COURT:  Let's take a brief recess, and then we
13   will return and address the government's motions *in limine*.
14      (Recess taken from 15:07:03 to 15:20:48.)
15      (Open court.)
16      (Defendant present.)
17          THE COURT:  Please be seated.  Okay.
18          Amanda, here are Exhibits 1 and 2.
19          THE CLERK:  Thank you.
20          THE COURT:  We are now at the United States' motion
21   *in limine* to preclude defenses of public authority and
22   entrapment by estoppel and innocent intent.
23          Ms. Clark, do you wish to be heard further on that
24   motion?
25          MS. CLARK:  Thank you, Judge.
```

I don't think we have much more to add than what has been contained in our motion to preclude those defenses.

Certainly I think there are issues that arise in the presentation of that evidence. Public authority, as we've stated, usually happens in cases where a confidential informant has worked with the government and they admit that they have done something wrong or illegal and that the government agent authorized them to do so.

In this case, certainly Mr. DeFrance is not acknowledging any illegal activity. He claims -- or his defense is that he legally possessed the firearms and legally purchased those firearms, so certainly there was no government agent that authorized him to engage in this illegal activity.

We had cited *United States v. Gentile* as -- it's a Ninth Circuit case, and that certainly discussed whether or not an FFL employee can be a government agent that authorizes an individual to engage in illegal activity.

We know that the *Tallmadge* case in the Ninth Circuit does say that an FFL could be perceived as a government entity that gives that authority. Other circuits are split on that.

In relation to the entrapment by estoppel, this -- again, when I've been looking at these cases, it kind of comes back to what came first, the chicken or the egg? Because we have that Mr. DeFrance got a firearm. Did he lie on the form to get the firearm? You know, which came first? Because he

says, "I didn't know, after I got the firearm."

The entrapment by estoppel, he has to provide relevant historical facts to the government and then be affirmatively told that his prescribed conduct was permissible. In this case, those two elements, we believe, cannot be met:

One, that he did not provide all relevant historical facts to the government because he didn't mark on the 4473 form that he had been convicted of a misdemeanor crime of domestic violence. As we had discussed before, had he marked "No" there, this case would have never gone to the NICS for further review.

Also, he has to be affirmatively told that the prescribed conduct was permissible. Defendant relies on the fact that NICS gave him a proceed determination on two occasions. Those are not affirmative -- that is not affirmatively telling him that. They are telling the FFL that they can transfer that firearm to Mr. DeFrance. And as we stated before, Mr. DeFrance most likely didn't know what the outcome of those NICS reviews were. He knew that he received the gun. He knew he had been delayed. I doubt that he knew if he had been proceeded or if the three days had passed.

And based on those and the other arguments in our brief, we submit to the Court that the affirmative defenses of public authority and entrapment by estoppel are not applicable

in this case.

That raises the question, of course, of the knowledge. Mr. DeFrance certainly has a defense that he didn't know that he was a member of the prohibited class, that being that he was convicted of a misdemeanor crime of domestic violence. I believe that that defense is still available to Mr. DeFrance and is viable in this case.

THE COURT: Okay. Thank you, Ms. Clark.

Mr. Donahoe, do you wish to be heard further on this one?

MR. DONAHOE: I don't have anything on it, no.

THE COURT: All right.

Well, I can tell you that, assuming this case goes to trial, most likely my ruling as it relates to these motions is that I'm going to reserve ruling, defer ruling until trial and we've heard some evidence and see what defenses are appropriate. But that's assuming the case goes to trial.

Let's go, then, to the final motions *in limine*, a ruling on the admissibility of certain evidence, including the defendant's consent to search his truck on June 27, 2018 which resulted in the observation of three firearms. The government also wishes to introduce evidence of the execution of a search warrant at Mr. DeFrance's residence on October 2, 2018 which resulted in the seizure of two firearms. And, three, the unavailability of the victim of the PFMA conviction in 2013 to

testify about the nature of their relationship.

As I understand this motion and the response brief, Mr. DeFrance argues that the evidence of the vehicle search and search warrant are unnecessary because he can or will stipulate that he possessed firearms because, of course, Mr. DeFrance maintains that he possessed them lawfully.

And Mr. DeFrance further argues that the PFMA victim's unavailability is irrelevant, or, alternatively, that her unavailability is more prejudicial than probative and that the jury can simply be instructed that she is unavailable and that they should draw no inferences against or in favor of either party because of her unavailability. I think that pretty much summarizes the arguments.

So, Ms. Clark, a couple of questions on this, and you can certainly argue if you wish. Who would you intend to call as a witness to testify regarding the consent to search the truck and the execution of the search warrant?

MS. CLARK: Detective Guy Baker from the Missoula Police Department.

THE COURT: That's what I suspected.

Why do you need to -- why does the government need to admit the consent to search the truck and the execution of the search warrant at the residence?

MS. CLARK: Well, Judge, prior to the concessions by the defendant, we needed to get that evidence in somehow and

explain how it came in the possession of law enforcement. I'm still wondering how we will explain or close that loop for the jury that -- how law enforcement came to the knowledge that he had the gun. And I'm certainly open to any suggestions that would limit a foray into the search warrant or the consent of the search.

THE COURT: Right, because if he stipulates that he possessed the firearms, then I'm not sure his consent to search or the execution of the search warrant are necessary. And in light of the issues surrounding this case, it's going to be a challenge for all of us, particularly for me, to make sure that no evidence is admitted that would open up the -- or that would potentially trigger any knowledge on the part of any prospective or actual jurors regarding Jermain Charlo and all of those issues.

MS. CLARK: Correct. And that's our concern as well, Your Honor.

THE COURT: Yeah. Which also goes to the unavailability of the victim.

MS. CLARK: (Nodded head affirmatively.)

THE COURT: Mr. Donahoe, you provided me with a transcript of Ms. Charlo's interview. And I certainly don't mean to suggest that I'm predicting what the evidence might be, but do you think that transcript is evidence that you would want to admit in your case in chief if this case

proceeds to trial?

MR. DONAHOE: Yes, Your Honor, I'm thinking about that. I mean, I've run through various iterations of how that could play out --

THE COURT: How do you think --

MR. DONAHOE: -- but it kind of depends on what the government does.

THE COURT: Right. I understand.

MR. DONAHOE: Yeah.

THE COURT: But if you wish to mount as a defense that -- if you wish to mount as a defense, go to the heart of the relationship between these two and whether it fits within the definitions, it would seem to me that that interview of her may be potential evidence.

MR. DONAHOE: Yes. Yeah, and I wanted you to be aware of it --

THE COURT: Right.

MR. DONAHOE: -- sooner rather than later.

THE COURT: Right. Yeah.

Am I safe in assuming, Mr. Donahoe, that if this case proceeds to trial, that you are prepared -- your client is prepared to stipulate that he possessed the firearms?

MR. DONAHOE: Yes.

THE COURT: Okay.

And, Ms. Clark, what I understand you're saying to

1 me is you still haven't -- I mean, in light of that potential

2 stipulation, does the government still intend to introduce

3 evidence concerning -- still, does the government still wish

4 to introduce evidence concerning the two searches?

5    MS. CLARK:  No, Judge.  My only thought is closing

6 the gap, how law enforcement -- and I think we can work that

7 out.  I just don't want there to be a gap for the jury to be

8 just like, oh, all of a sudden, they know that he has a gun.

9 But I am fine with not discussing that, given the stipulation

10 by the defendant.

11    THE COURT:  Right.

12    MS. CLARK:  And perhaps I can discuss it with

13 Mr. Donahoe about --

14    THE COURT:  Right, how that might play out --

15    MS. CLARK:  Correct, that perhaps --

16    THE COURT:  -- and whether you can agree to

17 something.  Because I am obviously concerned, if we do try

18 this case, about anything that would suggest that Mr. DeFrance

19 is a suspect as it relates to the missing Ms. Charlo.

20    Let me ask you, Ms. Clark:  In light of

21 Mr. Donahoe's suggestion that I give a jury instruction in the

22 case concerning the victim's unavailability, does that

23 eliminate the need for the government to introduce any

24 evidence on that subject?

25    MS. CLARK:  Yes, Judge.  I think, reading his

response, that would address the concerns that the government had. We didn't want the jury to be left wondering why didn't the government call the victim to establish this relationship. And if there's an instruction that says she's unavailable, that satisfies that concern.

THE COURT: Coupled with that, the jury is not to attach any significance to that.

MS. CLARK: Yes.

THE COURT: Well, if the matter goes to trial, I know both of you will endeavor to work out these evidentiary issues that are the subject of this motion *in limine* and propose -- hopefully jointly propose some jury instructions that we can use in light of our collective concerns.

Is there anything else you wish to add, either of you, on these motions *in limine*?

Ms. Clark?

MS. CLARK: No, Judge, the only -- just the discussion with Mr. Donahoe about the statement by Jermain to law enforcement in the underlying partner assault case. We've looked at that as well. Our position is that that's hearsay. I don't know how that would be admissible in the trial, and I don't know if the Court wants us to engage in briefing on that matter pretrial as well.

THE COURT: Well, you've alerted me to the issue. I'll look into it.

