# ADDENDUM

## SEC. 12005. MISDEMEANOR CRIME OF DOMESTIC VIOLENCE.

(a) DEFINING "DATING RELATIONSHIP".—Section 921(a) of title 18, United States Code, is amended—

(1) in paragraph (33)(A)(ii)—

<< 18 USCA § 921 >>

(A) by striking "or by a person" and inserting "by a person"; and

(B) by inserting before the period at the end the following: ", or by a person who has a current or recent former dating relationship with the victim"; and

(2) by adding at the end the following:

<< 18 USCA § 921 >>

"(37)(A) The term 'dating relationship' means a relationship between individuals who have or have recently had a continuing serious relationship of a romantic or intimate nature.

"(B) Whether a relationship constitutes a dating relationship under subparagraph (A) shall be determined based on consideration of—

"(i) the length of the relationship;

"(ii) the nature of the relationship; and

"(iii) the frequency and type of interaction between the individuals involved in the relationship.

"(C) A casual acquaintanceship or ordinary fraternization in a business or social context does not constitute a dating relationship under subparagraph (A).".

<< 18 USCA § 921 NOTE >>

(b) NO RETROACTIVE APPLICATION.—The amendments made by subsection (a) shall not apply to any conviction of a misdemeanor crime of domestic violence entered before the date of enactment of this Act.

(c) LIMITATIONS ON CONVICTIONS OF CRIMES OF DOMESTIC VIOLENCE WITH RESPECT TO DATING RELATIONSHIPS.—Section 921(a)(33) of title 18, United States Code, is amended—

(1) in subparagraph (A)—

<< 18 USCA § 921 >>

(A) in the matter preceding clause (i), by striking "subparagraph (C)" and inserting "subparagraphs (B) and (C)"; and

<< 18 USCA § 921 >>

(B) in clause (ii), by striking "State," and inserting "State,"; and

(2) by adding at the end the following:

 "(C) A person shall not be considered to have been convicted of a misdemeanor crime of domestic violence against an individual in a dating relationship for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had firearm rights restored unless the expungement, pardon, or restoration of rights expressly provides that the person may not ship, transport, possess, or receive firearms: *Provided*, That, in the case of a person who has not more than 1 conviction of a misdemeanor crime of domestic violence against an individual in a dating relationship, and is not otherwise prohibited under this chapter, the person shall not be disqualified from shipping, transport, possession, receipt, or purchase of a firearm under this chapter if 5 years have elapsed from the later of the judgment of conviction or the completion of the person's custodial or supervisory sentence, if any, and the person has not subsequently been convicted of another such offense, a misdemeanor under Federal, State, Tribal, or local law which has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, or any other offense that would disqualify the person under section 922(g). The national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act (34 U.S.C. 40901) shall be updated to reflect the status of the person. Restoration under this subparagraph is not available for a current or former spouse, parent, or guardian of the victim, a person with whom the victim shares a child in common, a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or a person similarly situated to a spouse, parent, or guardian of the victim.".

142 S.Ct. 2015
Supreme Court of the United States.

UNITED STATES, Petitioner

v.

Justin Eugene TAYLOR

No. 20-1459
|
Argued December 7, 2021
|
Decided June 21, 2022

**Synopsis**

**Background:** Prisoner filed successive motion to vacate sentence, relating to conviction and enhanced sentence pursuant to guilty plea to using a firearm in furtherance of a crime of violence, with attempted Hobbs Act robbery as the predicate crime of violence. The United States District Court for the Eastern District of Virginia, M. Hannah Lauck, J., 2019 WL 4018340, denied the motion. Prisoner appealed. The United States Court of Appeals for the Fourth Circuit, Motz, Circuit Judge, 979 F.3d 203, vacated and remanded. Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Gorsuch, held that attempted Hobbs Act robbery does not qualify as a crime of violence under the elements clause of statutory definition of crime of violence, as predicate for felony conviction and enhanced sentence for using a firearm in furtherance of a crime of violence, abrogating *United States v. St. Hubert,* 909 F. 3d 335.

Court of Appeals affirmed.

Justice Thomas filed a dissenting opinion.

Justice Alito filed a dissenting opinion.

**Procedural Posture(s):** Appellate Review; Post-Conviction Review.

**West Headnotes (7)**

**[1]** **Weapons** ⬦ Crimes of violence

An inquiry into how any particular defendant may commit the crime is not relevant when applying the categorical approach to determining whether a federal felony may serve as a predicate crime of violence for a conviction and enhanced sentence for using a firearm in furtherance of a crime of violence, under the elements clause of the statutory definition of crime of violence, and the only relevant question is whether the federal felony at issue always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force. 18 U.S.C.A. § 924(c)(3)(A).

1 Cases that cite this headnote

**[2]** **Weapons** ⬦ Crimes of violence

Under the categorical approach, attempted Hobbs Act robbery does not qualify as a "crime of violence" under the elements clause of the statutory definition of crime of violence, as predicate for felony conviction and enhanced sentence for using a firearm in furtherance of a crime of violence; to secure a conviction, the government must show an intention to take property by force or threat, along with a substantial step toward achieving that object, but whatever a substantial step requires, it does not categorically require the government to prove that the defendant used, attempted to use, or even threatened to use force against another person or his property, as would satisfy the elements clause; abrogating *United States v. St. Hubert,* 909 F. 3d 335. 18 U.S.C.A. §§ 924(c)(3)(A), 1951(a).

1 Cases that cite this headnote

**[3]** **Robbery** ⬦ Attempt

ADDENDUM - Page 3

To win a conviction for attempted Hobbs Act robbery, the government must prove two things: (1) the defendant intended to unlawfully take or obtain personal property by means of actual or threatened force, and (2) the defendant completed a substantial step toward that end.

🚩 18 U.S.C.A. § 1951(a).

**[4]**    **Robbery** 🔗 **Attempt**

Under the common law, there will be cases, appropriately reached by a charge of attempted robbery, where the actor does not actually harm anyone or even threaten harm, so if, for example, the defendant is apprehended before he reaches his robbery victim and thus before he has actually engaged in threatening conduct, proof of his purpose to engage in such conduct can justify a conviction for attempted robbery so long as his intention and some other substantial step are present.

**[5]**    **Weapons** 🔗 **Crimes of violence**

Threatened use of physical force against the person or property of another, for purposes of elements clause of statutory definition of crime of violence, as predicate for felony conviction and enhanced sentence for using a firearm in furtherance of a crime of violence, requires a communicated threat of force. 🚩 18 U.S.C.A. § 924(c)(3)(A).

1 Cases that cite this headnote

**[6]**    **Statutes** 🔗 **Associated terms and provisions; noscitur a sociis**

As a usual rule of statutory interpretation, a law's terms are best understood by the company they keep.

**[7]**    **Statutes** 🔗 **Statute as a Whole; Relation of Parts to Whole and to One Another**

When interpreting federal statutes, courts do not lightly assume that Congress adopts two separate clauses in the same law to perform the same work.

**West Codenotes**

**Recognized as Unconstitutional**

🚩 18 U.S.C.A. § 924(c)(3)(B)

*Syllabus* [*]

For his participation in an unsuccessful robbery during which his accomplice shot a man, respondent Justin Taylor faced charges of violating the Hobbs Act, 🚩 18 U.S.C. § 1951(a), and of committing a "crime of violence" under § 924(c). The Hobbs Act makes it a federal crime to commit, attempt to commit, or conspire to commit a robbery with an interstate component. 🚩 § 1951(a). Section 924(c) authorizes enhanced punishments for those who use a firearm in connection with a "crime of violence" as defined in either § 924(c)(3)(A)—known as the elements clause—or § 924(c)(3)(B)—known as the residual clause. Before the District Court, the government argued that Taylor's Hobbs Act offense qualified as a "crime of violence" under § 924(c). Taylor ultimately pleaded guilty to one count each of violating the Hobbs Act and § 924(c). The District Court sentenced Taylor to 30 years in federal prison—a decade more than the maximum sentence for his Hobbs Act conviction alone. Taylor later filed a federal habeas petition focused on his § 924(c) conviction, which was predicated on his admission that he had committed both conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery. Taylor argued neither Hobbes Act offense qualified as a "crime of violence" for purposes of § 924(c) after 🚩 *United States v. Davis*, 588 U. S. ——, 139 S.Ct. 2319, 204 L.Ed.2d 757. In 🚩 *Davis*, this Court held that § 924(c)(3)(B)'s residual clause was unconstitutionally vague. 🚩 *Id.*, at —— – ——, 139 S.Ct., at —— – ——. In his habeas proceeding, Taylor asked the court to apply 🚩 *Davis* retroactively and vacate his § 924(c) conviction and sentence. The government maintained that Taylor's § 924(c) conviction and sentence remained sound because his crime of attempted Hobbs Act robbery qualifies as a crime of violence under the elements clause. The Fourth Circuit held that attempted Hobbs Act robbery

ADDENDUM - Page 4

does not qualify as a crime of violence under § 924(c)(3)(A). The Fourth Circuit vacated Taylor's § 924(c) conviction and remanded the case for resentencing. In reaching its judgment, the Fourth Circuit noted that other courts have held that attempted Hobbs Act robbery does qualify as a crime of violence under the elements clause.

*Held*: Attempted Hobbs Act robbery does not qualify as a "crime of violence" under § 924(c)(3)(A) because no element of the offense requires proof that the defendant used, attempted to use, or threatened to use force. Pp. —— – ——.

(a) The Court applies a "categorical approach" to determine whether a federal felony may serve as a predicate for a conviction and sentence under the elements clause, which poses the question whether the federal felony in question "has *as an element* the use, attempted use, or threatened use of physical force." § 924(c)(3)(A) (emphasis added). The relevant inquiry is not how any particular defendant may commit the crime but whether the federal felony at issue always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force. This Court has long understood similarly worded statutes to demand similarly categorical inquiries. See, *e.g.*, *Borden* v. *United States*, 593 U. S. ——, ——, 141 S.Ct. 1817, 210 L.Ed.2d 63.

An attempted Hobbs Act robbery does not satisfy the elements clause. To secure a conviction for attempted Hobbs Act robbery, the government must prove that the defendant intended to complete the offense and that the defendant completed a "substantial step" toward that end. See, *e.g.*, 🚩 *United States v. Resendiz-Ponce*, 549 U.S. 102, 107, 127 S.Ct. 782, 166 L.Ed.2d 591. An intention is just that, no more. And whatever a substantial step requires, it does not require the government to prove that the defendant used, attempted to use, or even threatened to use force against another person or his property—even if the facts would allow the government to do so in many cases. As the Model Penal Code explains with respect to the Hobbs Act's common-law robbery analogue, "there will be cases, appropriately reached by a charge of attempted robbery, where the actor does not actually harm anyone or even threaten harm." ALI, Model Penal Code § 222.1, p. 114. But no element of attempted Hobbs Act robbery requires proof that the defendant used, attempted to use, or threatened to use force. Pp. —— – —— .

