IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL BLAKE DEFRANCE,<br><br>Defendant. | CR 21–29–M–DLC<br><br><br>FINDINGS OF FACT,<br>CONCLUSIONS OF LAW, and<br>ORDER |

On October 21, 2021, a Grand Jury returned a Second Superseding Indictment ("Indictment") charging Defendant Michael Blake DeFrance with one count of prohibited person in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(9), and three counts of false statement during a firearms transaction, in violation of 18 U.S.C. § 922(a)(6). (Doc. 55.) DeFrance waived his right to a jury trial on March 8, 2022. (Doc. 87.) Consequently, the Court conducted a bench trial on April 26 and April 27, 2023, pursuant to its jurisdiction under 18 U.S.C. § 3231. For the following reasons, the Court finds DeFrance guilty on all counts in the Indictment.

## FINDINGS OF FACT

The following findings of fact are based upon the testimony of witnesses and exhibits admitted at trial.

The Court provisionally admitted Exhibits 19 and 20, which were YouTube "blogs" created by Jermain Charlo in September 2013.  The Court finds that this evidence was not probative and does not rely upon this evidence, or any witness testimony relating to the blogs, in any way in reaching its verdict.  DeFrance's objection to this evidence is sustained.

1.      Jermain Charlo was born on April 23, 1995.

2.      In 2010, Charlo lived in Dixon, Montana with her great grandfather, Elmer "Sunny" Morigeau, at 309 Frank McClure/Pename Street.

3.      Until the summer of 2009, Charlo's friend, Jocelyn Stevens, lived at 509 Frank McClure/Pename.  Stevens testified that they were close friends.  Stevens testified that she dated a boy named Antone Lutty when she was in sixth to seventh grade, and Charlo dated him afterward.  Stevens testified that Charlo got pregnant by Lutty, but the pregnancy was not brought to term.  No other witnesses testified that they were aware of Lutty or that Charlo may have dated him.

4.      In February 2010, Defendant DeFrance moved to Dixon, Montana with his parents (Shawn and Jennifer DeFrance) and siblings and resided at 509 Frank McClure.

5.      Charlo and DeFrance became friends and were described as inseparable. Together, they fished, walked along the river, and hung out at DeFrance's house. Charlo's brother occasionally joined them to go fishing and hiking.

6.      Charlo's brother, Nathan Morigeau, estimated that Charlo and DeFrance began seeing each other about a month after the DeFrance family moved to Dixon.

7.      Charlo's mother, Jennifer Morigeau, testified that when Charlo was 14, she skipped school, and Jennifer Morigeau frequently found her at DeFrance's parents' house. Jennifer Morigeau testified that she had to call an officer to force Charlo to go home because the DeFrances would not force her to leave.

8.      Shawn DeFrance testified that he did not recall any time the police were summoned to remove Charlo from his house. Jennifer DeFrance testified that there was never a time when police were summoned to remove Charlo from the house and that she never had words with Jennifer Morigeau about the amount of time Charlo was spending at the DeFrances' house. The Court does not find any of Jennifer DeFrance's testimony credible as further explained herein.

9.      Jennifer Morigeau testified that from the time Charlo was 14 to 18, she spent the majority of her time with DeFrance.

10.     When Charlo was 14 or 15, her aunt, Valenda Morigeau, discovered on Charlo's phone a nude photograph of Charlo that she had sent to DeFrance.

11.     Stevens testified that Charlo told her that she had been physically intimate with DeFrance during this time period.

12.     Charlo attended Two Eagle River School in Pablo, Montana during the 2010–2011 school year until September 23, 2010.

13.     In the fall of 2010, Charlo moved to Dulce, New Mexico to live with her grandmother, Vicki Morigeau, and Vicki's husband, David Velarde, because Charlo was pregnant and Charlo's mother wanted her to stay in school rather than "running off with her boyfriend[,]" DeFrance.

14.     Charlo told her mother, Valenda, Danielle Matt, and others that DeFrance was the father.

15.     Jennifer and Shawn DeFrance testified that they did not believe that DeFrance fathered the child.

16.     Jennifer Morigeau testified that Charlo wanted to try to keep the pregnancy, but she was "really sick."

17.     Charlo's pregnancy was terminated.

18.     Danielle Matt, Charlo's aunt, overheard Charlo crying in a bathroom after the termination.  Danielle picked the lock to the bathroom and discovered that Charlo had received text messages from a contact she identified as DeFrance accusing Charlo of killing "our baby."

19.     In October 2010, Charlo enrolled at Dulce High School in New Mexico.

20.     Charlo visited Dixon, Montana with Colton Monarco in 2011.  She was dating Monarco at the time.  While they were in Dixon, DeFrance drove by Charlo and Monarco.  Charlo then left Monarco with her family to spend time with DeFrance.  Charlo and Monarco returned to New Mexico after a few days.

4

21.     Monarco testified that his relationship with Charlo was physically intimate, but he did not consider the relationship serious because he did not believe they would end up together.

22.     Christian Woody testified that Monarco later told him that he was heartbroken about the end of the relationship with Charlo.

23.     Charlo moved back to Montana in 2012.  She spent some time at Sunny's residence in Dixon and some time at her mother's residence, which by 2013 was in Polson.

24.     When Charlo moved back to Montana, she resumed her romantic relationship with DeFrance.

25.     At the beginning of the 2012–2013 school year, Charlo enrolled at Two Eagle River School and attended for the full year.  She had numerous unexcused absences during this school year.

26.     DeFrance had a camper on his family's property, which his father had purchased from Sunny in 2012.

27.     Valenda testified that Charlo spent the night with DeFrance "about 80 percent of the time," kept a lot of her clothing and all of her personal hygiene items there, and had unfettered access to DeFrance's camper; Nathan testified that Charlo had about half of her clothes at DeFrance's.  Valenda testified that they had a few animals together; Danielle testified that they had lizards, guinea pigs, and a

pig at one point; and Nathan testified that Charlo had a lizard and a rabbit at DeFrance's. Valenda testified that Charlo would skip school to be with DeFrance. Valenda testified that Charlo took trips with DeFrance's family, and Charlo and DeFrance also went skiing together, went to the fair together, took trips to Missoula or Kalispell together, and ate meals together.

28.     Danielle testified that in the weeks before Charlo turned 18, she would tell her mother that she was staying at Sunny's, but she would instead be staying in the camper with DeFrance. Nathan testified that Charlo lived in the camper before she turned 18.

29.     Shawn DeFrance denied that Charlo kept any items at his house except for art supplies, and he denied that Charlo spent the night in the camper or that she was living in it. The Court finds that this testimony is not credible based on the witness's manner while testifying, other evidence contradicting the witness's testimony, and the reasonableness of the witness's testimony in light of all of the evidence.

