IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 21–29–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| MICHAEL BLAKE DEFRANCE, | |
| Defendant. | |

Before the Court is Defendant Michael Blake DeFrance's Combined Opposed Motion for Acquittal and Motion to Arrest Judgment Under Rules 29(c) and 34, Fed. R. Crim. P.; and Alternative Motion for a New Trial Under Rule 33(b)(2), Fed. R. Crim. P.  (Doc. 189.)  For the reasons stated herein, the motion will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This case has a long and complicated procedural history.  This Court has ruled on a grand total of four motions to dismiss the indictment, several motions in limine, and a motion for leave to file a motion to reconsider the Court's previous rulings concerning one of the motions to dismiss (Docs. 71[1], 91, 111.)  Following dismissal of Mr. DeFrance's interlocutory appeal of the Court's order denying the

---

[1] *United States v. DeFrance*, 577 F. Supp. 3d 1085 (D. Mont. 2021).

1

reconsideration motion, this matter proceeded to a bench trial on April 26 and 27, 2023.  (Docs. 170–71.)  Pursuant to Mr. DeFrance's request for findings of fact and conclusions of law should he be found guilty of any count, the Court issued its Findings of Fact, Conclusions of Law, and Order finding Mr. DeFrance guilty as charged on all counts set forth in the Second Superseding Indictment.  (Doc. 182.)[2] Mr. DeFrance timely filed the instant motion.  *See* Fed. R. Crim. P. 29(c)(1), 33(b)(2), 34(b).

## LEGAL STANDARDS

### Motion for Judgment of Acquittal

Rule 29 provides that a defendant may move for a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction" during the trial or within 14 days after a guilty verdict.  Fed. R. Crim. P. 29(a), (c)(1).  In ruling on a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure based on sufficiency of the evidence, the Court must "review the evidence presented against the defendant 'in the light most favorable to the government to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Freter*, 31 F.3d 783, 785 (9th Cir. 1994) (quoting *United States v. Shirley*, 884 F.2d

---

[2] *United States v. DeFrance*, No. CR 21-29-M-DLC, 2023 WL 3172524 (D. Mont. May 1, 2023).

1130, 1134 (9th Cir. 1989)).  "[T]he government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or rule out every hypothesis except that of guilt beyond a reasonable doubt."  *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015) (quoting *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010)).  "That said, 'evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element.'"  *Id.* (quoting *Nevils*, 800 F.3d at 1167).

**Motion for New Trial**

Rule 33 provides that a defendant may file a motion for a new trial, and the Court may vacate any judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Because this case involved a bench trial, "the court may take additional testimony and enter a new judgment."  *Id.*  "A motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(2).

"A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal."  *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992).  The Court need not view the evidence in the light most favorable to the verdict, but rather may weigh the evidence and evaluate

credibility of witnesses itself, and if the Court "concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.* at 1211–12 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

**Motion to Arrest Judgment**

Rule 34 provides that the defendant may file a motion to arrest judgment, and "the court must arrest judgment if the court does not have jurisdiction of the charged offense." Fed. R. Crim. P. 34(a).  A Rule 34 motion must be filed within 14 days after the court accepts a verdict or finding of guilty.  Fed. R. Crim. P. 34(b).  The motion must be decided on "the face of the record," which excludes evidence adduced at trial.  *United States v. Sisson*, 399 U.S. 267, 281–82 (1970).

**ANALYSIS**

Mr. DeFrance contends that intertwined issues of federal jurisdiction and insufficient evidence in this case require this Court "to grant what is essentially a renewal of Mr. DeFrance's previous motion to [dismiss] for lack of jurisdiction, lack of fair warning, estoppel and/or the defense of public authority."  (Doc. 190 at 3.)  The Court will address each of the grounds set forth in the motion in turn.