```
1              MS. CLARK:  Okay.  Thank you.

2              THE COURT:  Okay.  Thank you, Ms. Clark.

3              Anything you wish to add, Mr. Donahoe?

4              MR. DONAHOE:  No.  Thank you, Your Honor, very much.

5              THE COURT:  Well, I have a lot of work to do here,

6    and all of this has been very helpful to me.

7              Let me just put on your calendars; again, I haven't

8    decided what I'm gonna do yet as it relates to the motions to

9    dismiss, but I need to do planning if there's going to be a

10   trial in this case, and you need to know what I'm thinking if

11   there's going to be a trial in this case because we've got a

12   very busy docket right now.  And considering the amount of

13   time left on the speedy trial clock, the amount of time I

14   think it's going to take me to get a ruling out on all of

15   these various motions, the week of June 6 is looking pretty

16   good to me if we're going to have a trial.  So I just want to

17   put that on your radar so you're at least aware of what I'm

18   thinking in terms of a possible trial date.

19             MS. CLARK:  (Nodded head affirmatively.)

20             MR. DONAHOE:  Okay.

21             THE COURT:  Okay?  All right.  We'll be in recess.

22             MS. CLARK:  Thank you.

23             THE COURT:  The motions are fully submitted.

24        (Proceedings were concluded at 15:37:23.)

25
```

1                    REPORTER'S CERTIFICATE

2          I, JoAnn Jett Corson, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11          I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14          IN WITNESS WHEREOF, I have set my hand at Missoula,

15   Montana this 4th day of March, 2022.

16

17                              /s/ JoAnn Jett Corson

18                              _____
                                JoAnn Jett Corson
19                              United States Court Reporter

20

21

22

23

24

25