(b) The government's countervailing arguments fail. Pp. —— – ——.

(1) The government first argues that the elements clause encompasses not only any offense that qualifies as a "crime of violence" but also any attempt to commit such a crime. But the elements clause only asks whether the defendant *did* commit a crime of violence as defined by the statute. Pp. —— – ——.

(2) The government next argues that the "substantial step" element of attempted Hobbs Act robbery categorically requires it to prove that a defendant used, attempted to use, or threatened to use physical force. But while many who commit the crime of attempted Hobbs Act robbery do use, attempt to use, or threaten to use force, the government's problem is that no element of attempted Hobbs Act robbery requires the government to prove such facts beyond a reasonable doubt. The government maintains that anyone who takes a substantial step toward completing Hobbs Act robbery always or categorically poses a "threatened use" of force because the word "threat" can be used to speak of an abstract risk. The government submits that the elements clause uses the term to require only an objective, if uncommunicated, threat to community peace and order. But when Congress uses the word "threat" in such an abstract and predictive (rather than communicative) sense, it usually makes its point plain. The textual clues in the statute point in the opposite direction of the government's reading. Moreover, the government's view of the elements clause would have it effectively replicate the work formerly performed by the residual clause. Under usual rules of statutory interpretation, the Court does not lightly assume Congress adopts two separate clauses in the same law to perform the same work. See, *e.g.*, 🚩 *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 839, n. 14, 108 S.Ct. 2182, 100 L.Ed.2d 836. Pp. —— – ——.

(3) The government's final theory accepts that a conviction under the elements clause requires a communicated threat of force and contends that most attempted Hobbs Act robbery prosecutions involve exactly that. But whatever this argument proves, the theory cannot be squared with the statute's terms. Congress in the elements clause did not mandate an empirical inquiry into how crimes are usually committed, let alone impose a burden on the defendant to present proof about the government's own prosecutorial habits. Attempted Hobbs Act robbery does not categorically require proof of the elements § 924(c)(3)(A) demands. That ends the inquiry, and nothing in 🚩 *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 127 S.Ct. 815, 166 L.Ed.2d 683, suggests otherwise. Pp. —— – ——.

ADDENDUM - Page 5

979 F.3d 203, affirmed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, SOTOMAYOR, KAGAN, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., and ALITO, J., filed dissenting opinions.

**Attorneys and Law Firms**

Rebecca Taibleson for petitioner.

Michael R. Dreeben, Washington, DC, for respondent.

Elizabeth B. Prelogar, Solicitor General, Counsel of Record, Department of Justice, Washington, DC, Brian H. Fletcher, Acting Solicitor General, Kenneth A. Polite, Jr., Assistant Attorney General, Eric J. Feigin, Deputy Solicitor General, Rebecca Taibleson, Assistant to the Solicitor General, Joshua K. Handell, Attorney, Department of Justice, Washington, DC, for Petitioner.

Michael R. Dreeben, Kendall Turner, Grace Leeper, Jenya Godina, O'Melveny & Myers LLP, Washington, DC, Frances H. Pratt, Counsel of Record, Office of the Federal Public Defender, Eastern District of Virginia, Alexandria, VA, for Respondent.

**Opinion**

Justice GORSUCH delivered the opinion of the Court.

Does attempted Hobbs Act robbery qualify as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A)? The answer matters because a person convicted of attempted Hobbs Act robbery alone normally faces up to 20 years in prison. But if that offense qualifies as a "crime of violence" under § 924(c)(3)(A), the same individual may face a second felony conviction and years or decades of further imprisonment.

I

After a robbery went awry and his accomplice shot a man, the federal government charged Justin Taylor with violating the Hobbs Act and § 924(c). The Hobbs Act makes it a federal crime to commit, attempt to commit, or conspire to commit a robbery with an interstate component. 18 U.S.C. § 1951(a). Meanwhile, § 924(c) authorizes further

punishments for those who use a firearm in connection with a "crime of violence."

For purposes of § 924(c), a federal felony qualifies as a "crime of violence" if it meets either of two definitions. The first definition is found in § 924(c)(3)(A), a provision sometimes called the elements clause. That clause covers offenses that "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person or property of another." The second definition, located next door in § 924(c)(3)(B) and often referred to as the residual clause, encompasses offenses that "by [their] nature, involv[e] a substantial risk that physical force ... may be used."

Before the District Court, the government argued that Mr. Taylor's Hobbs Act offense qualified as a "crime of violence" under these definitions. And at that point, Mr. Taylor did not disagree, choosing instead to plead guilty to one count each of violating the Hobbs Act and § 924(c). For his crimes, the District Court sentenced Mr. Taylor to 30 years in federal prison—a decade more than he could have received for his Hobbs Act conviction alone.

Later, Mr. Taylor filed a federal habeas petition. In it, he did not challenge his Hobbs Act conviction. Instead, he focused on § 924(c). Mr. Taylor submitted that his § 924(c) conviction was predicated on his admission that he had committed both conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery. And, Mr. Taylor argued, neither of those offenses continued to qualify as a "crime of violence" after *United States* v. *Davis*, 588 U. S. ——, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019). In *Davis*, this Court held § 924(c)(3)(B)'s residual clause unconstitutionally vague, and we refused to enforce a conviction and sentence premised on its terms. *Id.*, at —— – ——, 139 S.Ct., at 2336. In his habeas proceeding, Mr. Taylor asked the court to apply *Davis* retroactively and vacate his own § 924(c) conviction and sentence.

The government opposed Mr. Taylor's petition. In doing so, it did not seek to revisit *Davis* or oppose its retroactive application to Mr. Taylor's case. Instead, the government observed that *Davis* declared only the residual clause unconstitutional; even today the elements clause remains in

force. And, the government argued, the crime of attempted Hobbs Act robbery qualifies as a crime of violence under the elements clause even if conspiracy to commit Hobbs Act robbery may not. By this chain of logic, the government reasoned, Mr. Taylor's 🚩 § 924(c) conviction and sentence remained sound.

Ultimately, the Fourth Circuit agreed to hear the dispute and sided with Mr. Taylor. It held that attempted Hobbs Act robbery does not qualify as a crime of violence under 🚩 § 924(c)(3)(A) because no element of the offense requires the government to prove that the defendant used, attempted to use, or threatened to use force. By way of remedy, the Court of Appeals vacated Mr. Taylor's 🚩 § 924(c) conviction and remanded the case for resentencing in light of his sole remaining Hobbs Act conviction. In reaching its judgment, the Fourth Circuit acknowledged that other circuits have taken a different view, holding that attempted Hobbs Act robbery does qualify as a crime of violence under the elements clause. 🚩 979 F.3d 203, 208 (2020). We agreed to take up this case to resolve that question. 🚩 594 U. S. ——, 141 S.Ct. 2882, 210 L.Ed.2d 990 (2021).

## II

[1] The parties may not see eye to eye on the outcome of this case, but they at least agree on how we should go about deciding it. To determine whether a federal felony may serve as a predicate for a conviction and sentence under the elements clause, they say, we must apply a "categorical approach." We must because the clause poses the question whether the federal felony at issue "has *as an element* the use, attempted use, or threatened use of physical force." 🚩 § 924(c)(3)(A) (emphasis added). And answering that question does not require—in fact, it precludes—an inquiry into how any particular defendant may commit the crime. The only relevant question is whether the federal felony at issue always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted, or threatened use of force. This Court has long understood similarly worded statutes to demand similarly categorical inquiries. See, *e.g.*, *Borden* v. *United States*, 593 U. S. ——, ——, 141 S.Ct. 1817, 210 L.Ed.2d 63 (2021); 🚩 *Davis*, 588 U. S., at ——, 139 S.Ct., at 2328; 🚩 *Leocal* v. *Ashcroft*, 543 U.S. 1, 7, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004).

[2] [3] What are the elements the government must prove to secure a conviction for attempted Hobbs Act robbery? Here again the parties share common ground. Under the portion of the Hobbs Act relevant here, to win a conviction for a *completed* robbery the government must show that the defendant engaged in the "unlawful taking or obtaining of personal property from the person ... of another, against his will, by means of actual or threatened force." 🚩 § 1951(b). From this, it follows that to win a case for *attempted* Hobbs Act robbery the government must prove two things: (1) The defendant intended to unlawfully take or obtain personal property by means of actual or threatened force, and (2) he completed a "substantial step" toward that end. See, *e.g.*, *United States v. Resendiz-Ponce*, 549 U.S. 102, 107, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007). What exactly constitutes a substantial step is beyond the scope of today's case. For present purposes, it is sufficient to observe that the parties again agree. They accept that a substantial step demands something more than "mere preparation." *Swift & Co. v. United States*, 196 U.S. 375, 402, 25 S.Ct. 276, 49 L.Ed. 518 (1905). The step, they say, must be "unequivocal," Reply Brief 3, and "significant," though it "need not be violent," Brief for United States 22.

[4] To know that much is enough to resolve this case. Whatever one might say about *completed* Hobbs Act robbery, *attempted* Hobbs Act robbery does not satisfy the elements clause. Yes, to secure a conviction the government must show an intention to take property by force or threat, along with a substantial step toward achieving that object. But an intention is just that, no more. And whatever a substantial step requires, it does not require the government to prove that the defendant used, attempted to use, or even threatened to use force against another person or his property. As the Model Penal Code explains with respect to the Hobbs Act's common-law robbery analogue, "there will be cases, appropriately reached by a charge of attempted robbery, where the actor does not actually harm anyone or even threaten harm." ALI, Model Penal Code § 222.1, p. 114 (1980). "If, for example, the defendant is apprehended before he reaches his robbery victim and thus before he has actually engaged in threatening conduct, proof of his purpose to engage in such conduct" can "justify a conviction of attempted robbery" so long as his intention and some other substantial step are present. *Id.*, at 115.

A hypothetical helps illustrate the point. Suppose Adam tells a friend that he is planning to rob a particular store on a

particular date. He then sets about researching the business's security measures, layout, and the time of day when its cash registers are at their fullest. He buys a ski mask, plots his escape route, and recruits his brother to drive the getaway car. Finally, he drafts a note—"Your money or your life"—that he plans to pass to the cashier. The note is a bluff, but Adam hopes its implication that he is armed and dangerous will elicit a compliant response. When the day finally comes and Adam crosses the threshold into the store, the police immediately arrest him. It turns out Adam's friend tipped them off.