30.     Jennifer DeFrance denied that Charlo lived in the DeFrances' house any time in 2012, denied that Charlo spent time at the camper with DeFrance, and denied recalling that she even occasionally visited him at the camper. This testimony, which is contradicted by voluminous evidence, including her husband's testimony and her *own* testimony on cross-examination, has no credibility in the

Court's view.  Additional factors detracting from Jennifer DeFrance's credibility are the opportunity for her to see or hear or know the things she testified to, her manner while testifying, and the reasonableness of her testimony in light of all of the evidence.

31.     On the night of April 13, 2013, Deputy Robyn Largent of the Sanders County Sheriff's Office received a call from dispatch to the agency outside of Dixon, Montana.

32.     Deputy Largent was dispatched to 309 Frank McClure/Pename Street, and he arrived shortly after midnight on April 14, 2013.

33.     Deputy Largent recorded an interview with Charlo.

34.     Charlo stated she lived on Keeler River Lane in Polson, Montana, where her mother lived.

35.     Charlo stated she had been in Dixon since Friday evening.  She stated that on Saturday, she was supposed to meet with DeFrance in town, but she instead went home, and DeFrance was mad that she "made them sit there at China Buffet and Walmart for over an hour."

36.     Charlo stated she told DeFrance she wanted him to calm down and that she was going to go to her grandpa's home.  She stated she gathered the rest of her belongings because she "didn't want them broken," and she grabbed a couple of pairs of flip flops, threw them in DeFrance's camper, and walked away.

7

37.     Charlo said that as she walked away, DeFrance "came storming out of the door yelling at me about something," and when she tried to walk away, he shoved her into his family's white van, held her down, punched her in the ear, temple, and cheekbone, threw her onto the ground, spit in her face, told her how horrible she was, and walked off.  Charlo called the police.

38.     Charlo told the 911 dispatcher that she did not live with DeFrance and she was spending the weekend with him.

39.     Charlo stated that "months ago" she had been "called in" about "beating on him after finding another girl's underwear."

40.     Charlo said her relationship with DeFrance was "boyfriend/girlfriend" and that they'd been together since June of 2012, for about nine months.

41.     Charlo stated that DeFrance had previously said things like, "If I can't have you, nobody can."

42.     Deputy Largent requested officer assistance in removing Charlo's guinea pig from DeFrance's camper and returning it to her.

43.     Shawn DeFrance testified at trial that Charlo did not have a guinea pig in the camper, and that the guinea pig belonged to his daughter.  The Court does not find Shawn DeFrance's testimony that Charlo did not have a guinea pig in the camper credible because it is contradicted by contemporaneously recorded evidence produced by third parties in the record.

8

44.    Deputy Largent issued a citation to DeFrance, charging him with violating Montana Code § 45-5-206, Partner Family Member Assault ("PFMA"), a misdemeanor.

45.    On April 15, 2013, DeFrance made his initial appearance before Justice of the Peace Donald Strine in Sanders County Justice Court.  He was appointed a public defender and released on his own recognizance, subject to conditions.  The Initial Appearance form states: "A conviction for certain offenses may result in the loss of various rights regarding firearms under state and federal laws."  DeFrance signed and dated the form under a line stating "I understand my rights as advised above[.]"

46.    On April 23, 2013, Charlo turned 18 years old.  The same day, she moved out of her mother's house in Polson and moved in with DeFrance.

47.    Jennifer Morigeau testified that Stevens helped Charlo remove her belongings from Jennifer Morigeau's house.  Stevens testified that she did not help Charlo move, but she would give Charlo a ride whenever she asked.

48.    Jennifer DeFrance testified that Charlo and DeFrance were "apart" for about a month after the PFMA.  For the reasons explained above, the Court finds that the entirety of Jennifer DeFrance's testimony lacks credibility.

49.    On May 6, 2013, Justice Strine approved a plea agreement between the State of Montana and DeFrance, which required DeFrance to plead guilty to the PFMA

9

charge, serve a mandatory sentence of 24 hours in jail with credit for time served, pay a fine, pay for and complete a counseling assessment with a focus on violence, controlling behavior, and dangerousness, and complete all recommendations pursuant to Montana Code § 45-5-206(4).

50.     When DeFrance entered his plea of guilty on May 6, 2013, Justice Strine reviewed with DeFrance the information contained in Exhibit 5, which included a checkmark next to a statement that "I understand that other possible consequences of a guilty plea are: **loss of firearms rights**[.]"[1]  The form also stated: "I am pleading guilty to this charge because I did the following: **On 4-14-2013 in Sanders County I caused bodily injury to my girlfriend**[.]"  DeFrance signed and dated the form.

51.     Justice Strine testified that any admonition he may have given DeFrance concerning his firearms rights would have been under Montana law, not federal law.

52.     DeFrance's court-appointed attorney for the PFMA case testified that he did not tell DeFrance whether he categorically did or did not lose his firearms rights as a result of the conviction.  He testified that he felt his representation was ineffective because of that fact.

53.     Danielle testified that after the PFMA, Charlo would see DeFrance despite a

---

[1] The bolded typeface indicates where Justice Strine added handwritten remarks.

no-contact order and would take him to his anger management program, and Charlo wanted the relationship to work.

54.    On July 11, 2014, Charlo gave birth to her first child with DeFrance.  They later had another child.

55.    In June 2018, Charlo was reported missing.  As of the date of this order, she has not been located, and her disappearance is considered an open case.

56.    Charlo was unavailable to testify at trial.

57.    Cash 1 Pawn, Inc., in Missoula, Montana ("Cash 1 Pawn") is a federally licensed firearms dealer.

58.    A customer attempting to purchase or redeem a firearm at Cash 1 Pawn must fill out a 4473 form, which is transmitted to the NICS operation center.

59.    Joel Christensen, a manager at Cash 1 Pawn, testified that if a person answered "yes" to question 11(a) and "no" to questions 11(b) through (i) on the 4473 form, Cash 1 Pawn would proceed with the NICS background check process. If a person did not provide those answers, the transaction would be stopped.

60.    When a NICS background check is run, three databases are accessed: the Interstate Identification Index, the National Crime Information Center, and the NICS indices.

61.    The information in these databases is provided by local law enforcement agencies.

62.     If the background check results in information that the person attempting to acquire a firearm is potentially prohibited from possessing a firearm under federal law, the transaction may be delayed to allow for additional research.  The additional research may require reaching out to external contacts, such as courts or law enforcement agencies, for additional information or documentation.

63.     Steven Feuerstein testified that NICS handled more than 300 million background checks for firearms purchases last year, and investigators may fail to resume or complete an investigation before the NICS is purged from the system after 88 days.