**I.     The enactment of the Bipartisan Safer Communities Act does not alter**

**the Court's interpretation of the earlier version of the statute, under which Mr. DeFrance has been convicted.**

The Second Superseding Indictment (hereinafter "Indictment") charged Mr. DeFrance with one count of possessing firearms and ammunition in violation of 18 U.S.C. § 922(g)(9) on or about and between October 3, 2016 and October 2, 2018, and three counts of making a false statement during a firearms transaction in violation of 18 U.S.C § 922(a)(6) when, on three separate occasions in 2018, he denied having been convicted in any court of a misdemeanor crime of domestic violence on an ATF Form 4473. (Doc. 55.) The Indictment was filed October 21, 2021. (*Id.* at 1.) At the time the Indictment was filed, the applicable statutes read in relevant part as follows:

> (g) It shall be unlawful for any person— . . .
> > (9) who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(9) (2021).

> [T]he term "misdemeanor crime of domestic violence" means an offense that—
> > (i) is a misdemeanor under Federal, State, or Tribal law; and
> > (ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse,

parent, or guardian of the victim.

18 U.S.C. § 921(33)(A) (2021).

On June 25, 2022, President Biden signed into law the Bipartisan Safer Communities Act. Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022). As relevant here, that legislation added a fifth category of qualifying relationships to § 921(33)(A): "a person who has a current or recent former dating relationship with the victim." Bipartisan Safer Communities Act § 12005(a)(1)(B), 136 Stat. at 1332. The law also added a new subsection to 18 U.S.C. § 921, which defined "dating relationship":

> (37)(A) The term "dating relationship" means a relationship between individuals who have or have recently had a continuing serious relationship of a romantic or intimate nature.
> (B) Whether a relationship constitutes a dating relationship under subparagraph (A) shall be determined based on consideration of—
>> (i) the length of the relationship;
>> (ii) the nature of the relationship; and
>> (iii) the frequency and type of interaction between the individuals involved in the relationship.
> (C) A casual acquaintanceship or ordinary fraternization in a business or social context does not constitute a dating relationship under subparagraph (A).

*Id.* § 12005(a)(2), 136 Stat. 1332. The law expressly precluded retroactive application of these amendments "to any conviction of a misdemeanor crime of domestic violence entered before the date of enactment of this Act." *Id.* § 12005(b), 136 Stat. 1332. Finally, the law enacted a provision restoring firearm possession rights for persons who have only one conviction for a misdemeanor

6

crime of domestic violence against an individual in a dating relationship and who have not subsequently been convicted of such an offense "if 5 years have elapsed from the later of the judgment of conviction or the completion of the person's custodial or supervisory sentence, if any[.]"  *Id.* § 12005(c)(2), 136 Stat. 1333.

Mr. DeFrance contends that the 2021 version of the statute, under which he was indicted and convicted, "did not extend to someone convicted of domestic violence against a boyfriend or girlfriend with whom that person did not share a residence or a child."  (Doc. 190 at 4.)  Based on the amendments set forth in the Bipartisan Safer Communities Act, Mr. DeFrance argues that "Congress displays by negative implication that, as legislatively crafted initially, § 922(g)(9) does not apply to the relational context of dating."  (Doc. 190 at 5.)  He invokes the "accepted canon of statutory construction that where Congress has advertently changed the legislative language the change must be given effect."  (*Id.* (quoting *United States v. Rosser*, 528 F.2d 652, 655 (D.C. Cir. 1976)).)

The first problem with Mr. DeFrance's argument is that it rests on an assumption that this Court has already rejected, and one that the Court sees no basis to revisit: that a "similarly situated to a spouse" relationship requires cohabitation.  (Doc. 182 ¶¶ 99–104.)  Although Mr. DeFrance goes to great lengths to distinguish the cases the Court cited in support of this conclusion in its Findings of Fact and Conclusions of Law (Doc. 190 at 7–10), these distinctions do not

7

overcome the second fundamental flaw in Mr. DeFrance's argument:  His reading of the previous version of the statute renders the "similarly situated to a spouse" language superfluous.