There is little question the government could win a lawful conviction against Adam for attempted Hobbs Act robbery. After all, he intended to take property against the cashier's will by threat of force, and his actions constituted a substantial step toward that goal. At the same time, this example helps show why attempted Hobbs Act robbery does not qualify as a crime of violence under the elements clause. Adam did not "use" physical force. He did not "attempt" to use such force —his note was a bluff and never delivered. And he never even got to the point of threatening the use of force against anyone or anything. He may have intended and attempted to do just that, but he failed. Simply put, no element of attempted Hobbs Act robbery requires proof that the defendant used, attempted to use, or threatened to use force.

The upshot of all this for our case is clear. Mr. Taylor may be lawfully subject to up to 20 years in federal prison for his Hobbs Act conviction. But as the Fourth Circuit recognized, Congress has not authorized courts to convict and sentence him to a decade of further imprisonment under 🚩 § 924(c)(3)(A). [1]

### III

#### A

Resisting this conclusion, the government offers three principal replies. We take up first the argument the government presented before the Fourth Circuit and on which it prevailed in other circuits. See, *e.g.*, 🚩 *United States v. St. Hubert*, 909 F.3d 335, 352–353 (C.A.11 2018). This theory proceeds in the form of a syllogism. The government submits that the elements clause encompasses not only any offense that qualifies as a "crime of violence" but also any attempt to commit such a crime. And, the government reasons, because

completed Hobbs Act robbery qualifies as a crime of violence, it follows that attempted Hobbs Act robbery does too.

While the government pressed this argument in the courts of appeals, it affords it only a passing nod here. And the reason why quickly becomes clear: The government's syllogism rests on a false premise. The elements clause does not ask whether the defendant committed a crime of violence *or* attempted to commit one. It asks whether the defendant *did* commit a crime of violence—and it proceeds to define a crime of violence as a felony that includes as an element the use, attempted use, or threatened use of force. If Congress had wanted the elements clause to do the kind of work the government supposes, it could have easily said so. For example, it might have swept in those federal crimes that require as an element "the use or threatened use of force" *and* those "that constitute an attempt to commit an offense that has such an element." But that simply is not the law we have.

#### B

Recognizing the weakness of the argument it pressed below, the government spends much of its time before us elaborating two new theories. In the first, the government asks us to focus on the "substantial step" element of attempted Hobbs Act robbery. That element, the government submits, categorically requires it to prove that a defendant used, attempted to use, or threatened to use physical force.

This theory fails too, and for reasons we have already seen. Without question, many who commit the crime of attempted Hobbs Act robbery do use, attempt to use, or threaten to use force. Suppose, for example, that the police had arrested Adam after he handed over his threatening note to the cashier but before he received any money. In a case like that, the defendant would have threatened the use of force while committing an attempted Hobbs Act robbery. But *some* cases are not *all* cases, and the government's problem is that no *element* of attempted Hobbs Act robbery requires the government to prove beyond a reasonable doubt that the defendant used, attempted to use, or even threatened to use force. Individuals like our foiled robber who are arrested before they can threaten anyone may be convicted too. See *supra*, at –––––; cf. Model Penal Code, at 114–115.

Seeking a way around this problem, the government responds that we (and presumably the drafters of the Model Penal Code) misconstrue what qualifies as the "threatened use" of

ADDENDUM - Page 8

force. On its view, anyone who takes a substantial step toward completing Hobbs Act robbery (say, by buying a weapon, plotting his heist and getaway, writing an extortive note before he leaves home, and entering a store) objectively poses a "threatened use" of force even if he never communicates his threat to anyone.

This reply bears its own problems. To start, in the criminal law the word "threat" and its cognates usually denote "[a] communicated intent to inflict physical or other harm on any person or on property." [2] Of course, threats can be communicated verbally or nonverbally—pointing a gun at a cashier conveys a threat no less effectively than passing a note reading "your money or your life." But one way or another, some form of communication is usually required. Even the government concedes that the words "threatened force" in the Hobbs Act require proof that the defendant communicated a threat to a second person, whether or not that individual is the target of the threat. See Reply Brief 15.

That leaves the government to suggest that 🚩 § 924(c)(3)(A) differs from the Hobbs Act and represents an exception to the usual rule. Seeking to make that case, the government observes that, in some contexts, the word "threat" can be used to speak of a more objective or abstract risk. So, for example, a critic might say that a prison board's decision to parole a particular felon "threatens" community safety. Or a conservationist might argue that a government decision allowing commercial activity near a national park "threatens" wildlife habitat. Before us, the government submits that the elements clause uses the term in a similar way, requiring only an objective, if uncommunicated, threat to community peace and order. And, the government argues, anyone who takes a substantial step toward completing a Hobbs Act robbery always or categorically poses such a threat.

The trouble is, when Congress uses the word "threat" in this abstract and predictive (rather than communicative) sense, it usually makes its point plain. It may ask, for example, whether an individual or circumstance "poses" or "represents" a threat. See, e.g., 6 U.S.C. § 1170(a)(1) (discussing "individuals who may pose a threat to transportation security"); 8 U.S.C. § 1735(a) (immigration officials must determine that an "alien does not pose a threat to the safety or national security of the United States"). Here we have nothing like that. In fact, what textual clues we do have point in the opposite direction.

[5] [6] Take this one. The statute speaks of the "use" or "attempted use" of "physical force against the person

or property of another." Plainly, this language requires the government to prove that the defendant took specific actions against specific persons or their property. Reading the statute's remaining reference to the "threatened use of physical force against the person or property of another" as requiring a communicated threat fits with this design. By contrast, the government's competing interpretation would vastly expand the statute's reach by sweeping in conduct that poses an abstract risk to community peace and order, whether known or unknown to anyone at the time. It's a reading that would defy our usual rule of statutory interpretation that a law's terms are best understood by "the company [they] kee[p]."

🚩 *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995).

[7] Beyond that clue lies another. Next door to the elements clause Congress included the residual clause. Under its terms, "crimes of violence" were defined to embrace offenses that, "by [their] nature, involv[e] a substantial risk that physical force ... may be used" against a person or property. 🚩 § 924(c)(3)(B). Pretty plainly, that language called for an abstract inquiry into whether a particular crime, by its nature, poses or presents a substantial risk (or "threat") of force being used.

See 🚩 *Davis*, 588 U. S., at —— – ——, 139 S.Ct., at 2325–2327. Of course, this Court eventually held the residual clause to be unconstitutionally vague. 🚩 *Id.*, at ——, 139 S.Ct., at 2336. But if the government's view of the elements clause caught on, it would only wind up effectively replicating the work formerly performed by the residual clause, collapsing the distinction between them, and perhaps inviting similar constitutional questions along the way. It's an outcome that would (again) defy our usual rules of statutory interpretation—this time because we do not lightly assume Congress adopts two separate clauses in the same law to perform the same work. See, *e.g.*, 🚩 *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 839, n. 14, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988).

C

Heaping alternative upon alternative, the government's final theory accepts that a conviction under the elements clause requires a communicated threat of force. But, the argument goes, most attempted Hobbs Act robbery prosecutions involve exactly that. Indeed, the government faults Mr. Taylor for failing to identify a single case in which it has prosecuted

ADDENDUM - *Page 9*

someone for attempted Hobbs Act robbery without proving a communicated threat.

But what does that prove? Put aside the fact that Mr. Taylor *has* identified cases in which the government has apparently convicted individuals for attempted Hobbs Act robbery without proving a communicated threat. See, *e.g.*, *United States v. Williams*, 531 Fed. Appx. 270, 271–272 (C.A.3 2013). Put aside the oddity of placing a burden on the defendant to present empirical evidence about the government's own prosecutorial habits. Put aside, too, the practical challenges such a burden would present in a world where most cases end in plea agreements, and not all of those cases make their way into easily accessible commercial databases. See J. Turner, Transparency in Plea Bargaining, 96 Notre Dame L. Rev. 973, 974, 978–981 (2021).

An even more fundamental and by now familiar problem lurks here. The government's theory cannot be squared with the statute's terms. To determine whether a federal felony qualifies as a crime of violence, § 924(c)(3)(A) doesn't ask whether the crime is *sometimes* or even *usually* associated with communicated threats of force (or, for that matter, with the actual or attempted use of force). It asks whether the government must prove, as an *element* of its case, the use, attempted use, or threatened use of force.

Maybe that is the test the statute presupposes, the government answers, but this Court's case law requires its proposed empirical study all the same. Notice, though, the move implicit here. After previously admitting that we must employ a categorical approach when interpreting the reach of § 924(c)(3)(A), the government effectively backtracks. Instead of looking to the elements of attempted Hobbs Act robbery, the government now says that a defendant must present evidence about how his crime of conviction is normally committed or usually prosecuted. If this admittedly atextual theory seems doubtful on its face, a close look at the case the government invokes does not improve the picture.

The government points to *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007). There, this Court sought to apply provisions of the Immigration and Nationality Act. *Id.*, at 185, 127 S.Ct. 815. Under the INA, an individual with a prior state-court conviction that meets certain "generic" offense definitions under federal law may face deportation. *Id.*, at 186, 189, 127 S.Ct. 815; see

also 8 U.S.C. §§ 1101(a)(43)(G), 1227(a)(2)(A)(iii). In *Duenas-Alvarez*, there was no doubt that the relevant state offense overlapped significantly with the federal definition of generic "theft." 549 U.S. at 190, 127 S.Ct. 815. But, Mr. Duenas-Alvarez argued, state courts had interpreted the offense broadly to reach aiding and abetting conduct that fell "beyond generic theft." *Id.*, at 190–191, 127 S.Ct. 815. To test this assertion, the Court looked to state decisional law and asked whether a "realistic probability" existed that the State "would apply its statute to conduct that falls outside" the federal generic definition. *Id.*, at 193, 127 S.Ct. 815.

None of this begins to help the government for at least two reasons. First, the immigration statute at issue in *Duenas-Alvarez* required a federal court to make a judgment about the meaning of a state statute. Appreciating the respect due state courts as the final arbiters of state law in our federal system, this Court reasoned that it made sense to consult how a state court would interpret its own State's laws. Cf. *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709, n. 8, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985). Meanwhile, no such federalism concern is in play here. The statute before us asks only whether the elements of one federal law align with those prescribed in another. Second, in *Duenas-Alvarez* the elements of the relevant state and federal offenses clearly overlapped and the only question the Court faced was whether state courts *also* "appl[ied] the statute in [a] special (nongeneric) manner." 549 U.S. at 193, 127 S.Ct. 815. Here, we do not reach that question because there is no overlap to begin with. Attempted Hobbs Act robbery does not require proof of *any* of the elements § 924(c)(3)(A) demands. That ends the inquiry, and nothing in *Duenas-Alvarez* suggests otherwise. [3]

\*

The government quickly abandons the legal theory it advanced in the courts of appeals—and neither of the two new options it auditions before us begins to fill the void. In § 924(c)(3)(A), Congress did not condition long prison terms on an abstract judicial inquiry into whether and to what degree or that crime poses a risk to community peace and safety. Nor did it mandate an empirical inquiry into how crimes are usually committed, let alone impose a burden on

the defendant to present proof about the government's own prosecutorial habits.