64.     DeFrance completed a 4473 form at Cash 1 Pawn on February 24, 2018 to redeem a Stevens Arms 200 rifle.  In response to Question 11.i, "Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)*", DeFrance checked "No."  NICS gave a response of "Delay" on February 24, 2018, and later gave a "Proceed" response on March 1, 2018.  DeFrance picked up the gun on March 2, 2018.

65.      DeFrance completed a 4473 form at Cash 1 Pawn on March 2, 2018 to purchase a Smith & Wesson 60 Lady Smith revolver.  In response to Question 11.i, "Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)*", DeFrance checked "No."  NICS gave a response of "Delay" on March 3, 2018, and no further response was

provided within three business days.  DeFrance picked up the gun on March 10, 2018.

66.     DeFrance completed a 4473 form at Cash 1 Pawn on August 25, 2018 to redeem a Remington 770 rifle (.243).  In response to Question 11.i, "Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)*", DeFrance checked "No."  NICS gave a response of "Delay" on August 25, 2018, and later gave a "Proceed" response on August 30, 2018.  DeFrance picked up the gun on September 1, 2018.

67.     If a 4473 form submitted to NICS results in a "Deny," the NICS Transaction Number ("NTN") is recorded in a system within the Denial Enforcement and NICS Intelligence Branch of the United States Bureau of Alcohol, Tobacco, and Firearms.  The NTNs associated with DeFrance's 4473 forms were not in this database, which means that none of his transactions were denied.

68.     On October 2, 2018, Detective Guy Baker and the Missoula Police Department executed a search warrant at DeFrance's home to locate a Smith & Wesson .357 revolver.  The police seized the .357 revolver, which was fully loaded, a .243 caliber Remington rifle that was found next to DeFrance's bed, and a .22 Keystone Arms rifle.

69.     DeFrance told Detective Baker that the .357 was his and stated that the .243 was his father's gun, but he acknowledged that the .243 was next to his bed.

13

70.    Detective Baker asked DeFrance, "And you know you're not supposed to have guns, right?"  DeFrance stated, "I was never clear on that."

71.    The Smith & Wesson Lady Smith .357 revolver is a firearm as defined by federal law.  It was manufactured by Smith & Wesson in Massachusetts.

72.    The Remington model 770 .243 caliber rifle is a firearm as defined by federal law.  It was manufactured by Remington in Kentucky.

73.    The Keystone Arms rifle .22 long rifle caliber is a firearm as defined by federal law.  It was manufactured by Keystone in Pennsylvania.

## CONCLUSIONS OF LAW

74.    The Court concludes that a defendant commits the offense of prohibited person in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(9), if the government proves the following elements beyond a reasonable doubt: (1) the defendant knowingly possessed firearms and ammunition; (2) the firearms and ammunition had been transported from one state to another; (3) at the time the defendant possessed the firearms and ammunition, the defendant had been convicted of a misdemeanor crime of domestic violence; and (4) at the time the defendant possessed the firearms and ammunition, the defendant knew that he had been convicted of a misdemeanor crime of domestic violence.  Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit No. 14.15, Firearms—Unlawful Possession (18 U.S.C. § 922(g)) (2022 ed., updated 12/2022).

75.     At the time DeFrance allegedly possessed the firearms and ammunition in question, and at the time the Second Superseding Indictment was filed, federal law defined "misdemeanor crime of domestic violence" as "an offense that—(i) is a misdemeanor under Federal, State, or Tribal law; and (ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim."  18 U.S.C. § 921(a)(33)(A) (amended 2022).[2]

76.     Here, then, as to Count I, the government bears the burden to prove beyond a reasonable doubt that: (1) DeFrance knowingly possessed firearms and ammunition; (2) the firearms and ammunition had been transported from another state to Montana; (3) at the time DeFrance possessed firearms and ammunition, he had been convicted of a misdemeanor crime of domestic violence; and (4) at the time DeFrance possessed firearms and ammunition, he knew he had been

---

[2] In 2022, Congress amended § 921(a)(33)(A)(ii) to add another qualifying relationship status: "a person who has a current or recent former dating relationship with the victim."  Congress defined "dating relationship" as "a relationship between individuals who have or have recently had a continuing serious relationship of a romantic or intimate nature" and provided several factors to consider, including the length of the relationship, the nature of the relationship, and the frequency and type of interactions between the individuals involved in the relationship.  18 U.S.C. § 921(a)(37).

convicted of a misdemeanor crime of domestic violence.

77.     The Court concludes that a defendant commits the offense of false statement in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6), if the government proves the following elements beyond a reasonable doubt: (1) the seller was a licensed firearms dealer; (2) in connection with acquiring a firearm from the seller, the defendant made a false statement; (3) the defendant knew the statement was false; and (4) the false statement was material—that is, the false statement had a natural tendency to influence or was capable of influencing the seller into believing the firearm could be lawfully sold to the defendant.  Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit No. 14.8, Firearms—False Statement or Identification in Acquisition or Attempted Acquisition (18 U.S.C. § 922(a)(6)) (2022 ed., updated 12/2022).

78.     Here, then, as to Count II, the government bears the burden to prove beyond a reasonable doubt that: (1) Cash 1 Pawn was a licensed firearms dealer; (2) in connection with acquiring a Stevens Arms 200 rifle from Cash 1 Pawn, DeFrance made a false statement; (3) DeFrance knew the statement was false; and (4) the false statement was material—that is, the false statement had a natural tendency to influence or was capable of influencing Cash 1 Pawn into believing the Stevens Arms 200 rifle could be lawfully sold to DeFrance.

16

79.     As to Count III, the government bears the burden to prove beyond a reasonable doubt that: (1) Cash 1 Pawn was a licensed firearms dealer; (2) in connection with acquiring a Smith & Wesson 60 Lady Smith revolver from Cash 1 Pawn, DeFrance made a false statement; (3) DeFrance knew the statement was false; and (4) the false statement was material—that is, the false statement had a natural tendency to influence or was capable of influencing Cash 1 Pawn into believing the Smith & Wesson 60 Lady Smith revolver could be lawfully sold to DeFrance.

80.     As to Count IV, the government bears the burden to prove beyond a reasonable doubt that: (1) Cash 1 Pawn was a licensed firearms dealer; (2) in connection with acquiring a Remington 770 rifle from Cash 1 Pawn, DeFrance made a false statement; (3) DeFrance knew the statement was false; and (4) the false statement was material—that is, the false statement had a natural tendency to influence or was capable of influencing Cash 1 Pawn into believing the Remington 770 rifle could be lawfully sold to DeFrance.

## I.     Prohibited Person in Possession of Firearms and Ammunition (18 U.S.C. § 922(g)(9)) (Count I)

## A.     Knowing Possession of Firearms and Ammunition

81.     A person has possession of something if the person knows of its presence and has physical control of it or knows of its presence and has the power and intention to control it.  Manual of Model Criminal Jury Instructions for the District

17

Courts of the Ninth Circuit No. 6.15, Possession—Defined (2022 ed., updated 12/2022).