"[O]ne of the most basic interpretive canons" is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).  Mr. DeFrance's interpretation of "similarly situated to a spouse" to require cohabitation would render it superfluous to the preceding category: cohabitating with the victim as a spouse.  To be sure, the example Mr. DeFrance provides, a common law spouse, could fall within either of those categories—and also could fall within the definition of spouse, assuming the parties to the relationship satisfy all requirements in a state where common law marriage is recognized.  But the Court must give effect to every word of Congress's statutes, if possible, and this statute requires recognizing and giving effect to the broader relationship category of persons who are not spouses, do not have a child in common, and are not cohabitating as spouses, but nevertheless are "similarly situated to a spouse."  The Court described all of the factors it considered in determining whether the evidence adduced at trial established beyond a reasonable doubt that Mr. DeFrance and Ms. Charlo were in such a relationship, and found that it did.  (Doc. 182 ¶¶ 99–113.)

Finally, the third flaw with Mr. DeFrance's argument is that the Bipartisan Safer Communities Act's amendments established an even broader category of relationships that could establish that a previous conviction was a misdemeanor crime of domestic violence, but it did not eliminate the "similarly situated to a spouse" category, nor did it reflect any Congressional intent to retroactively declare that people who call themselves boyfriends, girlfriends, or dating could not also be categorized as "similarly situated to a spouse." Indeed, a couple labeled as boyfriend and girlfriend could have agreed to refer to each other that way five hours ago or five years ago; the label is not dispositive of the seriousness of the relationship. The Court continues to be persuaded by the United States' illustration of the relationship categories as overlapping circles reflecting the potential courses of a serious relationship: commitment to each other and to building a long-term relationship; cohabitation; children; and marriage. The structure of the pre-amendment statute makes clear that a person can be in a sufficiently serious relationship to call a physically violent incident in that relationship "domestic violence" even if the parties have no history of or plans for cohabitation, children, or marriage. Under the amended statute, the scope of sufficient relationships extends even farther, but that fact does not retroactively alter the meaning of the plain terms of the originally enacted statute, as described above.

## II.     It was not legally or factually impossible for Mr. DeFrance to be

**"similarly situated to a spouse" to Ms. Charlo.**

Mr. DeFrance contends that he and Ms. Charlo could not have been similarly situated to spouses at the time of his PFMA for several reasons.  First, he cites the Defense of Marriage Act, 1 U.S.C. § 7, which defined "marriage" and "spouse" as used in any federal law and which was in effect at the time of the PFMA.  (Doc. 190 at 6.)  This statute, which defined marriage as "only a legal union between one man and one woman as husband and wife," and spouse as "a person of the opposite sex who is a husband or a wife," sheds no light on the meaning of "similarly situated to a spouse."  Additionally, the statute was struck down as unconstitutional more than ten years ago.  *United States v. Windsor*, 570 U.S. 770–75 (2013).

Second, Mr. DeFrance once again contends that Ms. Charlo could not have been similarly situated to a spouse because she was a minor, and under Montana law, parental consent or court permission is required for a minor to marry, and the evidence adduced at trial established that Ms. Charlo's mother did not approve of her relationship with Mr. DeFrance (and, by inference, would not have granted consent to marry).  The Court has already rejected these arguments as a matter of law and as a matter of fact and will not revisit them yet again.  (Doc. 71 at 40–41; Doc. 182 ¶¶ 105, 111–12.)

Mr. DeFrance further contends that monogamy is a key feature of a spousal

relationship, and the trial evidence indicated he was not monogamous because Ms. Charlo found someone else's underwear in Mr. DeFrance's camper. (Doc. 190 at 6–7.) The Court drew a different conclusion from this evidence and is not persuaded to reconsider it. The Court's only direct mention of monogamy in reaching its verdict was noting that another court had concluded that "*expectations of fidelity and monogamy*" were relevant evidence that a relationship was one that was similarly situated to a spouse. (Doc. 182 ¶ 102 (emphasis added).) The Court acknowledged that Ms. Charlo told the 911 dispatcher that she had been "called in" about "beating on" Mr. DeFrance after she found another girl's underwear in his possession and concluded: "The fact that the relationship continued after physical violence and suspected infidelity indicates that DeFrance and Charlo wanted the relationship to continue despite incidents that might cause a person to end even a serious, long-term romantic relationship." (*Id.* ¶¶ 39, 110.) Ms. Charlo's visceral response to suspected infidelity supports rather than undermines an inference that her relationship with Mr. DeFrance included *expectations* of fidelity and monogamy.