Congress tasked the courts with a much more straightforward job: Look at the elements of the underlying crime and ask whether they require the government to prove the use, attempted use, or threatened use of force. Following that direction in this case, the Fourth Circuit correctly recognized that, to convict a defendant of attempted Hobbs Act robbery, the government does not have to prove any of those things. Accordingly, Mr. Taylor may face up to 20 years in prison for violating the Hobbs Act. But he may not be lawfully convicted and sentenced under 🚩 § 924(c) to still another decade in federal prison. The judgment of the Court of Appeals is

*Affirmed.*

Justice THOMAS, dissenting.

Justin Eugene Taylor and an accomplice pulled a gun on a fellow drug dealer as they tried to rob him. During the attempted robbery, the victim was shot and killed. Taylor pleaded guilty to using a firearm during an attempted Hobbs Act robbery, which he conceded was a "crime of violence" under 🚩 18 U.S.C. § 924(c)(3). Taylor made that concession because threatening to shoot someone during a robbery is undoubtedly a violent act. Yet, the Court holds that Taylor did not actually commit a "crime of violence" because a hypothetical defendant—the Court calls him "Adam"—could have been convicted of attempting to commit Hobbs Act robbery without using, attempting to use, or threatening to use physical force. *Ante,* at ——; see 🚩 § 924(c)(3)(A).

This holding exemplifies just how this Court's "categorical approach" has led the Federal Judiciary on a "journey Through the Looking Glass," during which we have found many "strange things." L. Carroll, Alice in Wonderland and Through the Looking Glass 227 (J. Messner ed. 1982). Rather than continue this 30-year excursion into the absurd, I would hold Taylor accountable for what he actually did and uphold his conviction. Accordingly, I respectfully dissent.

I

In 2002 and 2003, Justin Eugene Taylor was a middleman in the Richmond, Virginia, marijuana trade. He bought the drug wholesale and sold it to retail distributors. On August 14, 2003, he offered to obtain marijuana for retail distributor Martin Sylvester. Taylor ultimately failed to procure the drug but still aimed to purloin Sylvester's cash. To that end, Taylor contacted a co-conspirator who had a handgun. The two met Sylvester in an alley, ostensibly for the sale. They brandished the handgun and demanded the money. Sylvester resisted and was shot. The robbers fled, leaving Sylvester to die. 🚩 979 F.3d 203, 205 (C.A.4 2020).

Prosecutors in the Eastern District of Virginia charged Taylor with various drug and firearms offenses. Most relevant here, they charged him with violating 🚩 18 U.S.C. § 924(c), which punishes anyone who "uses or carries a firearm" "during and in relation to any crime of violence," or who possesses a firearm "in furtherance of any such crime." Congress defined a "crime of violence" in one of two ways: as an offense that has "as an element the use, attempted use, or threatened use of physical force against the person or property of another" (commonly called the "elements clause"), or as an offense that, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (commonly called the "residual clause"). 🚩 §§ 924(c)(3)(A), (B).

Prosecutors predicated Taylor's 🚩 § 924(c) charge on his commission of attempted Hobbs Act robbery. *Ante,* at —— (describing Hobbs Act robbery). In 2009, in exchange for the Government dropping most of the charges, Taylor pleaded guilty to conspiracy to commit Hobbs Act robbery and the 🚩 § 924(c) charge—that is, using a firearm during and in relation to a crime of violence. In doing so, he admitted to the attempted robbery and the shooting. He also admitted that attempted Hobbs Act robbery is a "crime of violence" under 🚩 § 924(c).

The District Court sentenced Taylor to 360 months' imprisonment—a 240-month sentence for the conspiracy and a 120-month consecutive sentence for the 🚩 § 924(c) conviction. Taylor appealed, but in 2011 the Court of Appeals dismissed the appeal because Taylor had waived his appellate rights in his plea agreement. Order in *United States* v. *Taylor*, No. 09–4468, ECF Doc. 54 (CA4, Jan. 7, 2011). In 2015, he then unsuccessfully sought postconviction relief under 28 U.S.C. § 2255. *United States v. Taylor,* 2015 WL 4095845, \*1 (ED Va., July 7, 2015).

ADDENDUM - Page 11

Decided around the time of his failed § 2255 motion, one of this Court's cases appeared to give Taylor another chance to challenge his conviction. In *Johnson v. United States, 576 U.S. 591, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015)*, the Court struck down the similarly worded residual clause of the Armed Career Criminal Act (ACCA), as unconstitutionally vague. The following year, in *Welch v. United States, 578 U.S. 120, 136 S.Ct. 1257, 194 L.Ed.2d 387 (2016)*, the Court held that *Johnson* applies retroactively on collateral review. Citing those two decisions, Taylor moved for permission to file a second-or-successive § 2255 petition. He argued that § 924(c)'s residual clause paralleled ACCA's residual clause and therefore was unconstitutionally vague. *979 F.3d at 206*. He further argued that attempted Hobbs Act robbery was not a "crime of violence" under § 924(c)'s elements clause because it lacked "as an element the use, attempted use, or threatened use of physical force." § 924(c)(3)(A).

The Court of Appeals granted the motion to file a successive habeas petition and, in 2020, vacated Taylor's § 924(c) conviction. It did so because, as the Court explains, our precedents require that courts apply a "categorical approach" when interpreting the elements clause. *Ante*, at ——. Under that approach, a criminal defendant who commits a violent crime nonetheless does not commit a "crime of violence" if a hypothetical criminal could commit the same offense without satisfying § 924(c)'s physical-force requirement. See *ibid.* Because someone else—"Adam"—could have committed attempted Hobbs Act robbery without physical force, the Court holds, Taylor's armed robbery that resulted in the victim's death is not a "crime of violence" under § 924(c).

## II

We have reached this point of absurdity only because this Court applies a narrow categorical approach to § 924(c)'s elements clause and has nullified the residual clause that would have captured crimes like Taylor's. It is hard to fathom why this makes sense or why any rational Congress would countenance such an outcome so divorced from reality.

## A

Our odyssey began in 1990, as the Court wrestled with a different clause found in a different part of § 924: ACCA's sentencing enhancement in § 924(e). Unlike § 924(c), which defines a substantive crime, ACCA imposes a sentencing enhancement that applies to any defendant with three or more prior "violent felon[ies]" whom the Federal Government convicts of illegally possessing a firearm. §§ 922(g), 924(e)(2). Like § 924(c), ACCA defines "violent felony" with an elements clause and a residual clause. The Act also includes an "enumerated-offenses" clause defining "violent felony" to include any crime that "is burglary, arson, or extortion, [or] involves use of explosives." § 924(e)(2).

In *Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)*, the Court first adopted a categorical approach when interpreting "burglary" under ACCA's enumerated-offenses clause. *Id., at 598, 110 S.Ct. 2143*. The Court construed "burglary" in the abstract, as a "generic burglary" with elements derived from a treatise and the Model Penal Code. *Id., at 593–598, 110 S.Ct. 2143*, and n. 8. The Court then held that the enumerated-offenses clause prohibits courts from looking to the "particular facts" of a defendant's burglary to see if the conduct satisfies the elements of generic burglary. *Id., at 600, 110 S.Ct. 2143*. It does not matter how violent the defendant's actual conduct was. Instead, courts must determine whether the elements of the burglary statute under which a defendant was convicted "substantially correspon[d]" to generic burglary. *Id., at 600, 602, 110 S.Ct. 2143*. Though *Taylor* gave "few reasons why" this so-called categorical approach "was the correct reading of ACCA," at the " 'heart of the decision' " were "worrie[s]" that a conduct-based approach to a sentencing enhancement might violate the Sixth Amendment by leading to "full-blown mini-trial[s], with factfinding by the judge instead of the jury." *Sessions v. Dimaya, 584 U. S. ——, —— – ——, 138 S.Ct. 1204, 1253, 200 L.Ed.2d 549 (2018)* (THOMAS, J., dissenting).

While *Taylor* applied the categorical approach only to ACCA's enumerated-offenses clause, the approach soon

migrated to the elements clauses in ACCA and elsewhere. See, *e.g., Borden* v. *United States*, 593 U. S. ——, ——, 141 S.Ct. 1817, 210 L.Ed.2d 63 (2021) (plurality opinion). In that context, the categorical approach demands that a court divine what constitutes the "*least* serious conduct [the prior conviction or predicate offense] covers" and decide whether that conduct "falls within the elements clause." *Id.*, at ——, 141 S.Ct., at 1827. To do that, a judge must "mull through any number of hypothetical ways to commit a crime that have nothing to do with the facts of the prior conviction" or the facts underlying a predicate 🚩 § 924(c) offense. 🏳️ *United States v. Burris*, 912 F.3d 386, 409 (C.A.6 2019) (Thapar, J., concurring). If a court identifies a way to commit the crime without using, attempting to use, or threatening to use force, then the crime is not a "violent felony" or "crime of violence" under ACCA's or 🚩 § 924(c)'s elements clauses. See 🏳️ *Borden*, 593 U. S., at ——, 141 S.Ct., at 1832.

This Court eventually extended the categorical approach to ACCA's residual clause as well. In 🏳️ *James v. United States*, 550 U. S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007), the Court, at the urging of both parties, "employ[ed] the 'categorical approach' " to analyze ACCA's residual clause. 🚩 *Id.*, at 202, 127 S.Ct. 1586 (quoting 🏳️ *Shepard v. United States*, 544 U. S. 13, 17, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005)). That clause defines a "violent felony" as one that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 🚩 § 924(e)(2)(B)(ii). 🚩 *James* explained that ACCA's residual-clause categorical approach boiled down to two steps. First, a court looked to the elements of the crime for which the defendant was convicted and asked what conduct the "ordinary case" of that crime entailed. 🚩 550 U. S., at 208, 127 S.Ct. 1586. Second, the court asked whether that "ordinary case" "present[ed] a serious potential risk of injury to another" comparable to that posed by the specific crimes listed in the enumerated-offenses clause. 🚩 *Id.*, at 204, 208–209, 127 S.Ct. 1586. If it did, then the predicate crime was a "violent felony."