82.     An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  A finder of fact may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.  Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit No. 4.8, Knowingly (2022 ed., updated 12/2022).

83.     DeFrance admitted to Detective Baker that the Smith & Wesson revolver, which was fully loaded at the time it was seized, belonged to him.

84.     The Remington .243 rifle was next to DeFrance's bed when the search warrant was conducted, and DeFrance acknowledged to Detective Baker that the rifle was next to his bed.

85.     Because DeFrance admitted ownership of the fully loaded Smith & Wesson revolver, and because DeFrance acknowledged the presence of the Remington rifle next to his bed, which proves that he had physical control of it, the Court concludes that DeFrance knowingly possessed the Smith & Wesson revolver, the ammunition inside the Smith & Wesson revolver, and the Remington rifle on October 2, 2018.

**B.     Firearms or Ammunition Affecting Interstate Commerce**

86.     The parties stipulated that the Smith & Wesson revolver was manufactured

in Massachusetts.  (Doc. 169.)

87.     The parties stipulated that the Remington rifle was manufactured in

Kentucky.  (Doc. 169.)

88.     The parties stipulated that the Keystone Arms rifle was manufactured in

Pennsylvania.  (Doc. 169.)

89.     The parties stipulated that the firearms seized during the October 2, 2018

search, including the Smith & Wesson revolver and the Remington rifle, were not

manufactured in the State of Montana and thus traveled in or affected interstate

and/or foreign commerce to arrive in Montana.  (Doc. 169.)

90.     Because all three firearms seized in Montana during the October 2, 2018

search were not manufactured in the State of Montana, the Court concludes that

those firearms traveled in interstate commerce to arrive in Montana.

## C.     Prohibited Status

91.     18 U.S.C. § 922(g)(9) prohibits firearm possession by any person who "has

been convicted in any court of a misdemeanor crime of domestic violence[.]"

92.     At the time DeFrance allegedly possessed the firearms and ammunition in

question, and at the time the Second Superseding Indictment was filed, federal law

defined "misdemeanor crime of domestic violence" as "an offense that—(i) is a

misdemeanor under Federal, State, or Tribal law; and (ii) has, as an element, the

use or attempted use of physical force, or the threatened use of a deadly weapon,

committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." 18 U.S.C. § 921(a)(33)(A) (amended 2022).

93.     DeFrance was convicted of violating Montana Code § 45-5-206, Partner Family Member Assault, on May 6, 2013.

94.     The Court reiterates its previous conclusion that DeFrance was convicted of violating Section (1)(a) of the PFMA statute, which provides that a person commits the offense of PFMA if the person "purposely or knowingly causes bodily injury to a partner or family member." *United States v. DeFrance*, 577 F. Supp. 3d 1085, 1095 n.2 (D. Mont. 2021).

95.     There is no evidence in the record that DeFrance had any prior convictions for PFMA.

96.     An offender convicted of PFMA must "be imprisoned in the county jail for a term not to exceed 1 year or not less than 24 hours for a first offense." Mont. Code Ann. § 45-5-206(3)(a)(i). The Court concludes that a PFMA first offense is a misdemeanor under State law.

97.     The Court reiterates its previous conclusion that subsection (1)(a) of Montana's PFMA statute has, as an element, the use or attempted use of physical

20

force within the meaning of 18 U.S.C. § 921(a)(33)(A)(ii). *DeFrance*, 577 F. Supp. 3d at 1094–98.

98.    The Court reiterates its previous conclusion that the relationship element of a § 922(g)(9) offense is confined by the plain text of the statute to the relationship as it existed at the time of the predicate domestic violence offense. *Id.* at 1104–05.

99.    Neither party contended or presented evidence that, at the time of the PFMA on April 13–14, 2013, DeFrance was Charlo's spouse or former spouse, cohabiting or had cohabited with her as a spouse, or shared a child in common with her. Accordingly, the Court concludes that it must determine whether the PFMA was "committed by . . . a person similarly situated to a spouse . . . of the victim." 18 U.S.C. § 921(a)(33)(A)(ii).

100.    Although neither the Supreme Court of the United States nor the United States Court of Appeals for the Ninth Circuit has issued a precedential opinion setting forth factors a factfinder must consider when determining whether an offender was similarly situated to a spouse of the victim, the Ninth Circuit held in an unpublished and non-precedential opinion that there was sufficient evidence to find this element satisfied where the evidence included the defendant's admission that he was convicted of a domestic violence crime, the victim of the crime was his girlfriend, he was required to enroll in a 52-week domestic violence batterers program as a result of his conviction, and the arresting agency's policy required

that, to be arrested under the statute of conviction, the suspect and victim had to be

spouses, co-parents, or currently cohabiting.  *United States v. Slaughter*, 124 F.

App'x 542, 543 (9th Cir. 2005).  The Court concludes that this case provides

persuasive authority.

101.   The Fifth and Eighth Circuits have held that cohabitation with a romantic

partner is sufficient to establish that a relationship partner is similarly situated to a

spouse, and other courts have cited cohabitating romantic relationships as

sufficient.  *Buster v. United States*, 447 F.3d 1130, 1133 (8th Cir. 2006); *United

States v. Shelton*, 325 F.3d 553, 562 (5th Cir. 2003) (concluding that "live-in"

girlfriend of two months "indicates living together with the implication that the

two were having sexual relations"); *see also United States v. Denis*, 297 F.3d 25,

31 (1st Cir. 2002) (rejecting vagueness challenge to § 922(g)(9) indictment where

defendant knew he was convicted of misdemeanor offense after assaulting live-in

girlfriend).  The Court concludes that these cases provide persuasive authority.

102.   The Federal Circuit held that the following evidence was "more than

sufficient" to prove by a preponderance of the evidence that a relationship was one

of cohabiting as a spouse or similarly situated to a spouse: the couple lived

together continuously from August 1998 to June 1999, and thereafter maintained

an intermittent relationship in which they stayed together up to five nights a week

although maintaining separate residences; and the relationship included

expectations of fidelity and monogamy, shared expenses, shared household

responsibilities, social activities in common, and discussions about having

children.  *White v. Dep't of Just.*, 328 F.3d 1361, 1369–70 (Fed. Cir. 2003).  The

Court concludes that this case provides persuasive authority regarding relevant

factors to consider in assessing whether a relationship was similarly situated to a

spousal relationship.

103.   The Court concludes that the textual analysis of § 921(a)(33)(A) contained

within the court's opinion in *United States v. Heckenliable*, No.

2:04CR00697PGC, 2005 WL 856389, at *4 (D. Utah Apr. 13, 2005), is persuasive:

"In dropping the word 'cohabiting' from the final clause, Congress apparently

intended to sweep into the statute relationships that did not involve cohabitation."