None of the arguments advanced in the briefing supports a conclusion of legal or factual impossibility.

## III.   The evidence adduced at trial was not insufficient to convict Mr. DeFrance of the charges contained in the Second Superseding Indictment,

**even considering Mr. DeFrance's proffered defenses.**

In the briefing on the present motion, Mr. DeFrance contends that the evidence was insufficient to convict him of the charged offenses. (Doc. 190 at 7–18.) He first invokes a hybrid defense of lack of fair warning and lack of knowledge that he belonged to the category of persons who had been convicted of a misdemeanor crime of domestic violence. (*Id.* at 7–10.) The Court has previously rejected his argument that the relationship element of 18 U.S.C. § 921(a)(33)(A) (2021) is unconstitutionally vague either for failure to provide fair warning of what conduct is prohibited or for failure to supply minimal guidelines to govern law enforcement, sees no reason to revisit those conclusions, and incorporates its prior reasoning by reference. (Doc. 71 at 36–41.) In the instant briefing, Mr. DeFrance objects to the Court's reliance on virtually every case the Court cited in support of its conclusions relating to Mr. DeFrance's relationship status with Ms. Charlo on the date of the PFMA, arguing that those cases are not binding authority and/or are distinguishable on their facts. The Court repeatedly stated that it relied upon these cases as *persuasive* authority supporting its conclusions regarding relevant factors to consider in determining whether the relationship was "similarly situated to a spouse" and whether Mr. DeFrance knew he belonged to the category of persons convicted of a misdemeanor crime of domestic violence, which includes knowing that he fell within an applicable

12

relationship category with the victim of his predicate offense.  (Doc. 182 ¶¶ 100–

13, 115–20.)  In so doing, the Court acknowledged that no case was both binding

and perfectly on point in light of the unique facts of this case.  The Court continues

to agree with its previous conclusion regarding the fair notice provided by the

statute:

> The phrase "similarly situated" "add[s] some imprecision" to the
> [relationship] element, but it "provide[s] an ascertainable, qualitative
> standard akin to others found in the law" and therefore "is not
> unconstitutionally vague."  *United States v. Lucero*, 989 F.3d 1088,
> 1103 (9th Cir. 2021); *see also Johnson*, 576 U.S. at 603–04 ("As a
> general matter, we do not doubt the constitutionality of laws that call
> for the application of a qualitative standard such as "substantial risk" to
> real-world conduct; 'the law is full of instances where a man's fate
> depends on his estimating rightly . . . some matter of degree[.]'"
> (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913))).

(Doc. 71 at 38.)  Likewise, whether viewing the facts in the light most favorable to

the government or de novo, the Court continues to agree with its conclusion that

Mr. DeFrance did, in fact, have requisite knowledge of his status (Doc. 182

¶¶ 115–20) and thus did not lack fair notice on the facts of this case.

Second, Mr. DeFrance again raises "the estoppel claim and the Public

Authority" defense, contending that the evidence shows that "on Mr. DeFrance's

NCIC report (Exhibit 522) the PFMA is listed" and that "ATF witness Mr.

Feuerstein testified that once the PFMA is known to the government . . .

investigation would be conducted into all the circumstances surrounding the

predicate PFMA," including looking at police reports and charging documents, and

thus "the only reasonable inference is that all of the appropriate documents were consulted in Mr. DeFrance's PFMA record; and the NICS analyst(s) concluded that Mr. DeFrance was not a prohibited person."  (Doc. 190 at 10–11.)  He suggests that because the PFMA is on the NCIC report, "the burden should shift to the government [to prove] that the appropriate documents were <u>not</u> consulted." (*Id.* at 11.)