That test proved difficult to apply. In particular, the Court struggled with how to define the "ordinary case" of a given predicate crime. See 🏳️ *Johnson*, 576 U.S., at 597, 135 S.Ct. 2551 ("How does one go about deciding what kind of conduct the ordinary case of a crime involves? A statistical analysis of the state reporter? A survey? Expert evidence? Google?

Gut instinct?" (internal quotation marks omitted)). The Court likewise struggled in assessing what level of risk the ordinary case presented. 🏳️ *Id.*, at 598, 135 S.Ct. 2551. After trying to apply this approach several times, see, *e.g.,* 🏳️ *Begay v. United States*, 553 U. S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), the Court in 🏳️ *Johnson* ultimately abandoned the project. But rather than reassess whether it had adopted the right analytical framework in light of ACCA's text and statutory context, the Court in 🏳️ *Johnson* nullified ACCA's residual clause altogether. See 🏳️ 576 U.S. at 624, 135 S.Ct. 2551 (THOMAS, J., concurring in judgment). According to the Court, the "[t]wo features" of the residual-clause analysis that the Court set out in 🏳️ *James*—identifying "ordinary case" conduct and judging whether that abstracted conduct "presents a serious risk of physical injury"—"conspire[d] to make [the residual clause] unconstitutionally vague." 🏳️ 576 U.S. at 597–598, 135 S.Ct. 2551 (majority opinion).

That conclusion was not inevitable. The 🏳️ *Johnson* Court did "not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." 🏳️ *Id.*, at 603–604, 135 S.Ct. 2551. Thus, the Court "all but concede[d] that the residual clause would be constitutional if," rather than incorporating 🏳️ *James*' categorical approach, it looked to whether the " 'real-world conduct' " of the underlying conviction presented a serious risk of physical injury to another. 🏳️ 576 U.S. at 632, 135 S.Ct. 2551 (ALITO, J., dissenting).

Despite recognizing that a conduct-based approach was constitutionally sound, the Court later extended 🏳️ *Johnson* to the residual clause in 🚩 § 924(c). See *United States* v. *Davis*, 588 U. S. ——, ——, 139 S.Ct. 2319, ——, 204 L.Ed.2d 757 (2019). The 🏳️ *Davis* Court decided that the 🚩 § 924(c) residual clause's language was so similar to the ACCA residual clause that it, too, must be void for vagueness. 🏳️ *Id.*, at —— – ——, —— – ——, 139 S.Ct., at 2326–2327, 2336. Four of us, however, advanced a more sensible approach: Rather than extend 🏳️ *Johnson* to nullify 🚩 § 924(c)'s residual clause, we should simply not use the categorical approach when interpreting residual clauses and adopt a framework focused on the defendant's actual conduct

ADDENDUM - Page 13

that *Johnson* conceded was constitutional. See 588 U. S., at –––– – ––––, 139 S.Ct., at 2331–2332 (KAVANAUGH, J., dissenting).

As the *Davis* dissent explained, § 924(c)'s residual clause is best interpreted to call for a conduct-based approach. *Id.,* at –––– – ––––, 139 S.Ct., at 2332–2336. To begin with, the plain text of the residual clause strongly supports a conduct-based approach. See *ibid.* Further, none of the perceived Sixth Amendment concerns that attend to ACCA's sentencing enhancement are present in the § 924(c) context, because a "jury will find the facts or, if the case ends in a guilty plea, the defendant will accept the facts in the plea agreement." *Id.,* at ––––, 139 S.Ct., at 2345. Finally, if any ambiguity remains, a conduct-based approach to § 924(c)'s residual clause best accords with the canon counseling courts to construe statutes not to violate the Constitution whenever possible. See *id.,* at –––– – ––––, 139 S.Ct., at 2351 ("To be clear, the case before us is not a case of avoiding *possible* unconstitutionality. This is a case of avoiding *actual* unconstitutionality"); see also *Dimaya,* 584 U. S., at ––––, 138 S.Ct., at 1252 (THOMAS, J., dissenting). Thus, read properly, the residual clause is as constitutionally sound as any other criminal law applying " 'a qualitative standard ... to real-world conduct.' " *Davis,* 588 U. S., at ––––, 139 S.Ct., at 2339 (KAVANAUGH, J., dissenting) (quoting *Johnson,* 576 U.S. at 604, 135 S.Ct. 2551). Nothing in the three years since *Davis* has changed that.

### B

To the contrary, the last three years have instead shown how our § 924(c) precedents have "left prosecutors and courts in a bind." *Borden,* 593 U. S., at ––––, 141 S.Ct., at 1835 (THOMAS, J., concurring in judgment). Section 924(c)'s residual clause—which squarely applies to the mine run of violent crimes—is no longer available. The categorical approach, meanwhile, forecloses § 924(c)'s elements clause unless, in every hypothetical prosecution, the crime of conviction requires the Government to prove that physical force against another was used, attempted, or threatened. In case after case, our precedents have compelled courts to hold that heinous crimes are not "crimes of violence" just because someone, somewhere, *might* commit that crime without using force.

A few examples from the Courts of Appeals demonstrate how our precedents have emasculated § 924(c). First, in *United States v. Walker,* 934 F.3d 375 (2019), the Fourth Circuit considered whether a conviction for federal kidnaping could predicate a § 924(c) conviction. See *id.,* at 376 (citing § 1201(a)). Walker and an accomplice had kicked in the door of a family's home, held the victims at gunpoint, beat some of them, demanded money, and threatened to kill the family's 4-year-old daughter, all before locking the family in a closet and ransacking the house. Factual Basis for Guilty Plea in *United States v. Walker,* 934 F.3d 375 (2014). No one could dispute that Walker's conduct presented a "substantial risk that physical force" would be used "in the course of committing the offense." § 924(c)(3)(B). Yet, because of *Davis,* the Fourth Circuit could not invoke the residual clause. See *Walker,* 934 F.3d at 378. That left only § 924(c)(3)'s elements clause, interpreted according to the inflexible categorical approach. Compelled to imagine whether federal kidnaping could hypothetically be committed without the use of physical force, the Fourth Circuit ultimately vacated Walker's § 924(c) conviction because a criminal could commit the offense by "inveigl[ing]" a victim and then holding him in captivity with a "mental restraint." *Id.,* at 378–379 (emphasis deleted). [1]

Second, in *United States v. Tsarnaev,* 968 F.3d 24 (C.A.1 2020), reversed on other grounds, 595 U. S. ––––, 142 S.Ct. 1024, 212 L.Ed.2d 140 (2022), the First Circuit considered whether a terrorist's conviction for federal arson—which he committed in the course of carrying out the Boston Marathon bombings—counted as a crime of violence under § 924(c). Tsarnaev and his brother intentionally detonated bombs that killed three people, including an 8-year-old, and injured hundreds more. See *id.,* at –––– – ––––. Yet, the categorical-approach precedents led the First Circuit to the admittedly "counterintuitive" conclusion that federal arson resulting in death arising from a terrorist bombing was not a crime of violence. *Tsarnaev,* 968 F.3d at 102. The residual clause

ADDENDUM - Page 14

had been nullified, *id., at 99*, and the First Circuit held that federal arson did not satisfy the elements clause because it theoretically could have been committed recklessly, *id., at 102*, [2] which, we have held in the ACCA context, renders a crime outside the elements clause, see *Borden*, 593 U. S., at —— – —— (plurality opinion).

Finally, in *United States v. Ledbetter*, 929 F.3d 338 (C.A.6 2019), the Sixth Circuit vacated two convictions under 18 U.S.C. § 924(j), which criminalizes "caus[ing] the death of a person through the use of a firearm" "in the course of a violation of " § 924(c). 929 F.3d at 360–361. The two defendants were associated with a gang called the "Short North Posse." *Id., at 359*. One belonged to a subunit of the gang, appropriately named the " 'Homicide Squad,' " which "specializ[ed] in murders and robberies." *Id., at 345*. In August 2007, they joined a team of gang members who broke into a home and shot a victim to death. *Id., at 359*. Section 924(c)'s residual clause would have covered the defendants' conduct, given that there is obviously a "substantial risk that physical force" would be "used in the course of " a gangland home-invasion murder. § 924(c)(3)(B). But *Davis* had nullified that clause, and the Government conceded that conspiracy to commit Hobbs Act robbery—the predicate crime for the defendants' § 924(j) convictions—was not a crime of violence under this Court's elements-clause precedents. 929 F.3d at 360–361. These are not the only homicide-related § 924 convictions that *Davis* has undermined. [3]

These examples show how our precedents have led the Federal Judiciary to "a pretend place." *United States v. Davis*, 875 F.3d 592, 595 (C.A.11 2017). With the residual clause nullified, courts cannot look to it to capture violent crimes. And, because of the categorical approach, the elements clause often does not apply because "other defendants at other times may have been convicted, or future defendants could be convicted, of violating the same statute without violence." *Ibid*. Like Alice, we have strayed far "down the rabbit hole," and "[c]uriouser and curiouser it has all become." *Ibid*.

## III

There is a straightforward solution to this problem—overrule *Davis*. Cf. *Borden*, 593 U. S., at ——, 141 S.Ct., at 1835 (opinion of THOMAS, J.) ("There is a straightforward solution to this dilemma—overrule *Johnson*"). It is a demonstrably erroneous precedent that veered from the best interpretation of § 924(c)'s residual clause. See *supra*, at —— – —— (citing *Davis*, 588 U. S., at —— – ——, 139 S.Ct., at 2331–2332 (KAVANAUGH, J., dissenting)); cf. *Johnson*, 576 U.S., at 613, 135 S.Ct. 2551 (THOMAS, J., concurring in judgment) (noting this Court's habit of wielding due process doctrines like vagueness "to achieve its own policy goals"). Accordingly, I would overrule *Davis* and adopt in its place the conduct-based approach that the *Davis* dissent described. Overruling *Davis* would revive § 924(c)'s residual clause, once again allowing the statute to capture the vast majority of § 924(c) convictions that elude an elements clause straightjacketed by the categorical approach.

With a revived residual clause, resolving this case is easy. Taylor's counsel acknowledged that Congress "enacted the residual clause to capture cases just like" Taylor's. Tr. of Oral Arg. 48–49. His confessed conduct—an attempted armed robbery during which the victim was shot and killed—"by its nature, involve[d] a substantial risk that physical force" would be used. § 924(c)(3)(B). Thus, Taylor committed a predicate offense that supported his § 924(c) conviction. *Taylor*'s appeal should therefore fail, and he should serve the 10 years in prison he received for the § 924(c) conviction.

This same logic would have saved the other convictions described above. Equipped with a revived residual clause focused on the defendant's actual conduct, those federal courts would not have had to vacate the § 924(c) convictions of kidnapers who threatened families, terrorists who bombed sporting events, or murderers who shot their victims. In other words, those courts could have applied the statute that Congress enacted rather than the one this Court effectively rewrote and then nullified.