104.   Consistent with this conclusion, other courts have held that previous or

current cohabitation is not required to satisfy the "similarly situated to a spouse"

element.  *E.g.*, *Eibler v. Dep't of Treasury, Bureau of Alcohol, Tobacco &

Firearms*, 311 F. Supp. 2d 618, 622 (N.D. Ohio 2004) (collecting cases and

concluding that "girlfriend with whom [plaintiff] had a long-time close and

personal relationship" satisfied element under preponderance of the evidence

standard).  The Court concludes that these cases provide persuasive authority for

the proposition that past or present cohabitation is not required to find that a

defendant was "similarly situated to a spouse" of the victim.

105.   The Court is not persuaded by DeFrance's argument that, as a matter of law, he could not be similarly situated to a spouse of Charlo because she was 17 years old at the time of the PFMA and thus could not legally enter into a spousal relationship with him under Montana law. *DeFrance*, 577 F. Supp. 3d at 1106.

106.   With these legal conclusions in mind, the Court concludes that the evidence presented at trial proved beyond a reasonable doubt that on April 13–14, 2013, DeFrance was similarly situated to a spouse of Charlo.

107.   The Court bases this conclusion on the following findings of fact pre-dating the PFMA: Charlo and DeFrance were in a romantic relationship that was physically intimate that began shortly after DeFrance moved to Dixon in February 2010, and ended when Charlo moved to New Mexico in the fall of 2010; Charlo was pregnant when she moved to New Mexico, she told others that DeFrance was the father, and witness testimony indicated that DeFrance suspected or acknowledged paternity; Charlo was briefly in a relationship with a young man in New Mexico, but the relationship ended shortly after she encountered DeFrance on a visit home and left the young man with her family so that she could spend time with DeFrance; Charlo and DeFrance resumed their relationship when she moved back to Montana in 2012; in the time frame of June 2012 to April 13–14, 2013, Charlo spent the night with DeFrance up to 80 percent of the time, she kept much of her clothing and personal hygiene items in his camper, Charlo had unfettered

access to the camper, and they had pets together that they kept in the camper; and Charlo and DeFrance's relationship at this time included fishing, hiking, walking, skiing, eating meals, and taking trips to other cities together.

108.   The Court also bases this conclusion on the following findings of fact relating to the date the PFMA occurred: Charlo was spending the weekend with DeFrance; Charlo had planned to spend time with him and his family in town that day; she removed some of her belongings from the camper and returned some belongings to DeFrance; Charlo told Deputy Largent that her relationship with DeFrance was "boyfriend/girlfriend," and they had been together for nine months; in the midst of denying that DeFrance had previously committed or exhibited many other indicators of being a controlling or abusive partner, Charlo told Deputy Largent that DeFrance had previously said things like, "If I can't have you, nobody can"; and Charlo had a guinea pig in the camper, and Deputy Largent called for assistance in removing it and returning it to Charlo.

109.   These facts lead the Court to conclude that, at the time of the PFMA, DeFrance and Charlo were in a serious, committed, and long-term romantic relationship that included physical intimacy and frequent overnights together; their family and friends were aware of the relationship; their relationship history included a prior stint of a romantic relationship including physical intimacy for several months, which resulted in a pregnancy, and they resumed the relationship

shortly after Charlo returned to Montana; Charlo kept many of her personal belongings, including at least one pet that she considered hers, on DeFrance's property; and their relationship included various recreational and social activities together.

110.   The Court finds additional facts, circumstances, and inferences relevant to, but not independently dispositive of, the relationship status on the date of the PFMA.  Months before the PFMA occurred, Charlo "beat on" DeFrance after finding another girl's underwear.  The fact that the relationship continued after physical violence and suspected infidelity indicates that DeFrance and Charlo wanted the relationship to continue despite incidents that might cause a person to end even a serious, long-term romantic relationship.  Charlo moved out of her mother's house and moved in with DeFrance ten days after the PFMA occurred, despite the significant violence DeFrance inflicted on Charlo that night.  Again, the continuation (and intensification) of this relationship after an incident that likely would cause many reasonable people to seriously consider ending a relationship— even a marriage—indicates that DeFrance and Charlo were deeply committed to each other and their romantic relationship.  This inference is further supported by Charlo's statements to Danielle after the PFMA that she continued to see DeFrance despite a no-contact order, that she took him to his court-ordered anger management program, and that she wanted the relationship to work.  And this

inference is further supported by the fact that less than one year after the PFMA occurred, Charlo gave birth to her first child with DeFrance.  Although many of these facts occurred after the PFMA, the Court finds they offer insight into DeFrance's and Charlo's attitudes toward the relationship on the night the PFMA occurred.  In short, the Court finds it incredibly unlikely that the relationship would have continued in the manner it did almost immediately after DeFrance's violence if, at the time the PFMA occurred, the relationship was merely casual, convenient, and non-committal.

111.   The Court acknowledges that there is conflicting record evidence regarding whether DeFrance and Charlo were cohabitating or practically cohabitating at the time of the PFMA, including Charlo's statement to the 911 dispatcher on the night of the PFMA that she did not live with DeFrance.  However, as discussed above, cohabitation is not required as a matter of law to find that a defendant is "similarly situated to a spouse" of a victim, and the Court finds that external factors, such as parental disapproval and her minor age, may have motivated Charlo to downplay the seriousness of their relationship to the authorities.

112.   The Court further acknowledges that Charlo was 17 at the time of the PFMA, but the Court concludes that this fact does not weigh heavily against finding that DeFrance was similarly situated to a spouse of Charlo for several reasons.  First, Charlo turned 18 a mere ten days later; the Court gravely doubts

that she underwent such profound maturation in less than two weeks that the

somewhat arbitrary dividing line between minority and majority age is dispositive

of the character of their relationship.  Second, the facts indicate that her maturity

level could cut either way. Charlo had attained a great deal of life experience in her

17 years; for example, she had moved across the country and back and she had

dated other people, which could support an inference that she felt capable of

entering a committed relationship at that age.  Some of her actions, like skipping

school to spend time with DeFrance, indicate a degree of immaturity, but that does

not necessitate a conclusion that she could not be in a committed relationship;

rather, it could support an inference that the relationship was emotionally intense

and was a higher priority to her than education at the time, which would support a

conclusion that she was seriously committed to the relationship.  In sum, the Court

finds that Charlo's age of 17 at the time of the PFMA did not render her incapable

of entering into a relationship that was similarly situated to a spouse of DeFrance.

113.   For all of the foregoing reasons, the Court concludes that on the night the

PFMA occurred, DeFrance was similarly situated to a spouse of Charlo.