The Court's Findings of Fact and Conclusions of Law make clear that the Court disagrees with Mr. DeFrance's contention that the "only reasonable inference" from the evidence presented in this case was that a government official concluded that Mr. DeFrance was not a prohibited person after consulting "all of the appropriate documents" relating to his PFMA.  The Court found that Mr. Feuerstein's "trial testimony established that the NICS process is imperfect, analysts are responsible for millions of transactions in a given year, and the law imposes significant time constraints on the external research that may be necessary to *confirm* whether an individual may possess firearms under federal law."  (Doc. 182 ¶ 121 (emphasis added).)  Whether viewing the evidence in the light most favorable to the United States or de novo, the Court continues to agree with its previous conclusions regarding the NICS process and its relationship to Mr. DeFrance's knowledge that he belonged to the category of persons convicted of a misdemeanor crime of domestic violence as well as its ultimate conclusion that the

government proved beyond a reasonable doubt that Mr. DeFrance had the requisite knowledge of status.  (*Id.* ¶¶ 114–22; *see also id.* ¶¶ 142–49; Doc. 91 at 8–9 (concluding that United States was not collaterally estopped from asserting that Mr. DeFrance was prohibited from possessing firearms even if he had been "proceeded" or cleared in all of his prior firearms transactions).)

Mr. DeFrance's third contention—that neither the judge presiding over Mr. DeFrance's PFMA case nor his court-appointed counsel in that case provided him actual notice that his PFMA conviction would prohibit him from possessing firearms—requires little discussion.  (Doc. 190 at 11–12.)  Unlike knowledge that "he belonged to the relevant category of persons barred from possessing a firearm," knowledge that federal law prohibits him from possessing a firearm is *not* an element of a § 922(g) offense.  *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019); *United States v. Singh*, 979 F.3d 697, 727–28 (9th Cir. 2020).  And as this Court has already concluded, his PFMA counsel's failure to advise him with certainty about the impact of the PFMA conviction on the right to possess firearms under federal law was not ineffective assistance of counsel.  (Doc. 182 ¶¶ 152–57.)

Mr. DeFrance's new contention that "[g]un rights are now equal to admonishment on topics along the lines of the right to counsel and jury trial which must be discussed with the defendant to make a PFMA plea valid" under recent Supreme Court precedent interpreting the Second Amendment fares no better.

(Doc. 190 at 17–18.)  This argument erroneously focuses on the importance of the

right lost rather than the key distinctions between direct and collateral

consequences of a guilty plea and/or conviction:

> A direct consequence is one that "represents a definite, immediate and largely automatic effect on the range of the defendant's punishment." *Torrey v. Estelle*, 842 F.2d 234, 236 (9th Cir. 1988) (citation omitted). But "where the consequence is contingent upon action taken by an individual or individuals other [than] the sentencing court—such as another governmental agency or the defendant himself—the consequence is generally 'collateral.'"  *Littlejohn*, 224 F.3d at 965.

*United States v. Hollins*, 70 F.4th 1258, 1262 (9th Cir. 2023).  The Supreme

Court's holding in *Padilla v. Kentucky*, 559 U.S. 356 (2010) that defense counsel

was ineffective for failure to advise a client about virtually certain deportation as a

consequence of conviction, "did not eschew" the distinction between direct and

collateral consequences of conviction "across the board," but rather concluded that

the distinction was "ill-suited" to dispose of Padilla's ineffective assistance claim

because of the unique nature of deportation in its severity "and the 'automatic' way

it follows from conviction."  *Chaidez v. United States*, 568 U.S. 342, 355 (2013).

This Court has already explained its conclusion that *Padilla* does not require

"every reasonable attorney representing a client facing a PFMA charge [to]

interrogate the details of their client's relationship with the victim to advise the

client with near certainty whether the offense qualifies as a misdemeanor crime of

domestic violence under federal law." (Doc. 182 ¶ 155.)  Subsequent Ninth Circuit

case law only further confirms this Court's conclusion that neither Mr. DeFrance's counsel nor the judge presiding over his PFMA case was required to do more than what they did—advising him that he *may* lose his firearms rights as a result of conviction.  *See Hollins*, 70 F.4th at 1263 ("None of the consequences of Hollins' *federal* conviction imposed under Arizona *state* law can be characterized as definite, immediate, or automatic."); *id.* at 1263 n.3 ("Though not required under Rule 11, the magistrate judge advised Hollins that he would need to register as a sex offender 'in accordance with tribal, state, and federal law.'  The district court had no duty to advise him of the minutiae of state law that may apply to him in the future.").