ADDENDUM - Page 15

## IV

The costs of our decisions imposing the categorical approach on § 924(c) and other statutes have been immense. Apart from the unnatural results it produces in § 924(c) cases, the categorical approach has led to equally baffling ones in the ACCA context and elsewhere. See, *e.g.*, *Burris*, 912 F.3d at 407 (Thapar, J., concurring) ("A casual reader ... might struggle to understand why we are even debating if ramming a vehicle into a police officer is a crime of violence");

*Davis*, 875 F.3d at 604 (holding that a man charged with first-degree rape who pleaded to first-degree sexual abuse by forcible compulsion had not committed an ACCA "violent felony" because the force required was insufficiently violent). Moreover, courts attempting to apply the categorical approach waste time thinking up improbable hypotheticals, making the approach "very difficult to administer." *Burris*, 912 F.3d at 407 (Thapar, J., concurring); see also, *e.g.*, *Cradler v. United States*, 891 F.3d 659, 672 (C.A.6 2018) (Kethledge, J., concurring) ("Whatever the merits of this approach, accuracy and judicial efficiency are not among them"). Finally, Congress, through legislation, created crimes like § 924(c) and enhancements like ACCA to reduce gun crime rates by imposing long sentences on violent criminals who use firearms. See *Davis*, 588 U. S., at —— – ——, 139 S.Ct., at 2336–2337(KAVANAUGH, J., dissenting). Yet, as a growing chorus of Court of Appeals judges has explained, the categorical approach stymies that effort. See, *e.g.*, *United States v. Ovalles*, 905 F.3d 1231, 1253–1257 (C.A.11 2018) (W. Pryor, J., concurring). No rational legislature would have implicitly imposed this byzantine and resource-depleting legal doctrine that so encumbers federal courts and threatens public safety.

Worse still, this Court has imposed these costs on the federal courts and the public even though the text of these provisions does not demand them. I have already pointed out the "absurdity of applying the categorical approach to the enumerated-offenses clause" of ACCA and have suggested that a conduct-based approach better fits the text. *Quarles v. United States*, 587 U. S. ——, ——, 139 S.Ct. 1872, 1880, 204 L.Ed.2d 200 (2019) (THOMAS, J., concurring). And although the categorical approach might

be a "linguistically possible" interpretation of the residual clauses, "the underlying-conduct approach is the better one." *Dimaya*, 584 U. S., at ——, 138 S.Ct., at 1255 (THOMAS, J., dissenting). And finally, while I have suggested that the categorical approach applies most plausibly in the elements-clause context, see *id.,* at ——, 138 S.Ct., at ——, the Government has suggested that even that clause might better accord with a conduct-based approach. Tr. of Oral Arg. 5–6; see also *Burris*, 912 F.3d at 409–410 (Thapar, J., concurring).

In light of the mischief that the categorical approach has caused, we should welcome briefing on whether a conduct-based approach tacks closer to statutory text and common sense—especially in the elements-clause context. If it does, we should adopt it. [4]

\* \* \*

Even Alice, having slaked her curiosity, eventually returned from the land beyond the looking glass. It is high time that this Court do the same. In this case, I would begin the trek back by adopting the *Davis* dissent's conduct-based approach, reviving § 924(c)'s residual clause, and reversing the judgment below. And in future cases, when it comes to interpreting § 924(c)'s elements clause, I will carefully consider alternatives to this Court's atextual and ever-more-absurd categorical approach. For these reasons, I respectfully dissent.

Justice ALITO, dissenting.

As Justice THOMAS clearly shows, the offense for which respondent Justin Taylor was convicted constituted a "violent felony" in the ordinary sense of the term. Taylor and an accomplice met with Martin Silvester for the ostensible purpose of selling him marijuana, but unbeknownst to Silvester, Taylor and his accomplice did not intend to complete the sale. Instead, they had agreed to threaten Silvester with a 9-millimeter pistol and demand that he hand over his money. When Silvester refused to comply with their demand, Taylor's accomplice shot Silvester, and he died the next day. Taylor was convicted of using and carrying a firearm during, and in relation to, a crime of violence, 18 U.S.C. § 924(c)(3)(A). That conviction was based on a predicate act of

attempted robbery in violation of the Hobbs Act, 🚩 18 U.S.C. § 1951(a).

The Court holds that this violent (and, indeed, deadly) offense did not constitute a "crime of violence" under the technical definition of that term in 🚩 § 924(c)(3)(A). I agree with Justice THOMAS that our cases involving 🚩 § 924(c)(3)(A) have veered off into fantasy land. [1] But if the Court is going to disregard the real world and base its decisions in this area on a strict reading of the text, the "offense" for which Taylor was convicted—attempted Hobbs Act robbery—meets the definition in 🚩 § 924(c)(3)(A). That definition provides that an "offense" qualifies as a " 'crime of violence' " if it is a felony and "has as an *element* the use, attempted use, or threatened use of physical force against the person ... of another." (Emphasis added.)

The key point is the meaning of "an element" of an offense. This is a fundamental criminal law concept, and we must therefore presume that 🚩 § 924(c)(3)(A) employs the term in its usual and established sense. See A. Scalia & B. Garner, Reading Law 320–321 (2012). And the usual and established meaning of an "element" is clear: It is a " 'constituent par[t]' of a crime's legal definition—[a] thin[g] the 'prosecution must prove beyond a reasonable doubt to sustain a conviction.' "

🚩 *Mathis v. United States*, 579 U.S. 500, 504, 136 S.Ct. 2243, 195 L.Ed.2d 604 (2016) (quoting Black's Law Dictionary 634 (10th ed. 2014)). See also, *e.g.*, 🚩 *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); 🚩 *United States v. Gaudin*, 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

It is also established that there are two different types of elements. Some are invariant; that is, they must be proved in every case. But it is not uncommon for statutes to include a set of alternative elements and to provide that one, but not all, of these alternative elements must be proved to secure a conviction. As the Court said in 🚩 *Descamps v. United States*, 570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013), a statute may "se[t] out one or more elements of the offense in the alternative—for example, [by] stating that burglary involves entry into a building *or* an automobile." 🚩 *Id.*, at 257, 133 S.Ct. 2276 (emphasis in original).

The Hobbs Act includes both types of elements. It criminalizes a robbery that "obstructs, delays, or affects" interstate commerce, 🚩 18 U.S.C. § 1951(a), and it defines "robbery" to mean "the unlawful taking or obtaining of personal property from the person ... of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future," 🚩 § 1951(b)(1). Accordingly, the elements of Hobbs Act robbery are (1) the unlawful taking or obtaining (2) of personal property (3) from the person of another (4) against his or her will (5) by means of actual or (6) by means of threatened force, or (7) by means of violence, or (8) by means of fear of injury. The first four elements must be proved in every case, while the last four are alternative elements any one of which is sufficient for conviction. [2] A completed Hobbs Act robbery satisfies 🚩 § 924(c)(3)(A) because multiple elements involve "the use, attempted use, or threatened use of physical force against the person or property of another." Elements (5) thorough (8) obviously qualify, and it is possible that element (4) does as well.

The offense of attempted Hobbs Act robbery also qualifies. A person commits a criminal attempt if he or she takes a " 'substantial step' toward completing" an intended offense. 🚩 *United States v. Resendiz-Ponce*, 549 U.S. 102, 106–107, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007) (quoting 2 W. LaFave, Substantive Criminal Law § 11.4) (2d ed. 2003)). In other words, a defendant must intend to commit some combination of elements that is sufficient to constitute Hobbs Act robbery and must take a substantial step toward the commission of such a combination of elements. If we label these combinations as A, B, C ..., then the elements of attempted Hobbs Act robbery are (1) intending to commit at least one qualifying combination, *i.e.*, A, B, C ..., and (2) taking a substantial step toward the commission of A, B, C .... Each such combination constitutes an "offense" within the meaning of 🚩 § 924(c)(3), and several combinations satisfy the definition of a "crime of violence."

Here is a straightforward example: A hypothetical defendant (let's call her "Eve") intends to take or obtain personal property from the person of another unlawfully and against his or her will by means of actual force. Eve is guilty of the "offense" of attempted Hobbs Act robbery, and her offense "has as an element the use ... of physical force against the

person ... of another." That is where the Court must end up if it looks at only the text of 🚩 § 924(c)(3)(A) and the Hobbs Act.

It is no answer to this argument that Taylor is not Eve. He is also not Adam. The whole point of the categorical approach that the Court dutifully follows is that the real world must be scrupulously disregarded.

The Court reaches the opposite conclusion only because it accepts the proposition—which the Government did not contest—that a felony "has *as an element* the use, attempted use, or threatened use of physical force" only if the felony "*always* requires the government to prove" the use, attempted use, or threatened use of force "beyond a reasonable doubt, as an element of its case." *Ante,* at —— (emphasis added); see Brief for Respondent 13–18. In other words, the Court assumes that an offense *X* has an element *A* if and only if convicting a defendant of *X* requires the Government to prove *A* in every prosecution for offense *X*. Based on this assumption, the Court infers that attempted Hobbs Act robbery is not a "crime of violence" under 🚩 § 924(c)(3)(A) because it is *possible* to commit that offense without attempting to use force.

There is no textual basis for this reading, and I would not adopt an erroneous interpretation that will govern a multitude of cases just because the Government has made an improvident concession in this case. If the Court wants to hold the Government to the position it has taken here, it can dismiss the case and give Taylor the benefit of the judgment in his favor below. But a party's mistaken argument should not be permitted to alter the meaning of the law Congress enacted.

Nothing in our precedent suggests that we should deviate from 🚩 § 924(c)(3)(A)'s plain text. We have never interpreted 🚩 § 924(c)(3)(A) to require a version of the categorical approach that would exclude from the elements that an offense "has" those elements that may be proved as alternatives to one another. The most we have said is that, in applying the categorical approach to *other* statutory provisions, statutes setting forth disjunctive or alternative elements should be analyzed through what we have called the "modified categorical approach." See 🚩 *Descamps,* 570 U.S. at 260–264, 133 S.Ct. 2276 ("burglary" under Armed Career Criminal Act, 🚩 18 U.S.C. § 924(e)); 🚩 *Shepard v. United States,* 544 U.S. 13, 24–26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (same). Under this approach, courts must examine "a

limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy)" to determine which alternative element of an offense figured in the crime for which the defendant was convicted. 🚩 *Mathis,* 579 U.S. at 505, 136 S.Ct. 2243.