## D.   Knowledge of Belonging to Category of Persons Prohibited from Possessing Firearms

114.   "[I]n a prosecution under 18 U.S.C. § 922(g) . . . the Government must

prove both that the defendant knew he possessed a firearm and that he knew he

28

belonged to the relevant category of persons barred from possessing a firearm."
*Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019).  Such knowledge may be
inferred from circumstantial evidence.  *Id.* at 2198.

115.   Neither the Supreme Court of the United States nor the United States Court
of Appeals has issued a precedential opinion regarding a defendant's knowledge of
having been convicted of a misdemeanor crime of domestic violence.  In an
unpublished memorandum disposition, however, the Ninth Circuit held that the
following evidence was sufficient to prove beyond a reasonable doubt that a
defendant had the requisite knowledge of status for a conviction under 18 U.S.C.
§ 922(g)(9): evidence of the defendant's conviction of a domestic violence
misdemeanor under a state law that prohibited the infliction of corporal injury on a
cohabitant or co-parent, and evidence that as part of the defendant's conviction, he
enrolled in a 52-week domestic violence program.  *United States v. Arnold*, 836 F.
App'x 500, 503 (9th Cir. 2020).  The Court concludes that this case provides
persuasive authority regarding the kinds of evidence from which knowledge of
status can be inferred.

116.   In a thorough opinion, the First Circuit Court of Appeals held that, to convict
a defendant of violating 18 U.S.C. § 922(g)(9), the factfinder must find the
defendant knew that, in order for him to be convicted of the underlying domestic
violence offense, the State would have had to prove beyond a reasonable doubt that

he used or attempted to use physical force.  *United States v. Minor*, 63 F.4th 112, 122 (1st Cir. 2023).  The court provided guidance to the parties on remand, instructing them that the district court could instruct the jury that the government must prove that the defendant "knew, at the time he possessed a gun, that: (i) he had previously been convicted of an offense that 'is a misdemeanor under Federal, State, or Tribal law'; (ii) in order for him to have been convicted of the prior offense at a trial, the government would have had to prove beyond a reasonable doubt that he 'use[d] or attempted [to] use . . . physical force'; and (iii) the victim of that offense was, at the time of the offense," within one of the relationship categories enumerated in 18 U.S.C. § 921(a)(33)(A).  *Id.* at 124.  The Court concludes that this case provides persuasive authority regarding the requisite proof of knowledge of status for a defendant prosecuted under 18 U.S.C. § 922(g)(9).

117.   The Court concludes that DeFrance knew, at the time he possessed the Smith & Wesson revolver, ammunition, and Remington rifle, that he had previously been convicted of an offense that is a misdemeanor under State law, that in order to be convicted of that offense at trial, the government would have had to prove beyond a reasonable doubt that he used physical force, and that the victim of the offense was, at the time of the offense, similarly situated to a spouse.

118.   DeFrance pleaded guilty to violating Montana's PFMA statute, and his plea agreement with the State required him to serve 24 hours in jail, pay a fine, and

comply with Montana Code § 45-5-206(4), which requires a person convicted of PFMA to pay for and complete a counseling assessment "with a focus on violence, controlling behavior, dangerousness, and chemical dependency" and complete all recommendations for counseling, referrals, attendance at psychoeducational groups, or treatment made by the counseling provider, including a minimum of 40 hours of counseling, which "must be directed to the violent or controlling conduct of the offender."  Danielle Matt's testimony that Charlo told her that Charlo took DeFrance to an anger management program after the PFMA occurred indicates that DeFrance complied with these requirements of his guilty plea.  The Court concludes that DeFrance's guilty plea to PFMA, his representation by counsel in the state court proceedings, the plea agreement, his colloquy with Justice Strine documented in Exhibit 5 in which he admitted to causing bodily injury to his girlfriend, and his compliance with the requirements imposed in his sentence together prove beyond a reasonable doubt that DeFrance knew he had been convicted of a misdemeanor under State law and that, if he had gone to trial, the State would have had to prove beyond a reasonable doubt that he used physical force.  There is no evidence presented at trial indicating that he had forgotten about this conviction or otherwise was unaware of the elements of the offense of conviction by the time he possessed the firearms five and a half years later.

119.   The Court concludes that DeFrance knew at the time he possessed the

firearms that he was similarly situated to a spouse of Charlo at the time he committed the PFMA against her based on the same evidence the Court relies upon to conclude that DeFrance was similarly situated to a spouse of Charlo.  There is no evidence in the record indicating that he was unaware of or had forgotten the nature of their relationship at the time of the PFMA in the five and a half years following the offense, particularly given the Court's findings that they remained in a relationship for years afterward, moved in together ten days after the offense, and had their first child together a little over one year after the offense.

120.   Although the government need not prove that DeFrance was aware that he was prohibited from possessing firearms, and although the Court would reach the same verdict absent this evidence, the Court finds that its conclusion is further supported by circumstantial evidence that DeFrance knew that he may have been prohibited from possessing firearms as a result of his PFMA conviction.  DeFrance affirmed to Justice Strine that he understood that "other possible consequences" of his guilty plea were "loss of firearms rights."  The 4473 forms DeFrance filled out to acquire the firearms he possessed all included the question 11.i., "Have you ever been convicted in any court of a misdemeanor crime of domestic violence?  (*See Instructions for Question 11.i.)*[,]" the cited instructions included the statutory definition, and DeFrance's signature on the forms certified that he had read and understood the instructions and definitions and that he understood that anyone who

answers "yes" to questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm.  To be sure, his signature also certified that he understood that making a false statement on the form is a crime punishable as a felony under Federal law, which could support an inference that he was aware of potential criminal liability and believed he was telling the truth in answering "no" each time to question 11.i., and that he thus did not know that he was similarly situated to a spouse of Charlo at the time of the PFMA.  However, the overwhelming record evidence described above that he and Charlo were in a close, committed, romantic relationship at the time of the PFMA, together with DeFrance's admission to Detective Baker that he was "never clear" on whether he was allowed to possess firearms, leads the Court to conclude that it is implausible that DeFrance was ignorant of his status or merely negligent in failing to inquire further.