Fourth and finally, Mr. DeFrance argues that the government has asserted inconsistent positions in this litigation, in violation of his due process rights, based upon an offered plea deal to the amended version of § 922(g)(9), pursuant to which the parties would have agreed "that the defendant's conviction for the misdemeanor crime of domestic violence was based on the fact he was in a current dating relationship with the victim at the time of the offense."  (Doc. 190 at 13–17; Doc. 190-1 at 4.)  Mr. DeFrance contends that the Court should construe the offered plea agreement as a concession by the government "that the fairest resolution of this case was to agree" that he and Ms. Charlo "were simply dating," and he argues that his conviction under the pre-amendment version of the statute

17

"violates due process under the Fifth Amendment and the doctrine of preclusion of inconsistent positions."  (Doc. 190 at 13–14.)

"The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) (quoting *Religious Tech. Ctr. v. Scott*, 869 F.2d 1306, 1311 (9th Cir. 1989) (Hall, J., dissenting)).  "Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one." *Id.* This doctrine is inapplicable here for multiple reasons.

Most importantly, the government's position that Mr. DeFrance was similarly situated to a spouse of Ms. Charlo does not "directly contradict" a rejected plea agreement in which both parties would have agreed that they were in a dating relationship.  As discussed above, the statute's enumerated relationship categories, at least as they relate to romantic partners, can overlap significantly; although there may be outliers, such as a married couple who maintain separate homes, or an engaged couple similarly situated to spouses who never "dated" in a traditional sense because their engagement was arranged by their families, in many cases a dating relationship will precede and even occur simultaneously with a

18

couple becoming similarly situated to spouses.  The facts of this case bear this out:

Mr. DeFrance and Ms. Charlo began as friends who shared recreational activities,

soon became "inseparable," eventually became physically intimate, broke up when

Ms. Charlo moved out of state, and resumed dating when she returned—at which

point she was spending the majority of her time with Mr. DeFrance on Mr.

DeFrance's property and keeping many of her personal belongings there in the

time leading up to the PFMA.  (Doc. 182 ¶¶ 4–30.)  To be sure, it could have been

easier for the government to prove that Mr. DeFrance and Ms. Charlo were in a

dating relationship as defined by the amended statute when Mr. DeFrance

committed the PFMA; he has all but conceded as much during this litigation.  But

the evidence and arguments supporting such a conclusion are consistent, not

inconsistent, with the government's position at trial that they were similarly

situated to spouses.  The United States nowhere conceded that it could *only* prove

that the couple was in a dating relationship, and the Court will not construe the

offered plea agreement in that manner.  To do so would place the government and

defendants alike in the unenviable position of being unable to engage in plea

negotiations involving lesser included offenses or a plea to some but not all

charged counts, lest they commit themselves to abandoning the operative

indictment (and available defenses to the charge or charges set forth in that

indictment) should plea negotiations ultimately fail.  *Cf.* Fed. R. Evid. 410.

19

Additionally, even if the offered plea agreement could be construed as the government changing its position regarding the relationship element, the Court finds there has been no adverse impact on the judicial process in this case. The parties and the Court have understood throughout this litigation that the government would seek to prove that Mr. DeFrance and Ms. Charlo were similarly situated to spouses. (Doc. 25 at 3 n.1; Doc. 132 at 5, 7, 23 (transcript of Sept. 13, 2021 hearing on first motions to dismiss).) In light of this fact, Mr. DeFrance cannot claim that he was unfairly surprised by this theory at trial based on the eleventh-hour plea negotiations. Moreover, the Court was entirely unaware of these negotiations—as it should have been—and thus could not have been impacted by them. The case presented to the Court, including Mr. DeFrance's defense, was based upon the law in effect at the time of Mr. DeFrance's offense conduct. These circumstances distinguish this case from the cases cited by Mr. DeFrance, where the government's inconsistent positions had a real impact on the outcome of the proceedings. *Russell*, 893 F.2d at 1038 ("Having persuaded the district court to deny appellant federal review on the ground that he had an 'adequate and available' state remedy, the state cannot now be permitted to oppose appellant's petition for relief on the theory he was actually procedurally barred in state court."); *Smith v. Groose*, 205 F.3d 1045, 1050–51 (8th Cir. 2000) (prosecution advanced two mutually exclusive theories of murder at separate trials