As I have previously explained, the modified categorical approach is difficult to apply, and I would not apply it here. See 🚩 *id.,* at 536–544, 136 S.Ct. 2243 (dissenting opinion); 🚩 *Descamps,* 570 U.S. at 281–296, 133 S.Ct. 2276 (ALITO, J., dissenting). Instead, I would simply hold that because one of the elements of the attempted Hobbs Act robbery is the attempted use of force, that offense falls within 🚩 § 924(c)(3)(A)'s definition of "crime of violence."

But if we were to apply the modified categorical approach in this case, the result would be the same. In his plea agreement and associated statement of facts, Taylor admitted that he and his accomplice intended to lure Silvester into an alleyway, hold him at gunpoint, and take his money "by force" in the event that he resisted. And Taylor and his accomplice took more than a substantial step toward realizing this plan. After all, they ultimately *shot and killed* Silvester. So in accepting Taylor's plea, it is plain that the sentencing judge determined that Taylor had intended to commit Hobbs Act robbery by using force and had taken a substantial step toward the accomplishment of that end. That is more than sufficient to show that Taylor's actual crime "ha[d] as an element the ... use of physical force against the person ... of another." 🚩 § 924(c)(3)(A).

For these reasons, I believe that the Court's approach and ultimate holding in this case are misguided. I would hold that Taylor committed a "crime of violence" within the meaning of 🚩 § 924(c)(3)(A) and reverse the judgment of the Fourth Circuit below. But there is a silver lining in the majority opinion. Because the Court assumes—and does not hold—that alternative elements do not qualify as independent elements of a crime for purposes of applying 🚩 § 924(c)(3)(A), the Government remains free to advance the correct interpretation of that provision in a future case. For my purposes, however, the text of the statute is clear enough to support reversal here and now. As a result, I respectfully dissent.

ADDENDUM - Page 18

**All Citations**

142 S.Ct. 2015, 22 Cal. Daily Op. Serv. 5988

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See 🚩 *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    Justice THOMAS concedes that the foregoing analysis is correct under our categorical approach precedents. See *post*, at —— (THOMAS, J., dissenting). He contends only that we should overrule 30 years' worth of our categorical approach precedents in order to relieve the " 'bind' " they place on prosecutors. *Post*, at ——, ——. But not even the prosecutors for whom Justice THOMAS professes concern seek anything like that. Nor does he articulate any plausible way to understand the terms of the elements clause without reference to the categorical approach. See *post*, at —— (merely "welcom[ing] briefing" on the topic).

2    Black's Law Dictionary 1327 (5th ed. 1979) (defining "threat"); Stroud's Judicial Dictionary 2633 (5th ed. 1986) (defining "threat" and "threaten"); see also, *e.g.*, Oxford English Dictionary 998 (2d ed. 1989) (threaten: "To try to influence (a person) by menaces; to utter or hold out a threat against; to declare (usually conditionally) one's intention of inflicting injury upon"); Webster's Third New International Dictionary 2382 (3d ed. 1986) (threaten: "to utter threats against"; to "promise punishment, reprisal, or other distress to"); American Heritage Dictionary 1265 (2d ed. 1985) (threat: "An expression of an intention to inflict pain, injury, evil, or punishment"); *ibid.* (threaten: "[t]o express a threat against").

3    Justice ALITO offers still another argument on the government's behalf. According to our colleague, the crime of completed Hobbs Act robbery requires the government to prove beyond a reasonable doubt, and a unanimous jury must agree on, the particular "means" by which the defendant committed his offense—by "actual" force, "threatened force," "violence," or "fear of injury." 🚩 § 1951(b)(1); *post*, at —— – —— (dissenting opinion). And because attempts to commit robbery by *some* of these means could qualify as crimes of violence under 🚩 § 924(c)(3)(A), Justice ALITO would classify the *entire* offense of attempted Hobbs Act robbery a "crime of violence." *Post*, at ——. But the parties have not whispered a word about any of this. Perhaps for good reason too. For one thing, it is unclear whether the Act's "means" clause sets forth elements or merely lists alternative ways a defendant may take or obtain property against the victim's will. If the latter is true, as some courts have held, a jury need unanimously conclude only that the defendant used one of the listed means; it need not agree on which one. See, *e.g.*, 🚩 *United States v. St. Hubert*, 909 F.3d 335, 348–349 (C.A.11 2018); *United States v. Hancock*, 168 F. Supp. 3d 817, 821 (D. Md. 2016). For another, even assuming the Act is divisible in the sense he suggests, Justice ALITO acknowledges that his some-is-good-enough approach defies this Court's precedents. *Post*, at ——; 🚩 *Descamps v. United States*, 570 U.S. 254, 260–264, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013).

1    See also, *e.g.*, *United States v. Brazier*, 933 F.3d 796, 798–801 (C.A.7 2019) (federal kidnaping not a crime of violence under 🚩 § 924(c) despite victim being bound, gagged, tortured, and shot); *Bufkin v. United States*, 800 Fed. Appx. 436, 437, 439 (C.A.7 2020) (Government conceding that federal kidnaping is not a crime of violence even when "the two defendants threatened the victim at gunpoint, robbed, bound, and gagged him,

ADDENDUM - Page 19

and drove him around in the trunk of the car for four hours before releasing him"); *United States v. Sanford*, 779 Fed. Appx. 568, 570 (C.A.10 2019) (vacating 🚩 § 924(c) convictions even when the underlying conduct involved kidnaping, threatening, and robbing a family, all at gunpoint).

2 See *United States v. Moore*, 802 Fed. Appx. 338, 340–342 (C.A.10 2020) (federal arson not a crime of violence even when the defendant ignited a homemade bomb during an attempt to blow up a shopping mall).

3 See, *e.g.,* 🚩 *United States v. Capers*, 20 F.4th 105, 111–112 (C.A.2 2021) (applying 🚩 *United States v. Davis*, 588 U. S. ——, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019), and finding that a federal Racketeer Influenced and Corrupt Organizations Act conspiracy resulting in a gangland killing could not predicate a 🚩 § 924(j) conviction; see also, *e.g.,* Brief for United States in *Grzegorczyk* v. *United States*, O. T. 2021, No. 21–5967 (Government conceding that, after *Davis*, a federal murder-for-hire conviction was not a crime of violence under 🚩 § 924(c)).

4 Meanwhile, Justice ALITO's dissent offers an intriguing alternative interpretation of 🚩 § 924(c)(3)(A)'s elements clause. See *post*, at —— – ——. While no party advocates for the interpretation in this case, we should welcome further briefing on it as well.

1 The major reason for this excursion was the adoption and spread of the so-called categorical approach. Although the Court originally adopted the "categorical approach" in 🚩 *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), for other reasons, the major impetus for the expansion of that approach was concern that allowing the enhancement of a sentence based on facts found by a judge would violate the Sixth Amendment jury-trial right as interpreted in 🚩 *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and later related cases. It is questionable whether those cases are consistent with the original meaning of the Sixth Amendment. See 🚩 *Alleyne v. United States*, 570 U.S. 99, 132–134, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013) (ALITO, J., dissenting); 🚩 *Cunningham v. California*, 549 U.S. 270, 298, n. 1, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007) (ALITO, J., dissenting); see also M. McConnell, The *Booker* Mess, 83 Denver U. L. Rev. 665, 679 (2006) (explaining that "fully discretionary sentencing" was the norm "when the Sixth Amendment was adopted"); J. Mitchell, Apprendi's Domain, 2006 S. Ct. Rev. 297, 298–299 ("*Apprendi*'s historical claim that sentencing enhancements were treated as 'elements' ... whenever they increased a defendant's maximum punishment is demonstrably mistaken"); R. Little & T. Chen, The Lost History of *Apprendi* and the *Blakely* Petition for Rehearing, 17 Fed.SentencingRep. 69, 69–70 (2004) (arguing that *Apprendi* was "undoubtedly founded on an erroneous historical understanding"); S. Bibas, Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Pleas, 110 Yale L. J. 1097, 1123–1132 (2001) (arguing that discretionary sentencing was characteristic of 18th-century misdemeanor sentencing and no fixed rule emerged even in the 19th century). But even if the approach were necessary when a court is determining a defendant's sentence, no Sixth Amendment concern is implicated under 🚩 § 924(c), and the Court thus erred in holding that the categorical approach applied to the residual clause of that statute in 🚩 *United States* v. *Davis*, 588 U. S. ——, —— – ——, 139 S.Ct. 2319, 2331–2332, 204 L.Ed.2d 757 (2019) (KAVANAUGH, J., dissenting).

2 There is no plausible argument that actual force, threatened force, violence, and fear of injury are only "means" of committing Hobbs Act robbery and not elements of the offense under the logic of the Court's decision in 🚩 *Mathis v. United States*, 579 U.S. 500, 136 S.Ct. 2243, 195 L.Ed.2d 604. Distinct "means" of carrying out an offense are "alternative means of satisfying one (or more) of its elements." 🚩 *Id.,* at 503, 136 S.Ct. 2243.

In other words, the "means" of carrying out an offense are ways of carrying out an element of that offense. But there is no overarching element of Hobbs Act robbery of which actual or threatened force, violence, or fear of injury could be subordinate means of performing. And in any case, a jury must find that the prosecution proved beyond a reasonable doubt that the defendant took or obtained property from the person of another by way of force, threatened force, violence, or fear of injury, which entails that these ways of effectuating robbery constitute elements of the offense. See 🚩 *id.*, at 504–506, 136 S.Ct. 2243.

---

**End of Document**© 2022 Thomson Reuters. No claim to original U.S. Government Works.



HOURLY NEWS
Play Live Radio
LISTEN LIVE

PLAYLIST



DONATE

SUBSCRIBE TO THE NPR POLITICS PODCAST

POLITICS

# The Senate gun bill would close the 'boyfriend loophole.' Here's what that means

Updated June 23, 2022 · 11:47 AM ET

Heard on Morning Edition

RACHEL TREISMAN

**5-Minute Listen**

PLAYLIST        Download

Transcript



ADDENDUM - Page 22

The U.S. Capitol Dome is pictured in Washington on Tuesday, the day Senate negotiators reached a bipartisan agreement on a gun safety bill.

*Anna Moneymaker/Getty Images*

Congress soon may pass its most significant gun legislation in three decades. Senators are working to fast-track a bipartisan gun safety bill that negotiators recently finalized, spurred by mass shootings last month in Buffalo, N.Y., and Uvalde, Texas.

The Senate, which advanced the bill in a 64-34 vote on Tuesday, will hold a procedural vote on Thursday to end debate and prevent a filibuster from blocking the bill.