121.   Throughout this litigation, DeFrance has contended that he was "on five (5) occasions . . . cleared after a NICS check to lawfully receive a firearm from the Federal Firearms Licensee (FFL) Pawn Shop."  (Doc. 167 at 3.)  In a previous order, the Court explained how the NICS process works, concluded based on regulatory language that the database is not expected to be comprehensive, relied upon Supreme Court precedent describing the background check system as intended to "enable *sellers* to keep guns out of the hands of criminals and others who should not have them, . . . not to provide confirmation of prohibited or non-

prohibited status to *purchasers*," and concluded that the United States was not collaterally estopped from asserting that DeFrance was prohibited from possessing a firearm in this prosecution even if he had been "proceeded" in all of his prior firearms transactions.  (Doc. 91 at 8–9 (internal quotation omitted).)  Considering the issue anew as a factual matter, the Court is not persuaded that DeFrance lacked the requisite knowledge that he belonged to the category of people convicted of a misdemeanor crime of domestic violence based on the facts that the NICS background check process never resulted in an outright denial and that Cash 1 Pawn allowed him to take possession of the firearms in question.  Steven Feuerstein's trial testimony established that the NICS process is imperfect, analysts are responsible for millions of transactions in a given year, and the law imposes significant time constraints on the external research that may be necessary to confirm whether an individual may possess firearms under federal law.  And DeFrance acknowledged to Detective Baker that he was "never clear" on whether he was allowed to possess firearms, belying any assertion that he relied on his past transactions to conclude that he was not in the category of people convicted of a misdemeanor crime of domestic violence.  For these same reasons, the Court rejects DeFrance's "innocent intent" defense.  "'Innocent intent' is not a defense *per se*, but a defense strategy aimed at negating the *mens rea* for the crime, an essential element of the prosecution's case."  *United States v. Smith*, 831 F.3d

34

1207, 1220 (9th Cir. 2016) (internal quotation omitted).

122.   At the time he possessed the firearms, DeFrance knew he had been convicted of PFMA committed against Charlo on April 13–14, 2013, and he had attended at least 40 hours of counseling directed toward his violent and controlling conduct as a consequence of his conviction.  There is no reasonable doubt that DeFrance knew that he belonged to the category of people convicted of a misdemeanor crime of domestic violence.

123.   For all of the foregoing reasons, the Court concludes that the government has proven beyond a reasonable doubt that DeFrance is guilty of violating 18 U.S.C § 922(g)(9) as set forth in Count I of the Indictment.

## II.    False Statement (18 U.S.C. § 922(a)(6)) (Counts II–IV)

### D.    Seller was Licensed Firearms Dealer

124.   Joel Christensen's trial testimony that Cash 1 Pawn was a federally licensed firearms dealer was uncontroverted.

125.   The Court concludes that Cash 1 Pawn was a federally licensed firearms dealer.

### B.    False Statement

#### i.    Count II – Steven Arms 200 Rifle

126.   DeFrance completed a 4473 form at Cash 1 Pawn on February 24, 2018 to redeem a Stevens Arms 200 rifle.  In response to Question 11.i, "Have you ever

been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)*", DeFrance checked "No."

127.   As the Court has already found, DeFrance had been convicted in state court of a misdemeanor crime of domestic violence on May 6, 2013, when he pleaded guilty to committing the offense of Partner Family Member Assault against Charlo.

128.   The Court concludes that, in connection with acquiring a Stevens Arms 200 rifle from Cash 1 Pawn, DeFrance made a false statement by checking "No" in response to Question 11.i. on the 4473 form.

### ii.      Count III – Smith & Wesson 60 Lady Smith Revolver

129.   DeFrance completed a 4473 form at Cash 1 Pawn on March 2, 2018 to purchase a Smith & Wesson 60 Lady Smith revolver.  In response to Question 11.i, "Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)*", DeFrance checked "No."

130.   As the Court has already found, DeFrance had been convicted in state court of a misdemeanor crime of domestic violence on May 6, 2013, when he pleaded guilty to committing the offense of Partner Family Member Assault against Charlo.

131.   The Court concludes that, in connection with acquiring a Smith & Wesson 60 Lady Smith revolver from Cash 1 Pawn, DeFrance made a false statement by checking "No" in response to Question 11.i. on the 4473 form.

### iii.    Count IV – Remington 770 Rifle

132.    DeFrance completed a 4473 form at Cash 1 Pawn on August 25, 2018 to redeem a Remington 770 rifle (.243).  In response to Question 11.i, "Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)*", DeFrance checked "No."

133.    As the Court has already found, DeFrance had been convicted in state court of a misdemeanor crime of domestic violence on May 6, 2013, when he pleaded guilty to committing the offense of Partner Family Member Assault against Charlo.

134.    The Court concludes that, in connection with acquiring a Remington 770 rifle from Cash 1 Pawn, DeFrance made a false statement by checking "No" in response to Question 11.i. on the 4473 form.

## C.    Knowledge of Falsity

135.    As the Court has already found, DeFrance knew at the time he possessed the firearms on October 2, 2018 that he belonged to the category of people who had been convicted of a misdemeanor crime of domestic violence.

136.    There is no evidence in the record to suggest that DeFrance did not know that he belonged to the category of people who had been convicted of a misdemeanor crime of domestic violence on the earlier dates on which he completed the 4473 forms in connection with acquiring the Stevens Arms 200 rifle, the Smith & Wesson 60 Lady Smith revolver, or the Remington 770 rifle.

137.   The Court concludes that each time DeFrance made the false statements described above, he knew the statements were false.

**D.     Materiality of False Statement**

138.   Joel Christensen's uncontroverted testimony established that if a Cash 1 Pawn customer checked "Yes" to any of Questions 11.b. through 11.i., "it just stops the transaction because they can't have a firearm and there's no need in dealing with doing the background check at that point."

139.   Each of the 4473 forms DeFrance completed in connection with acquiring the Stevens Arms 200 rifle, the Smith & Wesson 60 Lady Smith revolver, and the Remington 770 rifle included his signature under a certification that states, in relevant part, "I understand that a person who answers 'yes' to any of the questions 11.b. through 11.i and/or 12.b. through 12.c. is prohibited from purchasing or receiving a firearm."

140.   The Court concludes that the false statement on each of the 4473 forms described above had a natural tendency to influence Cash 1 Pawn into believing the Stevens Arms 200 rifle, the Smith & Wesson 60 Lady Smith revolver, and the Remington 770 rifle could be lawfully sold to DeFrance.

141.   For all of the foregoing reasons, the Court concludes that the government has proven beyond a reasonable doubt that DeFrance is guilty of violating 18 U.S.C. § 922(a)(6) as set forth in Counts II, III, and IV of the Indictment.

## AFFIRMATIVE DEFENSES

### Public Authority

142.   To prove the affirmative defense of public authority or government authorization, the defendant must prove by a preponderance of the evidence that: (1) the defendant believed he was acting as an authorized government agent to assist in law enforcement activity at the time of the offense charged in the indictment; and (2) the defendant's belief was reasonable.  Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit No. 5.13, Public Authority or Government Authorization Defense (2022 ed., updated 12/2022).

143.   There is no evidence in the record that DeFrance believed he was acting as an authorized government agent to assist in law enforcement activity at the time he possessed firearms or made false statements in connection with acquiring firearms.