20

of co-defendants to secure convictions of as many defendants as possible: one

theory that victims were killed before burglary, and one theory that victims were

killed after burglary); *id.* at 1050 (describing case in which prosecutorial theories

were not inconsistent because identity of shooter did not affect liability of both

defendants for felony murder); *Thompson v. Calderon*, 120 F.3d 1045, 1056–59

(9th Cir. 1997) (en banc) (plurality opinion) (prosecution advanced mutually

exclusive theories of murder—one theory that two defendants killed victim, and

one theory that one defendant alone raped and killed victim—to secure convictions

and death sentences), *reversed on other grounds by Calderon v. Thompson*, 523

U.S. 538 (1998);  *see also Bradshaw v. Stumpf*, 545 U.S. 175, 187–88 (2005)

(remanding for further proceedings on habeas petition because prosecution's

inconsistent theories of which co-defendant shot victim may have been material to

decision to impose death sentence).

Finally, the Court declines the parties' invitations to consider whether either

party had potential ulterior motives in engaging in the particular plea negotiations

at issue.  In any criminal case, the government and defendant alike have significant

incentives to avoid trial and reach agreement on appropriate consequences of

conviction, all in good faith, and there is no evidence suggesting otherwise here.

(*See* Doc. 195-1 (correspondence regarding plea offer indicating shared goals of

bringing case to conclusion without trial and allowing potential reinstatement of

21

Mr. DeFrance's firearms rights).)

**IV.    Binding precedent forecloses Mr. DeFrance's argument that the state predicate offense must contain a relationship element that is a categorical match for the relationship element of an offense under 18 U.S.C. § 922(g)(9), and Mr. DeFrance's invocation of collateral estoppel, issue preclusion, and double jeopardy do not change that analysis.**

Mr. DeFrance once again argues that the categorical or modified categorical approach and double jeopardy clause of the Fifth Amendment prohibit his conviction under 18 U.S.C. § 922(g)(9) because "his original PFMA was premised on a dating relationship."  He characterizes the instant case as being "tried and convicted on a Montana PFMA involving a 'spousal' type relationship."  (Doc. 190 at 19–20.)

This order marks the fourth time this Court has rejected this argument as foreclosed by Supreme Court and Ninth Circuit precedent.  (Doc. 71 at 23–28; Doc. 111 at 3; Doc. 117 at 4.)  For the final time:  The relationship element of a prosecution under 18 U.S.C. § 922(g)(9), 18 U.S.C. § 921(a)(33)(A), is an element of the federal offense.  *United States v. Hayes*, 555 U.S. 415, 418 (2009) ("[T]he domestic relationship [defined by 18 U.S.C. § 921(a)(33)(A)], although it must be established beyond a reasonable doubt in a § 922(g)(9) firearms possession prosecution, need not be a defining element of the predicate offense."); *id.* at 426

("To obtain a conviction in a § 922(g)(9) prosecution, the Government must prove beyond a reasonable doubt that the victim of the predicate offense was the defendant's current or former spouse or was related to the defendant in another specified way."); *United States v. Nobriga*, 474 F.3d 561, 563–64 (9th Cir. 2006) (holding that because "the domestic relationship element . . . is an element of the federal offense under § 922(g)(9), to be proven at trial[,]" any "mismatch between the [state] and federal domestic violence statutes is not a basis for invalidating the indictment"), *abrogated on other grounds by Voisine v. United States*, 136 S. Ct. 2272 (2016). As relevant to this argument, this Court's role as the factfinder in this trial was to determine whether Mr. DeFrance's and Ms. Charlo's relationship fell within one of the enumerated categories in the pre-amendment version of 18 U.S.C. § 921(a)(33)(A). (Doc. 182 ¶¶ 91–113.) The Court did not, and could not, relitigate Mr. DeFrance's liability for the PFMA offense, including determining whether his relationship with Ms. Charlo fell within the categories enumerated by Montana Code § 45-5-206. (*Id.* ¶ 93.) There is no double jeopardy violation in this case. (*See also* Doc. 71 at 26–28 (conducting full double jeopardy analysis).)