UVALDE ELEMENTARY SCHOOL SHOOTING

Senators reach final bipartisan agreement on a gun safety bill

The Bipartisan Safer Communities Act is expected to clear that vote and head for final passage in the Senate by the weekend, just ahead of lawmakers' July recess. It would then go to the House for expected passage, at which point President Biden — who has urged Congress to move without delay — has said he would sign it.

The bill's measures are narrowly focused, with lawmakers aiming to craft legislation that would earn a filibuster-proof 60 votes in the evenly-divided Senate. That means it falls short of many of the changes that Democrats long have been pushed for, including universal background checks and a ban on military-style semiautomatic rifles.

**Sponsor Message**

ADDENDUM - Page 23

Still, Democrats and gun safety advocates are hailing the legislation as an important and incremental step in the right direction. Among other provisions, it would expand background checks for prospective gun buyers between the ages of 18 and 21, incentivize states to create red-flag laws, and give states more funding for school safety and mental health resources.



**LIFE KIT**

Abusive relationships are disturbingly common. Here's how to support a loved one

It also would close the so-called "boyfriend loophole" in a law that prevents people convicted of domestic abuse from owning a gun. That law currently only applies to people who are married to, living with or have a child with the victim.

April Zeoli, a professor of criminal justice and public health at Michigan State University, says those limited categories don't reflect the fact that people spend a lot more time dating now than they did in the past, with women marrying on average in their late 20s and men in their early 30s.

"Because we spend all this time dating, it doesn't mean that violence doesn't happen," Zeoli told *Morning Edition*'s A Martínez. "It still happens, but the dating partners right now aren't covered by the federal restriction."

ADDENDUM - Page 24

More than a thousand women are killed by intimate partners every year in the United States, based on FBI and CDC data, and about half of the intimate partner homicides in the U.S. are perpetrated by an unmarried partner, a 2018 study found.

## The bill would close the loophole, but add a caveat

Democrats long have tried to broaden the definition of who qualifies for the ban. Their most recent attempt, an effort to add it to the reauthorization of the 1994 Violence Against Women Act that passed in March, was unsuccessful.

While that effort was on going, some states addressed the boyfriend loophole within their jurisdictions.

Thirty-one states have policies prohibiting convicted domestic abusers from having guns, according to a tracker from Everytown for Gun Safety. Of those, 19 go beyond the federal prohibition to cover abusive dating partners.



**POLITICS**

Violence Against Women Act reauthorization is added to a $1.5 trillion spending bill

The Bipartisan Safer Communities Act is poised to finally make that change on the federal level. It adds and defines the term dating relationship as "a relationship between individuals who have or have recently had a continuing serious relationship of a romantic or intimate nature," with considerations for the length and nature of the relationship as well as the frequency and type of interactions between the individuals involved.



**UVALDE ELEMENTARY SCHOOL SHOOTING**

Poll: Support for controlling gun violence hits its highest point in a decade

The bill includes a related provision, allowing people who were convicted of misdemeanor domestic violence to have their gun rights restored if their record stays

ADDENDUM - Page 25

clean for five years. There are some exceptions for victims' spouses, parents, guardians or cohabitants.

Zeoli says she'd like to know more about the reasoning behind that provision, as it doesn't appear to be informed by any research.

"If we're talking about dating partners versus spouses, both of them can do the same types of violence, both of them can be the same level of dangerous, get the same conviction and get the same firearm restriction," she said. "But the spouses will have this lifetime firearm restriction, and the dating partners will have this five-year restriction, and I don't know the logic behind that disparity."

## Baseless fears of deception and retaliation

Why hasn't the federal law evolved with the times or research data? Zeoli offers one explanation:



ANALYSIS
The Depp verdict could bring a chilling effect for domestic abuse survivors

"I think that there has always been a fear that women will make things up, that women will try to take revenge on their dating partners through lying about abuse and trying to get these firearm restrictions on them," she says. "And that fear is unfounded. In fact ... a large proportion of people who experience abuse never report it to the courts or law enforcement."

As a researcher, she says it's been difficult to watch as measures that data suggest could save lives — such as closing the boyfriend loophole — haven't been implemented. Zeoli says the bipartisan bill, even with its limited provisions, is a step in the right direction.

"I am encouraged by the fact that we are seeing movement at the federal level on gun safety legislation, when we haven't seen it for literally decades," Zeoli says.

ADDENDUM - Page 26

*The audio for this interview was produced by Jeevika Verma and Ben Abrams, and edited by Raquel Maria Dillon.*

---

*If you or someone you know is experiencing domestic abuse, use a safe computer and contact help. That can include a local shelter, or call 911 or the National Domestic Violence Hotline at 1-800-799-7233.*

intimate partner violence     gun legislation     gun safety     domestic abuse

## Subscribe to The NPR Politics Podcast



| NPR ONE | APPLE PODCASTS | SPOTIFY |

| GOOGLE PODCASTS | RSS |

## More Stories From NPR



ADDENDUM - Page 27

**The New York Times** | https://www.nytimes.com/2022/06/17/us/politics/senate-guns-boyfriend-loophole.html

# *Gun Talks Snag on Tricky Question: What Counts as a Boyfriend?*

Among the sticking points holding up a final agreement on gun legislation is how to define a boyfriend in a provision meant to keep guns away from domestic abusers.

**By Emily Cochrane and Stephanie Lai**

June 17, 2022

> **Sign Up for On Politics, for Times subscribers only.** A Times reader's guide to the political news in Washington and across the nation. Try the On Politics newsletter for 4 weeks.

WASHINGTON — Among the sticking points standing in the way of a final deal on what could be the first significant bipartisan gun safety legislation in decades is an age-old question: How do you define a boyfriend?

The question may sound frivolous, but for a small group of Republicans and Democrats who are pressing to translate a hard-won compromise on guns into legislation that can draw 60 votes in the Senate, it is vital. And for millions of women who have been threatened with a firearm by an intimate partner, it is deadly serious.

At issue is a provision in the proposed agreement that would make it more difficult for domestic abusers to obtain guns.

Current law bars people convicted of domestic violence or subject to a domestic violence restraining order from being able to buy a gun, but it applies only if they have been married to or lived with the victim, or had a child with them. Lawmakers have worked unsuccessfully for years to close what has come to be known as the "boyfriend loophole" by expanding the law to include other intimate partners. Taking such a step is seen as one of the more publicly popular and effective ways to reduce gun violence.

But first, lawmakers must agree on what exactly makes someone an intimate partner. Is it one date or several? Could an ex-boyfriend count?

Senator Christopher S. Murphy, the Connecticut Democrat who has been leading the talks, described it as "a complicated question of state statutes and state charging practices."

Senator John Thune of South Dakota, the No. 2 Republican, said the boyfriend question was surprisingly complex.

"The surface explanation seems like it would be fairly simple, but I know that as they try to reduce it to legislative text, I think it's gotten a little bit more uncomfortable," said Mr. Thune, who is not directly involved in the negotiations.

Lawmakers are racing to finalize the legislation and pass it before the Senate's upcoming Fourth of July recess, which would require at least 10 Republican senators to join Democrats to break a Republican filibuster.

The agreement on new gun legislation includes enhanced background checks for prospective gun purchasers under the age of 21, which would for the first time allow law enforcement to examine juvenile and mental health records. It would provide federal money for states with so-called red flag laws that allow the authorities to temporarily seize firearms from people deemed to be dangerous. The compromise also is expected to toughen laws to stop gun trafficking and include money to shore up mental health resources in communities and schools, as well as for school security.

The final haggling has centered on the details of closing the boyfriend loophole, including the definition and whether those subject to the gun ban should be able to appeal. Negotiators also spent Thursday debating the red flag law funding and whether states that do not have such laws can receive money.

The impasse on the boyfriend loophole has become so sticky that Senator John Cornyn, Republican of Texas and a crucial player in the talks, said the proposal could be dropped from the package altogether.

"We're not ready to release any smoke, so we don't have a deal yet," Mr. Cornyn said, declaring "I'm not frustrated — I'm just done" as he left a private negotiating session that stretched into the afternoon on Thursday.

Republicans want to limit the reach of the domestic violence provision, while Democrats want to write it broadly.

"There are many people who committed domestic violence who aren't actually charged with domestic violence — they are charged with simple assault, but they unquestionably committed an act of domestic violence," Mr. Murphy said, adding, "We are at a pretty critical stage of the negotiation, and so I'm not going to share anything that jeopardizes our ability to land this."

ADDENDUM - Page 28

The inclusion of the boyfriend provision in the bipartisan framework, which was released on Sunday with the backing of 10 Republicans and 10 Democrats, was one of the biggest surprises for officials in both parties, given the repeated failed attempts to address it in the past. Earlier this year, lawmakers were forced to drop a similar provision from an updated version of the Violence Against Women Act — a landmark law intended to stop domestic violence, stalking and sexual assault — because Republicans objected.

"This is the difference between doing what sounds good and actually saving lives," Representative Cori Bush, Democrat of Missouri, said of closing the boyfriend loophole. "We understand that we can't get everything, but we have to do enough when we can see the research is there."

That research, as well as analysis from leading gun safety organizations, shows that millions of women have been threatened with a gun by an intimate partner. Between 1980 and 2008, more than two-thirds of people killed by a spouse or former spouse were shot. Several of the gunmen involved in mass shootings in recent years, including at the Pulse nightclub in Orlando, Fla., in 2016 and a church in Sutherland Springs, Texas, in 2017, had histories of domestic or familial abuse.



Senator John Cornyn said on Thursday that the boyfriend provision could be dropped from the package altogether.  Anna Rose Layden for The New York Times

As talks began over a compromise on gun safety legislation in the aftermath of devastating mass shootings in Buffalo, N.Y., and Uvalde, Texas, Senator Kyrsten Sinema, Democrat of Arizona, led the push to address domestic violence as part of the framework, aides involved with the discussions said.

But an agreement on the details of the provision has proved elusive, even as the lead negotiators — Ms. Sinema, Mr. Cornyn, Mr. Murphy and Senator Thom Tillis, Republican of North Carolina — have huddled repeatedly in hopes of a breakthrough that could allow votes on the legislation next week.

Other senators have raised questions about whether the provision should be retroactive, or whether someone barred from purchasing a gun under the measure, particularly because of a misdemeanor, should have an opportunity to appeal — and how long they must wait before they can do so.

"A lot of our members, as you know, are always concerned about making sure that there is robust due process built into some of those provisions, and so I think that'll be really key on that one," Mr. Thune said.

The proposal under discussion, like many of the elements of the agreement, is narrower than what Democrats have pushed for in the past, including in a bill introduced by Senator Amy Klobuchar of Minnesota. In a floor speech this week, Ms. Klobuchar signaled that she, like other Democrats, would support the legislation even if it fell short of her original plan and other gun safety proposals.

ADDENDUM - Page 29