144.   The Court concludes that DeFrance has not proven the affirmative defense of public authority.

### Entrapment by Estoppel

145.   To establish the defense of entrapment by estoppel, the defendant has to show by a preponderance of the evidence that: (1) an authorized federal government official or agent of the federal government was empowered to render the claimed erroneous advice; (2) the federal government official or agent of the

federal government had been made aware of all the relevant historical facts; (3) the federal government official or agent of the federal government affirmatively told the defendant the proscribed conduct was permissible; (4) the defendant relied on the false information; and (5) this reliance was reasonable.  Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit No. 5.4, Entrapment by Estoppel Defense (2022 ed., updated 12/2022).

146.   Although "the United States Government has made licensed firearms dealers federal agents in connection with the gathering and dispensing of information on the purchase of firearms," *United States v. Tallmadge*, 829 F.2d 767, 774 (9th Cir. 1987), the evidence in this case shows that Cash 1 Pawn was not made aware of all of the relevant historical facts.

147.   There is no evidence in the record that DeFrance provided to Cash 1 Pawn or any of its employees any information regarding his PFMA conviction.  To the contrary, on each 4473 form he filled out at Cash 1 Pawn, he checked "No" in response to the Question 11.i., "Have you ever been convicted in any court of a misdemeanor crime of domestic violence?"

148.   There is no evidence in the record that Cash 1 Pawn, having been made aware of all relevant historical facts—including DeFrance's PFMA conviction— affirmatively told DeFrance that his possession of a firearm or his false statements made in connection with acquiring firearms were permissible.

40

149.   The Court concludes that DeFrance has not established the defense of entrapment by estoppel.

**Lack of Fair Warning**

150.   DeFrance contends that "unforeseeable judicial enlargement of a criminal statute is akin to an ex post facto law and is prohibited by the Due Process Clause." (Doc. 167 at 9.)  The Court concludes that its application of the law to the facts of this case is not an unforeseeable judicial enlargement of a criminal statute of the kind described in *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964), but rather reflects a straightforward application of the plain terms of Sections 922(g)(9) and 922(a)(6) as they were effective at the time DeFrance possessed the firearms and made the false statements at issue.

151.   The Court concludes that DeFrance has not established a defense of lack of fair warning.

**18 U.S.C. § 921(a)(33)(B)(i)(I) – Ineffective Assistance of Counsel**

152.   The version of 18 U.S.C. § 921(a)(33) in effect at the time DeFrance possessed the firearms in question and at the time the Grand Jury returned the Indictment stated: "A person shall not be considered to have been convicted of [a misdemeanor crime of domestic violence] for purposes of this chapter, unless— (I) the person was represented by counsel in the case[.]"  18 U.S.C. § 921(a)(33)(B)(i)(I) (amended 2022).

153.   DeFrance contends that inherent in this statutory requirement is the right to representation by competent counsel in the case, and he contends his appointed counsel during the PFMA case was incompetent because counsel failed to advise him with certainty regarding the impact of a conviction on right to possess a firearm under federal law.  (Doc. 167 at 9–10.)

154.   In *Padilla v. Kentucky*, the Supreme Court held that a defendant's counsel performed deficiently by providing him false assurances that his conviction would not result in removal from the United States, but "[t]he consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect."  559 U.S. 356, 368–69 (2010).  The Court simultaneously recognized, however, that "[w]hen the law is not as succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences."  *Id.* at 369.

155.   The Court concludes that the facts of this case present the latter situation as opposed to the former.  Had DeFrance been considering pleading guilty to a felony offense, his attorney may have performed deficiently (and thus not been acting as the counsel guaranteed by the Sixth Amendment) if he affirmatively advised DeFrance that he would not be subjected to the "presumptively mandatory" prohibition on firearm possession by felons contained in 18 U.S.C. § 922(g)(1).

42

But § 922(g)(9), and the definitions contained within § 921(a)(33)(A), require a more fact-intensive analysis, and the Court cannot say that every reasonable attorney representing a client facing a PFMA charge must interrogate the details of their client's relationship with the victim to advise the client with near certainty whether the offense qualifies as a misdemeanor crime of domestic violence under federal law. DeFrance was informed during his plea colloquy of the possibility that he may face the loss of his firearms rights as a result of his conviction for PFMA, and he affirmed that understanding and proceeded with the plea of guilty. Nothing further was required on the facts of this case.

156.   Additionally, it is not at all clear to the Court that firearm possession is similar to deportation in being "uniquely difficult to classify as either a direct or a collateral consequence" of conviction, such that a defendant could base an ineffective assistance of counsel claim on the failure to advise the client accurately regarding the potential impacts of conviction on the right to possess firearms. *Padilla*, 559 U.S. at 366.

157.   For the foregoing reasons, the Court concludes that DeFrance was represented by counsel in his PFMA case within the meaning of 18 U.S.C. § 921(a)(33)(B)(i)(I) (amended 2022).

**Statute of Limitations**

158.   DeFrance contends that the offenses charged in the Indictment are subject to

the five-year statute of limitations set forth in 18 U.S.C. § 3282.  (Doc. 167 at 11.)

He further argues that the statute of limitations has expired on each count in the

Indictment "because the government has been aware of [his] background status

since at least February 10, 2015," when he "filled out what would be the first of

five 4473 forms."  (*Id.*)

159.   As the Court has already found, DeFrance was a prohibited person in

possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(9) on

October 2, 2018, when the firearms at issue were seized from his home.  The

offense therefore was committed on October 2, 2018, and this case was

commenced on July 28, 2021, well within the limitations period.

160.   Likewise, the Court has already found that DeFrance made false statements

in connection with acquiring firearms when filling out 4473 forms at Cash 1 Pawn

on February 24, 2018 (Count II), March 2, 2018 (Count III), and August 25, 2018

(Count IV).  The offenses thus were committed on those dates, and this prosecution

was commenced on July 28, 2021, well within the limitations period.

161.   DeFrance's construction of the limitations period as beginning to run for

§ 922 offenses upon the date the United States *could* have learned that a prohibited

person was attempting to acquire a firearm would result in the absurdity that

prohibited persons could possess and acquire firearms with impunity unless they

were prosecuted within five years of their very first false 4473 form.  There is no

indication in the statutory language of § 922 that Congress intended to criminalize only the early years of a prohibited person's possession of firearms.

162.   The Court concludes that the offenses alleged in the operative Indictment were charged within the statute of limitations period.

## VERDICT

After considering the facts presented at trial and making the foregoing conclusions of law, the Court finds:

The government proved beyond a reasonable doubt every required element of Count I charged in the Indictment.  Accordingly, the defendant, Michael Blake DeFrance, is GUILTY of being a prohibited person in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(9).

The government proved beyond a reasonable doubt every required element of Counts II, III, and IV charged in the Indictment.  Accordingly, the defendant, Michael Blake DeFrance, is GUILTY of making a false statement during a firearms transaction, in violation of 18 U.S.C. § 922(a)(6).

DATED this 1st day of May, 2023.

Dana L. Christensen, District Judge
United States District Court

45