## V.   Application of Rules 29, 33, and 34

For all of the foregoing reasons, the Court concludes that Mr. DeFrance's motion for judgment of acquittal must be denied because, reviewing the evidence presented against the defendant in the light most favorable to the government, a

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Fed. R. Crim. P. 29; *Freter*, 31 F.3d at 785.

Likewise, for all of the foregoing reasons, the Court concludes that Mr. DeFrance's motion for a new trial must be denied because the Court does not conclude that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred[.]"  Fed. R. Crim. P. 33; *Alston*, 974 F.2d at 1211.

Finally, for all of the foregoing reasons, Mr. DeFrance's motion to arrest judgment must be denied because he has not demonstrated that the Court lacks jurisdiction over the charged offenses.  Fed. R. Crim. P. 34.

## VI.    The Impact of *United States v. Castro*

Finally, although Mr. DeFrance cited a recent Ninth Circuit case as supplemental authority for his "notice arguments concerning whether a Montana PFMA should have been considered a lawful predicate sufficient to support a § 922(g)(9) offense" (Doc. 197 at 2), the Court does not consider the decision relevant to Mr. DeFrance's relationship-element-focused arguments concerning notice or vagueness.  However, the Court feels compelled to briefly address the decision at this juncture, as it likely will become central when this case is appealed.

This Court extensively discussed the force element described in 18 U.S.C. § 921(a)(33)(A) in its order denying Mr. DeFrance's first, second, and third

24

motions to dismiss.  (Doc. 71 at 13–23.)  The Court ultimately concluded that the Supreme Court's decision in *United States v. Castleman*, 572 U.S. 157 (2014), required this Court to conclude that subsection (1)(a) of Montana's PFMA requires the use of physical force as defined by § 921(a)(33)(A).  (*Id.* at 17–18.)  However, the Court acknowledged that the issue "presents a close question that could lead reasonable jurists to opposite answers."  (*Id.* at 17.)

In *United States v. Castro*, 71 F.4th 735 (9th Cir. 2023), the Ninth Circuit held that a conviction under subsection (1)(a) of Montana's PFMA was not a "crime of violence" as defined by the federal Sentencing Guidelines, which requires "force capable of causing physical pain or injury to another person."  *Id.* at 736–37 (quoting *Johnson v. United States*, 559 U.S. 133, 140 (2010)).  The court did not address whether a conviction under subsection (1)(a) of Montana's PFMA would require the lesser physical force required by § 921(a)(33)(A).  *Id.* at 739–40 & n.4.  However, the court disagreed with this Court's alternative analysis and conclusion that there was not a realistic probability that Montana would apply subsection (1)(a) of its PFMA statute in cases not involving the use of physical force.  *Id.* at 743.

The Court concludes that the Ninth Circuit's decision in *Castro* does not require reconsideration of its previous conclusion that *Castleman* required the Court to hold that subsection (1)(a) of Montana's PFMA requires the use of

25

physical force as defined in the context of a prosecution under 18 U.S.C.

§ 922(g)(9), because the *Castro* opinion concerned the use of "violent" force as

defined by the Sentencing Guidelines.  71 F.4th at 739.  Accordingly, the Court

will not enter a judgment of acquittal as a result of *Castro*.  However, the Ninth

Circuit clearly rejected this Court's alternative basis for its use-of-force conclusion,

and thus the Court observes in closing that this case will squarely present the

*Castleman* issue on appeal.

### CONCLUSION

IT IS ORDERED that the motion (Doc. 189) is DENIED.

DATED this 13th day of July, 2023.

_Dana L. Christensen_
Dana L. Christensen, District Judge
United States District Court